**MORRISON & FOERSTER LLP**
1290 Avenue of the Americas
New York, New York 10104
Gary S. Lee (GL6049)
Kathleen E. Schaaf (KS6925)

*Attorneys for the Petitioner*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | |
| | : | In a Case Under Chapter 15 |
| MINSTER INSURANCE COMPANY LIMITED, | : | of the Bankruptcy Code |
| | : | |
| | : | Case No. 10-13899 |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

| | | |
|---|---|---|
| In re | : | |
| | : | In a Case Under Chapter 15 |
| MALVERN INSURANCE COMPANY LIMITED, | : | of the Bankruptcy Code |
| | : | |
| | : | Case No. 10-13900 |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

**VERIFIED PETITION FOR RECOGNITION OF A FOREIGN MAIN**
**PROCEEDING AND MOTION FOR A PERMANENT INJUNCTION AND**
**RELATED RELIEF PURSUANT TO 11 U.S.C. §§ 1504, 1515, 1517, 1520 AND 1521**

JAMES LEE SAITCH, in his capacity as the duly authorized foreign representative (the "Petitioner") of Minster Insurance Company Limited ("Minster") and Malvern Insurance Company Limited ("Malvern") (collectively, the "Companies"), debtors in a proceeding (the "English Proceeding") currently pending before the High Court of Justice of England and Wales (the "English Court"), by his U.S. counsel, Morrison & Foerster LLP, respectfully submits this verified petition for recognition of a foreign main proceeding and motion for a permanent injunction and related relief (the "Petition and Motion") pursuant to sections 1504, 1515, 1517,

1520 and 1521 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 65 of the Federal Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy Procedure.

## PRELIMINARY STATEMENT

1.     The Companies, both incorporated in England and Wales, are insurance and reinsurance companies that no longer write new business and are in run off.  The Companies' audited financial statements for the year ended December 31, 2009, attached as Exhibit A (Minster) and Exhibit B (Malvern), reflect that the Companies are solvent.

2.     Because the Companies expected that the run-off of their business would not be concluded for a number of years, the Companies proposed solvent schemes of arrangement pursuant to Part 26 of the U.K. Companies Act 2006 (the "Schemes of Arrangement") as the most efficient and effective method of making full payment to their creditors in the shortest practical time.

3.     A solvent scheme of arrangement is an agreement between a company and its creditors pursuant to which the present and future claims of creditors of the company are valued and paid in full.

4.     For the Schemes of Arrangement to become binding upon the Companies' creditors, they must be sanctioned by the English Court.

5.     On July 17, 2009, the Companies commenced the English Proceeding for the purpose of obtaining an order from the English Court sanctioning the Schemes of Arrangement. The English Court approved the Schemes of Arrangement on March 16, 2010.  The Schemes of

Arrangement became effective on March 25, 2010.  The Final Claims Submission Date, by when all Scheme Creditors must submit their scheme claims in accordance with the Schemes of Arrangement, is September 21, 2010.

6.     The Petitioner, by commencement of these Chapter 15 cases and the relief requested herein, seeks to have the Schemes of Arrangement made binding and enforceable in the United States.

## BACKGROUND

**Minster Insurance Company Limited**

7.     Minster is an insurance and reinsurance company that discontinued underwriting in December 2000.

8.     Minster was incorporated on May 18, 1940, under the name of Minster Insurance Company Limited.  From January 1, 1992 to December 31, 1994, Minster was known as GAN Minster Insurance Company Limited; it was renamed GAN Insurance Company Limited on January 1, 1995 and became Groupama Insurance Company Limited on June 1, 2000.  From March 31, 2003 to the present, it has again been known as Minster Insurance Company Limited.

9.     Minster is headquartered in London, England and its assets are primarily located in England.  Minster's principal assets in the United States are located in New York, including collateral that supports more than 200 letters of credit issued by a bank in New York.

10.     Minster ceased writing new business and went into run-off in 2000.  Run-off describes the conduct of business solely for the purpose of running off liabilities under policies previously written, including adjusting and settling creditors' claims and collecting reinsurance recoveries due from reinsurers.  The period of coverage for all contracts written by Minster has expired.

11.     Because Minster expected that the run-off of its business would not be concluded for a number of years, Minster proposed a solvent scheme of arrangement pursuant to Part 26 of the U.K. Companies Act 2006 (the "Minster Scheme of Arrangement") as the most efficient and effective method of making full payment to its creditors in the shortest practical time.

12.     The insurance and reinsurance contracts that are affected by the Minster Scheme of Arrangement were written before December 31, 2000, predominantly from Minster's headquarters in London.

13.     Minster did not expect the claims against it to be run off or crystallized for a number of years and therefore proposed the Minster Scheme of Arrangement as the most efficient and effective method of making full payment to persons who have, or may in the future have, a claim against Minster in relation to an insurance or reinsurance contract underwritten or entered into by Minster ("Minster Scheme Creditors") in the shortest practicable time.

**Malvern Insurance Company Limited**

14.     Malvern is an insurance and reinsurance company that discontinued underwriting all classes of business in December 2000.

15.     Malvern was incorporated on February 18, 1954, under the name of Malvern Insurance Company Limited.  Malvern was renamed Touchline Insurance Company Limited on January 1, 1993.  On March 31, 2003, it was again named Malvern Insurance Company Limited. Malvern was purchased by Minster in 1961, but remains a separate legal entity.

16.     Malvern is headquartered in London, England and its assets are primarily located in England.  Malvern's principal assets in the United States are located in New York, including collateral that supports more than 200 letters of credit issued by a bank in New York.

17.     Malvern ceased writing new business and went into run-off in 2000 and the period of coverage for all contracts written by Malvern has expired.  Because Malvern expected

that the run-off of its business would not be concluded for a number of years, Malvern proposed

a solvent scheme of arrangement pursuant to Part 26 of the U.K. Companies Act 2006 (the

"Malvern Scheme of Arrangement") as the most efficient and effective method of making full

payment to its creditors in the shortest practical time.

18.     The insurance and reinsurance contracts that will be affected by the Malvern

Scheme of Arrangement were written predominantly from Malvern's headquarters in London.

19.     Malvern did not expect the claims against it to be run off or crystallized for a

number of years and therefore proposed the Malvern Scheme of Arrangement as the most

efficient and effective method of making full payment to persons who have, or may in the future

have, a claim against Malvern in relation to an insurance or reinsurance contract underwritten or

entered into by Malvern ("Malvern Scheme Creditors") (collectively with the Minster Scheme

Creditors, the "Scheme Creditors") in the shortest practicable time.


20.     The Companies believe that the Schemes of Arrangement will conclude the run-

off of the Companies' insurance and/or reinsurance business earlier than would be the case if the

Companies were to continue until all claims materialize and are agreed and paid in the normal

course.  Copies of the Schemes of Arrangement and the explanatory statement with respect to the

Schemes of Arrangement are attached hereto as Exhibit C.

## THE SCHEMES OF ARRANGEMENT

21.     The Schemes of Arrangement establish a process by which Scheme Creditors'

claims against Minster and/or Malvern will be valued and paid in full.

22.     The Schemes of Arrangement apply to all liabilities (including present, future and contingent liabilities) arising out of contracts or policies of insurance and/or reinsurance or retrocession to which either of the Companies is subject as of December 31, 2008 (the "Ascertainment Date") or to which either of the Companies may become subject after the Ascertainment Date by reasons of an obligation incurred on or before that date.[1]  Scheme claims will be valued as of the Ascertainment Date.

23.     The documents accompanying the Schemes of Arrangement envisage that the Companies will seek recognition of the English Proceeding under Chapter 15 of the Bankruptcy Code and a permanent injunction from this Court in order to make the Schemes of Arrangement binding on, and enforceable against, Scheme Creditors located in the U.S.  An order of the English Court dated November 4, 2009 (the "November Order") appointed the Petitioner to act as the foreign representative to execute and verify these Chapter 15 Petitions and to cause these Chapter 15 petitions to be filed in this Court.  A certified copy of the November Order is attached hereto as Exhibit D.

24.     In order for the Schemes of Arrangement to become legally binding, (a) a majority in number representing not less than 75% in value of voting Scheme Creditors, or any class of them, of the Companies must vote in favor of the Schemes of Arrangement at a specially convened meeting held at the direction of the English Court, (b) the English Court must issue an order sanctioning the Schemes of Arrangement, and (c) such order must be delivered to the Registrar of Companies in England and Wales (the "Registrar") for registration.

---

[1] However, the Schemes of Arrangement will not apply to Previously Agreed Liabilities, that is, to claims that have been agreed by the Companies and are due and payable, but unpaid, as of the Effective Date.

**THE ENGLISH PROCEEDING**

25.     On July 17, 2009, the Companies filed an application with the English Court requesting the Court's permission to convene a creditors' meeting for the purpose of allowing Scheme Creditors to vote on the Schemes of Arrangement.

26.     The English Court conducted a hearing and, in the November Order, directed the Companies to convene the creditors' meetings.

27.     In accordance with the November Order, by notice dated November 4, 2009, the Companies notified Scheme Creditors that the Schemes of Arrangement were being promoted. A notice of the creditors' meeting on January 18, 2010, together with the Schemes of Arrangement, a voting form (together with guidance notes for the completion of the voting form), a map giving directions to the location of the creditors' meeting and an explanatory statement (collectively, the "Scheme Documents") were mailed to (a) all parties whose addresses were known to the Companies and who, according to the Companies' records, may have a claim against Minster or Malvern arising under an insurance or reinsurance contract (including U.S. creditors) and (b) all brokers and agents whose addresses were known to the Companies and who were identified as having placed business with or on behalf of Minster or Malvern.

28.     The information contained in the notice of the creditors' meeting was also published in the publications listed in Schedule A of the November Order (collectively, the "Notice Publications") shortly after the November Order was issued.

29.     In accordance with the November Order, on January 18, 2010, the Companies convened the creditors' meeting.  The Schemes of Arrangement were approved by the Scheme Creditors at the January 18 meeting.  On March 16, 2010, the English Court approved the

Minster and Malvern Schemes of Arrangement (the "Sanction Orders"). Certified copies of the Minster and Malvern Sanction Orders are attached as Exhibit E and Exhibit F, respectively. The Sanction Order was delivered for registration to the Registrar of Companies in England and Wales on March 25, 2010; this is the Effective Date of the Schemes of Arrangement.

30.     Other than the English Proceeding, neither Minster nor Malvern is the subject of any foreign proceedings, as that term is defined under section 101(23) of the Bankruptcy Code. See Statement Pursuant to 11 U.S.C. § 1515(c) Identifying Foreign Proceedings, dated July 15, 2010, and filed contemporaneously herewith.

## JURISDICTION AND VENUE

31.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.) dated July 10, 1984.

32.     Pursuant to 28 U.S.C. § 157(b)(2)(A), this is a core proceeding.

33.     Venue is properly located in this District in accordance with 28 U.S.C. § 1410 because the Companies' principal assets in the United States are located in New York, including collateral that supports more than 200 letters of credit issued by a bank in New York.

## RELIEF REQUESTED

34.     The Petitioner respectfully requests the entry of an order by this Court substantially in the form attached hereto as Exhibit G (the "Proposed Order"), pursuant to sections 1504, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and Rule 65 of the Federal

Rules of Civil Procedure, as made applicable by Rule 7065 of the Federal Rules of Bankruptcy

Procedure, ordering that:

(a)     The English Proceeding is granted recognition as a foreign proceeding

pursuant to 11 U.S.C. § 1517(a);

(b)     The English Proceeding is granted recognition as a foreign main

proceeding pursuant to 11 U.S.C. § 1517(b)(1);

(c)     The Petitioner is the duly appointed foreign representative of the

Companies within the meaning of 11 U.S.C. § 101(24) (the "Foreign Representative");

(d)     The Schemes of Arrangement shall be given full force and effect and be

binding on and enforceable against all Scheme Creditors in the United States (the "U.S.

Scheme Creditors");

(e)     All claims of the U.S. Scheme Creditors shall be adjudicated pursuant to

the terms of the Schemes of Arrangement;

(f)     Except as provided in the Schemes of Arrangement, all U.S. Scheme

Creditors are permanently enjoined and restrained from:

(i)      taking or continuing any act to obtain possession of, or exercise

control over, Minster or Malvern or any of the property of either of them that is

located within the territorial jurisdiction of the United States or any proceeds

thereof ("Property");

(ii)     transferring, relinquishing or disposing of any Property to any person other than the Foreign Representative;

(iii)     commencing or continuing any action or legal proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim (each individually, an "Action") against Minster and/or Malvern or any of the Property or seeking discovery of any nature against Minster and Malvern;

(iv)     commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against Minster or Malvern or the Property, including, without limitation, rights under insurance, reinsurance or retrocession contracts underwritten by Minster or Malvern;

(v)     invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state or local law or regulation requiring Minster or Malvern to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any Action, and such statute, rule or requirement shall not apply to Minster or Malvern as a party to any Action; provided, however, that nothing in this Order shall in any respect affect any security in existence at the Effective Date or the replacements for such security;

10

(vi)     drawing down any letter of credit established by, on behalf of or at the request of Minster or Malvern unless expressly authorized by the terms of any agreement pursuant to which the letter of credit has been established;

(vii)    withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which Minster or Malvern has an interest in excess of amounts expressly authorized by the terms of the contract or any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established; provided, however, that no Action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction; and

(viii)   declaring, considering or treating the filing of the Petition or any pleadings, declarations, memoranda or statements in support thereof, or the Schemes of Arrangement, a default or event of default under any agreement, contract or arrangement;

(g)     Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors that are parties to any trust, escrow agreement or similar arrangement in which Minster or Malvern has an interest, are required to:

(i)      in addition to any notice required by the relevant agreements between the parties, provide notice within the later of thirty (30) days after the entry of the Order or fifteen (15) days after any action set forth below to the Foreign Representative's U.S. counsel, Morrison & Foerster LLP, 1290 Avenue

11

of the Americas, New York, New York (Attn: Gary S. Lee, and Kathleen E. Schaaf), of any withdrawal from, set-off against, or other application of property located within the territorial jurisdiction of the United States that is the subject of any such trust or escrow agreement or similar arrangement in which Minster or Malvern has an interest, together with information sufficient to permit the Foreign Representative to assess the propriety of such withdrawal, set-off or other application, including, without limitation, the date and amount of such withdrawal, set-off or other application and a copy of any contract, related trust or other agreement pursuant to which any such withdrawal, set-off or other application was made, and provide such notice and other information contemporaneously; and

(ii)     turn over and account to the Foreign Representative for all funds resulting from such withdrawal, set-off or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established;

(h)     Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors that are beneficiaries of letters of credit established by, or on behalf or at the request of, Minster or Malvern are required to:

(i)     in addition to any notice required by the relevant agreements between the parties, provide notice within the later of thirty (30) days after the entry of the Order or fifteen (15) days after any action set forth below provide

12

notice to the Foreign Representative's U.S. counsel of any drawdown (without the express written consent of the Companies or the Foreign Representative and/or in contravention of the Schemes of Arrangement) of any such letter of credit, together with information sufficient to permit the Foreign Representative to assess the propriety of such drawdown, and a copy of any letter of credit pursuant to which any such drawdown was made, and provide such notice and other information contemporaneously; and

(ii)     turn over and account to the Foreign Representative for all funds resulting from such drawdown;

(i)     Except as provided in the Schemes of Arrangement, all Scheme Creditors are required to:

(i)     turn over and account to the Foreign Representative for any Property of which they have possession, custody or control;

(ii)     deliver to the Foreign Representative any books, papers or records of Minster or Malvern of which they have possession, custody or control and all Scheme Creditors having any books, papers or records that Minster or Malvern or the Foreign Representative may reasonably require in relation to their duties or related to any matter that may affect the implementation of the Schemes of Arrangement shall preserve them and submit them to the Foreign Representative, or his designees for examination at all reasonable times; and

(iii)     to the extent that they have a claim of any nature or source against Minster or Malvern or any Property, or are a party to any Action in which Minster or Malvern is or was named as a party, or as a result of which a liability of either of them may be established, notify the Foreign Representative and put the Foreign Representative's U.S. counsel on the master service list (or similar common notice mechanism) of any such Action and to take such other steps as may be necessary to ensure that they receive (a) copies of any and all documents sent by the parties to such Action or issued by the court, administrator, arbitrator, regulator or similar official having jurisdiction over such Action, and (b) any and all correspondence or other documents circulated to parties named in the master service list;

(j)     Subject to the terms and provisions of the Schemes of Arrangement, all U.S. Scheme Creditors shall be permanently enjoined and restrained from commencing or continuing any act or Action against the provider of any letter of credit that has been released by the execution of a deed of release as provided for in the Schemes of Arrangement;

(k)     Nothing in the Order would prevent the continuance or commencement of an Action against any insurer other than the Companies, provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Companies, such settlement or judgment shall not be binding on or enforceable against Minster or Malvern;

(l)     This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of the Order or requests for any additional relief in this case filed under Chapter 15 of the Bankruptcy Code and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court; and

(m)     No action taken by Minster, Malvern, the Foreign Representative, or their successors, agents or representatives, or any of their counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Schemes of Arrangement, the Order, these Chapter 15 cases, any further order for additional relief in these Chapter 15 cases or any adversary proceedings in connection therewith shall be deemed to constitute a waiver of the immunity afforded to the Companies, the Foreign Representative or their successors, agents, attorneys or representatives pursuant to section 1510 of the Bankruptcy Code.

## BASIS FOR RELIEF

35.     Under the auspices of the English Court and with the ancillary assistance of this Court, the ultimate goal of the Petitioner and the Companies is to satisfy the claims of the Scheme Creditors in full and conclude the business of Minster or Malvern sooner than would be the case if the Companies remained in run-off outside the Schemes of Arrangement.

36.     To effectuate this goal, the Petitioner requires that the Schemes of Arrangement be made binding and enforceable in the United States.

37.     The relief requested herein is necessary to give effect to the Schemes of Arrangement in the United States and to prevent Scheme Creditors in the United States from taking actions that may frustrate the Schemes of Arrangement and the English Proceeding.

15

38.     For the reasons set forth in the Memorandum of Law in Support of the Petition

and Motion and the Declaration of James Lee Saitch in Support of the Petition and Motion, both

of which have been filed contemporaneously herewith, the Petitioner respectfully submits that

the relief sought herein is appropriate under Chapter 15 of the Bankruptcy Code and is not

manifestly contrary to the public policy of the United States.

## CONCLUSION

**WHEREFORE,** the Petitioner respectfully requests that the Court enter an order

substantially in the form of the Proposed Order granting the relief requested herein and such

other and further relief as is just and proper.

Dated: New York, New York
      July 19, 2010

MORRISON & FOERSTER LLP

By: _____

Gary S. Lee (GL6049)
Kathleen E. Schaaf (KS6925)
1290 Avenue of the Americas
New York, New York 10104
(212) 468-8000

Attorneys for the Petitioner

ny-796764

## VERIFICATION OF PETITIONER

James Lee Saitch, being duly sworn, deposes and says:

I am the duly authorized Foreign Representative of Minster Insurance Company Limited and Malvern Insurance Company Limited and, as such, am authorized to commence this Chapter 15 case, request the relief sought thereby and make this Verified Petition in this case.

I have read the foregoing Verified Petition and the factual allegations contained therein, based on my current knowledge, information and belief after reasonable inquiry, are true and correct.

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: this 15th day of July 2010

At: _____LONDON_____, England

By:

_T. X~~~_
_____
JAMES LEE SAITCH
As duly authorized Foreign Representative in respect of the Chapter 15 Petition of Minster Insurance Company Limited and Malvern Insurance Company Limited

Sworn to the 15th day of July 2010 before the undersigned who is duly authorized to witness and attest to the execution of documents of this nature within England

_____
JONATHAN YOUKUK.

EXHIBIT A

**MINSTER INSURANCE COMPANY LIMITED**

**Registered Number 361302**


**FINANCIAL STATEMENTS**

**FOR YEAR ENDED 31 DECEMBER 2009**

# Contents

| | |
|---|---|
| Contents | 1 |
| Directors and Officers | 2 |
| Directors' Report | 3 |
| Independent Auditors' Report | 6 |
| Consolidated Profit and Loss Account | 8 |
| Consolidated Balance Sheet | 10 |
| Company Balance Sheet | 12 |
| Notes to the Financial Statements | 14 |

# Directors and Officers

**Directors**

| | |
|---|---|
| C. A. E. P. Gilroy | Chairman |
| P.B.Demong | |
| J.G.Madigan | |
| R.L.Barclay | |
| J.L.Saitch | |
| I.R. Lyall | |
| G.J. Meadows | |

**Secretary**

J P Morgan Secretaries ( UK ) Limited

**Registered Office**

125 London Wall, London, EC2Y 5AJ

**Auditors**

Deloitte LLP, 2 New Street Square, London, EC4A 3BZ

# Directors' Report

The Directors of Minster Insurance Company Limited, a limited liability company incorporated and domiciled in the United Kingdom, present their Report and the audited Financial Statements of the Group for the year ended 31 December 2009.

## Principal activity and review of the business

The principal activity of the Group is the run off of insurance business entered into by the Group in previous years.

The Group recorded a net profit of £2,616k during 2009 (2008:£3,345k). There is a material uncertainty attaching to the run off of certain of the Group's liabilities as explained in Note 1 – Material Uncertainty and Going Concern. Notwithstanding these matters, the Directors have prepared the accounts on the going concern basis in the light of their best estimate of the outcome of these uncertainties.

The principal key performance indicators that the Directors and senior managers use are the technical result, expenses and investment return. The technical result, a profit of £146k (2008 a loss of £2,588k) includes allocated investment income of £6,772k (2008: £7,144k) and expenses of £7,531k (2008: £9,292k). The return on investment income for 2009 was 4.4% (2008 : 5.3%).

In order to bring finality to the Group's liabilities the Directors proposed during the year a Solvent Scheme of Arrangement ("Scheme") for each of its insurance companies, Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company Limited and Progress Insurance Company Limited. ("Scheme Companies")

In June 2009 the Scheme Companies advised all their policyholders that they were proposing a Solvent Scheme of Arrangement under Part 26 of the Companies Act 2006 to all their insurance and reinsurance creditors.

The objective of the Scheme is to finalise liabilities arising out of the business activities of the Scheme Companies and pay Scheme creditors in respect of such liabilities earlier than would be the case if claims were left to mature in the normal course.

The Directors believe that the Scheme is the most efficient and effective method of finalising their liabilities in the shortest practical time, offering Scheme creditors the advantage of achieving finality and certainty in relation to their claims in the Scheme.

On 4 November 2009, the Scheme Companies were granted leave by the Royal Courts of Justice to convene Scheme meetings for the purpose of considering a solvent Scheme.

The Scheme Companies held meetings on 18 January 2010, following which votes were assessed by the Independent Vote Valuer, who concluded that each Scheme proposal was approved by the statutory majority of creditors for each of the Scheme Companies.

On 16 March 2009 the Scheme Companies applied for sanction of the Schemes by the Royal Courts of Justice. All of the proposed Schemes were sanctioned.

All Scheme creditors will be given an opportunity to submit their claims. Scheme claims will be agreed and paid in accordance with the terms and conditions of the Scheme documents. Disputed claim amounts will be subject to an independent adjudication process.

## Results and dividends

The results for the year are set out on pages 8 and 9. The Directors do not propose a dividend in 2009 (2008: nil).

# Directors' Report

**Minster Management Services Limited**

All expenses in 2009 were paid by the Group's service company, Minster Management Services Limited ("MMS"). A management fee is charged to the Company in respect of these expenses. Details are provided in Note 5 to the Financial Statements.

**Going concern**

The Group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Directors' Report above. There is a material uncertainty in respect of the Company's insurance liabilities and related reinsurance recoveries. This has been discussed in more detail in Note 1.

The Company has considerable liquid financial resources available, and as a consequence, the Directors believe that both the company and the group are well placed to manage its business risks successfully despite the current uncertain economic outlook. After making enquiries, the Directors have a reasonable expectation that the Company and the Group have adequate resources to continue in operational existence for the foreseeable future. Accordingly, they continue to adopt the going concern basis in preparing the annual report and accounts.

**Directors**

T.Morzaria and I.R.Lyall were appointed as directors on 21 May 2009 and G.J.Meadows was appointed as a director on 3 September 2009.

M.S Pearlman & T Morzaria resigned as directors on 19 June 2009 and 3 September 2009 respectively.

The present Directors of the Company are shown on page 2.

**Financial Instruments and Risk Management**

The Group is exposed to financial risk through its financial assets, reinsurance assets and policyholder liabilities. In particular, the key financial risk is that the proceeds from financial assets are not sufficient to fund the obligations arising from policies as they fall due. The most important components of this financial risk are interest rate risk, currency risk, and liquidity risk. The Group's strategy in respect of its financial assets is determined by the Board of Directors and monitored on a monthly basis by the Chief Executive Officer, the Investment Committee and the Finance Manager.

Interest rate risk arises primarily from investments in fixed rate securities. The Group monitors interest rate risk by calculating the mean duration of the investment portfolio. The mean duration is an indicator of the sensitivity of the assets to changes in current interest rates.

The Group is exposed to currency risk in respect of liabilities under policies of insurance denominated in currencies other than Sterling. The most significant other currency is US Dollar. The Group seeks to mitigate the risk by matching the estimated foreign currency denominated liabilities with assets denominated in the same currency.

Credit risk is the risk that a counterparty will be unable to pay amounts in full when due. Examples of this are corporate bonds, debts arising from reinsurers' share of insurance liabilities or of claims already paid and amounts due from intermediaries. The Group places limits on the exposure to a single counterparty. In respect of financial assets the Group has established certain investment criteria by reference to credit agencies' ratings. The creditworthiness of reinsurers is considered on a regular basis by reviewing their financial strength prior to assessing the recoverability of reinsurance recoveries.

Liquidity risk is the risk that cash may not be available to pay obligations when due at a reasonable cost. The Group has a policy of ensuring minimum amounts of working capital are available on a daily basis, that a minimum proportion of funds is invested in easily realisable securities and that borrowing facilities are in place to cover unexpected levels of demand.

# Directors' Report

## Statement of Directors' Responsibilities

The Directors are responsible for preparing the Annual Report and the financial statements in accordance with applicable law and regulations.

Company law requires the Directors to prepare financial statements for each financial year. Under that law the Directors have elected to prepare the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards and applicable law). The financial statements are required by law to give a true and fair view of the state of affairs of the Company and of the profit or loss of the Company for that period. In preparing these financial statements, the Directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgments and estimates that are reasonable and prudent;
- state whether applicable UK Accounting Standards have been followed, subject to any material departures disclosed and explained in the financial statements; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Company will continue in business.

The Directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the Company and enable them to ensure that the financial statements comply with the Companies Act 2006. They are also responsible for safeguarding the assets of the Company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities

## Auditors

Each of the persons who is a Director at the date of approval of this report confirms that:

(1) so far as the Director is aware, there is no relevant audit information of which the Company's auditors are unaware; and

(2) the Director has taken all the steps that he ought to have taken as a Director in order to make himself aware of any relevant audit information and to establish that the Company's auditors are aware of that information.

This confirmation is given and should be interpreted in accordance with the provisions of s418 of the Companies Act 2006.

The Directors expect Deloitte LLP to be reappointed as auditors for a further term at the next Annual General Meeting.

By order of the Board

J.L. Saitch
Director
25 March 2010

125 London Wall
London
EC2Y 5AJ

# Independent Auditors' Report

**INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF MINSTER INSURANCE COMPANY LIMITED**

We have audited the financial statements of Minster Insurance Company Limited for the year ended 31 December 2009 which comprise the Consolidated Profit and Loss Account, the Consolidated and Company Balance Sheets and the related notes 1 to 20. The financial reporting framework that has been applied in their preparation is applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice).

This report is made solely to the Company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**Respective responsibilities of Directors and auditors**

As explained more fully in the Directors' Responsibilities Statement, the directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's (APB's) Ethical Standards for Auditors.

**Scope of the audit of the financial statements**

An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the Group's and the parent company's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the Directors; and the overall presentation of the financial statements.

**Opinion on financial statements**

In our opinion the financial statements:
- give a true and fair view of the state of the Group's and the parent company's affairs as at 31 December 2009 and of the group's profit for the year then ended;
- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice; and
- have been prepared in accordance with the requirements of the Companies Act 2006.

**Emphasis of matter – uncertainty relating to technical provisions**

In forming our opinion, which is not qualified, we draw attention to the claims provisions and related reinsurance recoveries disclosures made in Note 1 to the Financial Statements concerning the Company's technical provisions. Considerable uncertainty exists regarding the ultimate cost of settlement of these liabilities and the recoverability of the reinsurers' share of technical provisions. These uncertainties are such that the ultimate liabilities, which will vary as a result of subsequent information and events, may result in material, but presently unquantifiable, adjustments to the amounts provided. Adjustments to the amount of provisions are reflected in the Financial Statements for the period in which the adjustments are made.

**Opinion on other matter prescribed by the Companies Act 2006**

In our opinion the information given in the Directors' Report for the financial year for which the financial statements are prepared is consistent with the financial statements.

# Independent Auditors' Report

**Matters on which we are required to report by exception**

We have nothing to report in respect of the following matters where the Companies Act 2006 requires us to report to you if, in our opinion:

- adequate accounting records have not been kept by the parent company, or returns adequate for our audit have not been received from branches not visited by us; or
- the parent company financial statements are not in agreement with the accounting records and returns; or
- certain disclosures of Directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

Colin Rawlings (Senior Statutory Auditor)
for and on behalf of Deloitte LLP
Chartered Accountants and Statutory Auditors
London
United Kingdom

25 March 2010

# Consolidated Profit and Loss Account
# Technical Account – General Business

For the year ended 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Earned premiums, net of reinsurance** | | | |
| Gross premiums written | 2 | 1,110 | 538 |
| Outwards reinsurance premiums | | 754 | 70 |
| **Earned premiums, net of reinsurance** | | 356 | 468 |
| Allocated investment return transferred from the non-technical account | | 6,772 | 7,144 |
| **Total technical income** | | 7,128 | 7,612 |
| **Claims incurred, net of reinsurance** | | | |
| Claims paid      - Gross amount | | 20,771 | 49,511 |
|                  - Reinsurers' share | | 4,661 | 21,551 |
| Net claims paid | | 16,110 | 27,960 |
| Change in provision for claims | | | |
|                  - Gross amount | | (23,554) | (42,222) |
|                  - Reinsurers' share | | 14,168 | 24,446 |
| Change in provision for net claims | | (9,386) | (17,776) |
| **Claims incurred, net of reinsurance** | | 6,724 | 10,184 |
| Net operating expenses | 4 | 258 | 16 |
| **Total technical charges** | | 6,982 | 10,200 |
| **Subtotal (Balance on the Technical Account for General Business)** | | 146 | (2,588) |

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

# Consolidated Profit and Loss Account
# Non Technical Account

For the year ended 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Balance on the General Business Technical Account** | | 146 | (2,588) |
| Investment income | 7 | 8,122 | 11,630 |
| Unrealised gains (losses) on investments | 7 | 1,433 | (1,357) |
| Investment expenses and charges | 7 | (461) | (550) |
| Allocated investment return transferred to Technical Account for General Business | | (6,772) | (7,144) |
| Other income | | 148 | 2,866 |
| **Profit on ordinary activities before tax** | | 2,616 | 2,857 |
| Tax on profit on ordinary activities | 8 | - | - |
| Tax adjustment credit in respect of prior years | 8 | - | 488 |
| **Retained profit for the financial year** | | 2,616 | 3,345 |

There are no recognised gains or losses for the current and preceding financial years other than the profit of £2,616k (2008:profit of £3,345k) shown above.

All amounts shown above relate to discontinued operations.

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

# Consolidated Balance Sheet

As at 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Investments** | | | |
| Other financial investments | 10 | 197,911 | 213,561 |
| Deposits with ceding undertakings | | - | 714 |
| | | 197,911 | 214,275 |
| **Reinsurers' share of technical provisions** | | | |
| Claims outstanding | | 64,898 | 87,613 |
| **Debtors** | | | |
| Debtors arising out of direct insurance operations | | 1,847 | 3,341 |
| Debtors arising out of reinsurance operations | | 15,161 | 18,558 |
| Other debtors | 11 | 44 | 973 |
| | | 17,052 | 22,872 |
| **Other assets** | | | |
| Cash at bank and in hand | | 8,116 | 14,146 |
| **Prepayments and accrued income** | | | |
| Accrued interest | | 1,760 | 2,064 |
| **Total Assets** | | 289,737 | 340,970 |

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

# Consolidated Balance Sheet

As at 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Capital and Reserves** | | | |
| Called up share capital | 12 | 232,600 | 232,600 |
| Profit and loss account | 13 | (200,983) | (203,599) |
| Total shareholders' funds | 14 | 31,617 | 29,001 |
| | | | |
| **Subordinated Liabilities** | 15 | 25,000 | 25,000 |
| | | | |
| **Technical provisions** | | | |
| Claims outstanding | | 214,263 | 264,232 |
| | | | |
| **Deposits received from reinsurers** | | 3,362 | 6,237 |
| | | | |
| **Creditors** | | | |
| Creditors arising out of direct insurance operations | | 9,279 | 9,548 |
| Creditors arising out of reinsurance operations | | 4,643 | 5,266 |
| Other creditors including taxation and social security | 16 | 1,573 | 1,686 |
| | | 15,495 | 16,500 |
| | | | |
| **Total Liabilities** | | 289,737 | 340,970 |

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

# Company Balance Sheet

As at 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Investments** | | | |
| Investments in group undertakings | 9 | 24,956 | 24,872 |
| Other financial investments | 10 | 190,523 | 207,190 |
| Deposits with ceding undertakings | | - | 714 |
| | | 215,479 | 232,776 |
| **Reinsurers' share of technical provisions** | | | |
| Claims outstanding | | 64,898 | 87,613 |
| **Debtors** | | | |
| Debtors arising out of direct insurance operations | | 1,846 | 3,341 |
| Debtors arising out of reinsurance operations | | 15,161 | 18,558 |
| Other debtors | 11 | 44 | 442 |
| | | 17,051 | 22,341 |
| **Other assets** | | | |
| Cash at bank and in hand | | 8,116 | 14,146 |
| **Prepayments and accrued income** | | | |
| Accrued interest | | 1,760 | 2,054 |
| **Total Assets** | | 307,304 | 358,930 |

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

# Company Balance Sheet

As at 31 December 2009

| | Notes | 2009 £000 | 2008 £000 |
|---|---|---|---|
| **Capital and Reserves** | | | |
| Called up share capital | 12 | 232,600 | 232,600 |
| Revaluation reserve | 13 | 3,886 | 3,802 |
| Profit and loss account | 13 | (204,869) | (207,401) |
| Total shareholders' funds | 14 | 31,617 | 29,001 |
| **Subordinated Liabilities** | 15 | 25,000 | 25,000 |
| **Technical provisions** | | | |
| Claims outstanding | | 213,880 | 263,807 |
| **Deposits received from reinsurers** | | 3,362 | 6,237 |
| **Creditors** | | | |
| Creditors arsing out of direct insurance operations | | 9,273 | 9,545 |
| Creditors arsing out of reinsurance operations | | 4,644 | 5,266 |
| Other creditors including taxation and social security | 16 | 19,528 | 20,074 |
| | | 33,445 | 34,885 |
| **Total Liabilities** | | 307,304 | 358,930 |

The Financial Statements on pages 8 to 23 were approved by the Board of Directors on 25 March 2010 and signed on its behalf by

C. A. E. P. Gilroy
Chairman

25 March 2010

Company Registration Number : 361302

The Notes on pages 14 to 23 form an integral part of these Financial Statements.

Minster Insurance Company Limited                    Company Balance Sheet 13

# Notes to the Financial Statements

For the year ended 31 December 2009

## 1. ACCOUNTING POLICIES

### Basis of presentation

The Minster Insurance Group (the Group) comprises Minster Insurance Company Limited and its subsidiary undertakings.

The Financial Statements have been prepared in accordance with the provisions of s396 of the Companies Act 2006, together with those of the Large & Medium Sized Companies & Groups (Accounts & Reports) Regulations 2008 relating to insurance companies, the Statement of Recommended Practice on Accounting for Insurance Business issued by the Association of British Insurers ("the ABI SORP") in December 2005 (as amended in December 2006) and in accordance with applicable accounting standards.

The Company has taken advantage of the exemption conferred by s408 of the Companies Act 2006 not to disclose the individual Company Profit and Loss Account. The profit after tax for the Company was £2,532k (2008: a profit of £2,476k).

At the balance sheet date the Company was a wholly owned subsidiary of BSG Insurance Holdings Limited. The Group has taken advantage of an exemption conferred by FRS1 (Revised 1996) not to present a cash flow statement as part of J P Morgan Chase & Co.

### Basis of consolidation

The consolidated Financial Statements incorporate the assets, liabilities and results of the Company and its subsidiary undertakings drawn up to 31 December each year, with the exception of Dudley Hill Investments Limited which has an accounting period of 12 months to 28 February 2010. The results of subsidiary undertakings acquired or sold during the period are included in the consolidated results from the date of acquisition or up to the date of disposal. On acquisition of a subsidiary undertaking, all of its assets and liabilities that exist at the date of acquisition are recorded at their fair values reflecting their condition at that date.

### Material uncertainty and going concern

There is a material uncertainty attaching to the run off of certain of the Company's insurance liabilities and related reinsurance recoveries as explained on page 14 under "Claims provisions and related reinsurance recoveries". The provisions held in respect of these classes, which include asbestos, pollution and health hazard, are material to the Financial Statements. Future changes in these reserves arising from the effects of these uncertainties could have a material effect on the Company's results and shareholders' funds in future periods. However, taking account of the level of capital available to sustain the run off of the business, the Directors consider that it is unlikely that future deterioration in these claims reserves will impair the Company's ability to continue as a going concern. Accordingly they have concluded that it is appropriate to prepare the accounts on a going concern basis and as noted in the Directors' report.

# Notes to the Financial Statements

For the year ended 31 December 2009

## 1. ACCOUNTING POLICIES (Continued)

### Basis of accounting for General Insurance Business

Premiums Written

Premiums written relate to reinstatement premiums receivable in respect of inwards treaty business.

Claims Incurred

Claims incurred comprise claims and related expenses paid in the year and changes in the provisions for outstanding claims, including provisions for claims incurred but not reported and related expenses, together with adjustments to claims from previous years. Where applicable, deductions are made for salvage and other recoveries.

Claims provisions and related reinsurance recoveries

Provision is made at the year end for the estimated cost of claims incurred but not settled at the balance sheet date, including the cost of claims incurred but not yet reported to the Company. The estimated cost of claims includes expenses to be incurred in settling claims and a deduction for the expected value of salvage and other recoveries. The Company takes all reasonable steps to ensure that it has appropriate information regarding its claims exposures. However, given the uncertainty in establishing claims provisions, it is likely that the final outcome will prove to be different from the original liability established.

The estimation of claims incurred but not reported ("IBNR") is generally subject to a greater degree of uncertainty than the estimation of the cost of settling claims already notified to the Company, where more information about the claims event is generally available. Claims IBNR may often not be apparent to the insured until many years after the event giving rise to the claims which have happened. Classes of business where the IBNR proportion of the total reserve is high will typically display greater variations between initial estimates and final outcomes because of the greater degree of difficulty of estimating these reserves. Classes of business where claims are typically reported relatively quickly after the claim event tend to display lower levels of volatility. In calculating the estimated cost of unpaid claims the Company uses a variety of estimation techniques, generally based upon statistical analyses of historical experience, which assumes that the development pattern of the current claims will be consistent with past experience.

Allowance is made, however, for changes or uncertainties which may create distortions in the underlying statistics or which might cause the cost of unsettled claims to increase or reduce when compared with the cost of previously settled claims including:

- changes in Company processes which might accelerate or slow down the development and/or recording of paid or incurred claims compare with the statistics from previous periods;

- changes in the legal environment;

- the effects of inflation, and

- the impact of large losses

A component of these estimation techniques is usually the estimation of the cost of notified but not paid claims. In estimating the cost of these, the Company has regard to the claim circumstance as reported, any information available from loss adjusters and information on the cost of settling claims with similar characteristics in previous periods.

Large claims impacting each relevant business class are generally assessed separately, being measured on a case by case basis or projected separately in order to allow for the possible distortive effect of the development and incidence of these large claims.



# Notes to the Financial Statements

For the year ended 31 December 2009

## 1. ACCOUNTING POLICIES (Continued)

Where possible the Company adopts multiple techniques to estimate the required level of provisions. This assists in giving greater understanding of the trends inherent in the data being projected. The projections given by the various methodologies also assist in setting the range of possible outcomes. The most appropriate estimation technique is selected taking into account the characteristics of the business class and the extent of the development of each accident year.

### Property and personal accident business

Property and personal accident business is short tail, that is there is not a significant delay between the occurrence of the claim and the claim being settled by the Company. The costs of claims notified to the Company at the balance sheet date are estimated on a case by case basis to reflect the individual circumstances of each claim. The ultimate expected cost of claims is projected from this data by reference to statistics which show how estimates of claims incurred in previous periods have developed over time to reflect changes in the underlying estimates of the cost of notified claims and late notifications.

### Liability claims

These claims, which include both employers' liability and general liability, are longer tail than for those of the other classes of business described above and so a larger element of the claims provision relates to incurred but not reported claims. Claims estimates for the Company's contingency and liability business are derived from a combination of loss ratio based estimates and an estimate based upon actual claims experience. In respect of liability claims, the assessment of claims inflation and anticipated market experience is particularly sensitive to the level of court awards and to the development of legal precedent on matters of contract and tort. The liability class of business is also subject to the emergence of new types of latent claims but no allowance is included for this as at the balance sheet date.

### Asbestos, pollution and health hazard claims

There may be a long delay between the occurrence and notification of these types of claims. In estimating the cost of claims the Company considers the type of risks written historically that may give rise to exposure to these risks, notifications received from policyholders, the nature and extent of the cover provided, the current legal environment, changes in the effectiveness of clean up techniques and industry benchmarks of the typical cost of claims of this kind and of total expected insured losses.

For certain of these liabilities legislative and judicial actions to date have failed to determine the basis of liability to indemnify losses. These claims are not expected to be settled for many years and there is considerable uncertainty as to the amounts at which they will ultimately be settled. Whilst the Directors consider that the gross provision for claims and the related reinsurance recoveries are fairly stated on the basis of the information currently available to them, the ultimate liability will vary as a result of subsequent information and events and may result in significant adjustments to the amount provided. The method used, and the estimates made, are reviewed regularly.

### Marine, Aviation and Treaty business

Marine and Aviation business has a relatively long tail and a large element of the claims provisions relates to incurred but not reported claims. Treaty business in recent underwriting years has shown a relatively short reporting delay but the nature of the business is such that there are significant provisions for IBNR claims. Earlier underwriting years have a large element of incurred but not reported claims because of the long tail nature of LMX business. Claims estimates for Marine, Aviation and Treaty business are derived from estimates based upon actual historical claims experience and claims development patterns. Claims reserves are particularly sensitive to changes in the market's evaluation of claims and to changes in the legal environment. These classes of business include environmental claims, the reserving for which is described above.

# Notes to the Financial Statements

For the year ended 31 December 2009

## 1. ACCOUNTING POLICIES (Continued)

### Reinsurance recoveries

Estimates are made for reinsurance recoveries in respect of claims provisions established at the year end. Reinsurance recoveries in respect of claims incurred but not reported are assumed to be consistent with the estimated recoveries on the known outstanding claims in each year. Ceded reinsurance arrangements do not relieve the Company from its direct obligations to its insured. Thus a credit exposure exists with respect to reinsurance ceded, to the extent that any reinsurer is unable to meet its obligations assumed under the reinsurance arrangements. An assessment is made of the recoverability of reinsurance recoveries having regard to market data on the financial strength of each of the reinsurance companies. The ultimate recoveries, and any irrecoverable amounts, cannot be known with certainty at the balance sheet date.

### Investments

### (a)    Investment valuations

Investments are stated at current value. For this purpose listed investments are stated at market value on the balance sheet date. The aggregate surplus or deficit on revaluation is taken to the non-technical account.

In the balance sheet of the Company, investments in Group undertakings are stated at cost adjusted for the value of post-acquisition reserves. The aggregate surplus on revaluation is taken to a revaluation reserve.

### (b)    Investment return

Investment return comprises all investment income, realised investment gains and losses and movements in unrealised gains and losses, net of investment expenses, charges and interest.

Interest and expenses are accounted for on an accruals basis.

Realised gains and losses on investments are calculated as the difference between net sales proceeds and purchase price. Movements in unrealised gains and losses on investments, excluding those arising on investments in Group undertakings, represent the difference between the valuation at the balance sheet date and their purchase price or, if they have been previously valued, their valuation at the last balance sheet date, together with the reversal of unrealised gains and losses recognised in earlier accounting periods in respect of investment disposals in the current period.

Investment return is initially recorded in the non-technical account. A transfer is made each quarter from the non-technical account to the technical account of the investment return on investments supporting the insurance technical provisions.

### Exchange rates

Assets and liabilities in overseas currencies are translated into sterling at the rates of exchange ruling at the end of the year. Revenue results in overseas currencies are translated into sterling at the average rates of exchange during the year. Profits and losses arising on currency fluctuations are accounted for in the non-technical account.

### Deferred taxation

Deferred taxation is recognised as an asset or liability if transactions have occurred at the balance sheet date that give rise to a right to pay less taxation in future or an obligation to pay more taxation in future. An asset is not recognised to the extent that the transfer of economic benefits in the future is uncertain.

# Notes to the Financial Statements

## 1. ACCOUNTING POLICIES (Continued)

### Run off Provision

No provision has been made for administration and other costs estimated to be incurred during the period of the run-off because the Directors are of the opinion that these costs will be covered by future investment income.

## 2. SEGMENTAL ANALYSIS

The Group has taken advantage of the exemption given in Section 6(2) of Part II of The Large and Medium Sized Companies and Groups (Accounts and Reports) Regulations 2008 not to disclose the particulars of business.

## 3. MOVEMENT IN PRIOR YEARS' PROVISION FOR CLAIMS OUTSTANDING

|  | 2009 £000 | 2008 £000 |
|---|---|---|
| Provision for claims outstanding at 1 January |  |  |
| Gross amounts | 264,232 | 229,890 |
| Reinsurers' share | (87,613) | (84,466) |
|  | 176,619 | 145,424 |
| Exchange adjustment | (17,868) | 48,971 |
|  | 158,751 | 194,395 |
| Net claims paid during the year in respect of the provision | 16,110 | 27,960 |
| Net provision for claims outstanding carried forward | 149,365 | 176,619 |
| (Under)/over provision of prior years' claims outstanding | (6,724) | (10,184) |

Analysed by class of business:

|  | 2009 | 2008 |
|---|---|---|
| Accident & Health | 682 | 2,295 |
| Marine, Aviation & Transport | 857 | 5,043 |
| Fire and other property damage | 1,117 | (465) |
| General Liability | 182 | (1,367) |
|  | 2,838 | 5,506 |
| Reinsurances accepted | 3,886 | (15,690) |
|  | 6,724 | (10,184) |

## 4. NET OPERATING EXPENSES

|  | 2009 £000 | 2008 £000 |
|---|---|---|
| Net acquisition costs | 258 | 16 |
| Administrative expenses (Note 5) | - | - |
| Net Operating Expenses | 258 | 16 |

# Notes to the Financial Statements

For the year ended 31 December 2009

## 5. ADMINISTRATIVE EXPENSES

|  | 2009 £000 | 2008 £000 |
|---|---|---|
| Staff Costs | 2,356 | 2,993 |
| Premises | 396 | 422 |
| Other | 4,779 | 5,877 |
| Total Management Fee | 7,531 | 9,292 |
| Costs treated as claims handling expenses | (7,531) | (9,292) |
| Administrative expenses | - | - |
| Other expenses include: Auditors' remuneration including expenses Audit (Company: £168,000; 2008, £178,000) | 196 | 206 |

Non-audit fees payable to the Company's auditors in respect of actuarial services were £138,000 (2008:£nil).

All costs of employees, premises and other operating activities incurred by the Company and its wholly owned UK registered subsidiaries are borne by Minster Management Services Limited ('MMS'), a fellow subsidiary undertaking. A full disclosure of these costs is presented in the financial statements of MMS. MMS charged the Group a management fee in respect of these costs.

The company operates a defined contributions pension scheme. During 2009 contributions of £132k (2008:£192k) to the defined contributions scheme have been charged to the Company.

## 6. DIRECTORS' EMOLUMENTS

|  | 2009 £000 | 2008 £000 |
|---|---|---|
| Directors' emoluments paid by a fellow Group undertaking for managing the Company: |  |  |
| Aggregate emoluments | 464 | 415 |
| Company pension contributions to defined contribution scheme | - | 12 |
|  | 464 | 427 |
| The number of Directors accruing pension benefits under Defined contributions schemes | - | 1 |

The highest paid Director received remuneration of £200,000 (2008 : £228,000).

# Notes to the Financial Statements

For the year ended 31 December 2009

## 7. INVESTMENT RETURN SUMMARY

| | 2009 £000 | 2009 £000 | 2008 £000 | 2008 £000 |
|---|---|---|---|---|
| Investment Income | 6,840 | | 10,748 | |
| Income from other investments | 1,282 | | 882 | |
| Gains on the realisation of investments | | 8,122 | | 11,630 |
| Unrealised gains (losses) on investments | | 1,433 | | (1,357) |
| Investment expenses and charges | (298) | | (284) | |
| Investment management expenses | (163) | | (266) | |
| Interest payable | | (461) | | (550) |
| Total investment return | | 9,094 | | 9,723 |

## 8. TAX ON PROFIT ON ORDINARY ACTIVITIES

### (a) Current tax charge (credit)

| | 2009 £000 | 2008 £000 |
|---|---|---|
| UK Corporation tax charge on current year profits/(losses) | - | - |
| Adjustment in respect of prior years | - | (488) |
| Total tax charge/(credit) to profit and loss | - | (488) |

### (b) Factors affecting the current tax (credit) / charge for the year

The current tax charge/(credit) for the year differs from the Standard rate of corporation tax in the UK of 28%

| | 2009 | 2008 |
|---|---|---|
| Profit on ordinary activities before tax | 2,616 | 2,857 |
| Profit on ordinary activities multiplied by standard rate of corporation tax in the UK of 28% (2008 : 28.5%) | 732 | 814 |

Effects of:

| | | |
|---|---|---|
| Permanent differences | - | (1,481) |
| Short term timing differences | (7) | (2,850) |
| Utilisation of tax losses | (704) | 0 |
| Current year losses not recognised | - | 3,517 |
| Group relief | (21) | 0 |
| Adjustments in respect of prior periods | - | (488) |
| Current tax charge/(credit) for the year | - | (488) |

### (c) Factors affecting future tax changes

The Company has unutilised losses and other short term timing differences of £5,024k (2008:£12,300k) which may be offset against future trading profits and give rise to an unprovided deferred tax asset of £1,407k (2008:£3,444k).
The Company has not recognised a deferred tax asset in respect of these items.

# Notes to the Financial Statements

For the year ended 31 December 2009

### 9. INVESTMENTS IN GROUP UNDERTAKINGS

|  | Current value | Cost |
|---|---|---|
|  | £000 | £000 |
| Shares in Group Undertakings at 1 January 2009 | 24,872 | 21,070 |
| Group undertakings' reserve movements during the year | 84 | - |
| Shares in Group Undertakings at 31 December 2009 | 24,956 | 21,070 |

Investments in Group undertakings, all of which are consolidated, are as follows:

| | |
|---|---|
| The Contingency Insurance Company Limited | Insurance Company |
| Dudley Hill Investments Limited | Investment Company |
| Progress Insurance Company Limited | Service Company |
| Malvern Insurance Company Limited | Insurance Company |

All subsidiary undertakings are 100% owned by Minster Insurance Company Limited. All subsidiary undertakings are registered in England and Wales. Dudley Hill Investments Limited has an accounting period of 12 months to 28 February 2010.

The issued share capital of each company is exclusively in the form of ordinary shares.

### 10. OTHER FINANCIAL INVESTMENTS

|  | Market Value | Cost | Market Value | Cost |
|---|---|---|---|---|
|  | 2009 £000 | 2009 £000 | 2008 £000 | 2008 £000 |
| Debt securities and other fixed income securities | 168,676 | 167,427 | 181,081 | 181,264 |
| Loans secured by mortgages | - | - | 20 | 20 |
| Deposits with credit institutions | 21,847 | 21,847 | 26,089 | 26,089 |
| **Total Financial Investments - Company** | 190,523 | 189,274 | 207,190 | 207,373 |
| Deposits with credit institutions held by subsidiary undertakings | 7,388 | 7,388 | 6,371 | 6,371 |
| **Total Financial Investments – Group** | 197,911 | 196,662 | 213,561 | 213,744 |
| Included in the above were investments: | | | | |
| Listed on the UK Stock Exchange | 90,266 | 89,051 | 59,893 | 58,750 |
| Listed on other investment exchanges | 78,410 | 78,376 | 121,188 | 122,514 |
|  | 168,676 | 167,427 | 181,081 | 181,264 |

# Notes to the Financial Statements

For the year ended 31 December 2009

### 11. OTHER DEBTORS

|  | 2009 | | 2008 | |
|  | Group £000 | Company £000 | Group £000 | Company £000 |
| --- | --- | --- | --- | --- |
| Taxation recoverable | 44 | 44 | 525 | 50 |
| Other | - | - | 448 | 392 |
|  | 44 | 44 | 973 | 442 |

### 12. CALLED UP SHARE CAPITAL

|  | 2009 £000 | 2008 £000 |
| --- | --- | --- |
| Authorised | | |
| 350,000,000 ordinary shares of £1 each | 350,000 | 350,000 |
| Allotted and fully paid | | |
| 232,600,000 ordinary shares of £1 each | 232,600 | 232,600 |

### 13. RESERVES

|  | Revaluation Reserve Company £000 | Profit and Loss Account Group £000 | Profit and Loss Account Company £000 |
| --- | --- | --- | --- |
| At 1 January 2009 | 3,802 | (203,599) | (207,401) |
| Retained profit (loss) for the year | | 2,616 | 2,532 |
| Movement in reserves during the year | 84 | - | - |
| At 31 December 2009 | 3,886 | (200,983) | (204,869) |

### 14. RECONCILIATION OF MOVEMENT IN SHAREHOLDERS' FUNDS

|  | Group and Company | |
|  | 2009 £000 | 2008 £000 |
| --- | --- | --- |
| Profit for the financial year and movement in reserves | 2,616 | 3,345 |
| Shareholders' funds at beginning of year | 29,001 | 25,656 |
| Shareholders' funds at end of year | 31,617 | 29,001 |

### 15. SUBORDINATED LIABILITIES

|  | Group and Company | |
|  | 2009 £000 | 2008 £000 |
| --- | --- | --- |
| 25,000,000 redeemable ordinary shares of £1 each | 25,000 | 25,000 |

The redeemable ordinary shares are redeemable on 31 December 2010. However, the shares can be redeemed earlier at the option of the Company. There is no premium payable on redemption. Both classes of ordinary shares rank equally for dividends and voting rights. In the event of winding-up, the redeemable ordinary shares rank equally with the other ordinary shares.

# Notes to the Financial Statements

For the year ended 31 December 2009

## 16. OTHER CREDITORS INCLUDING TAXATION AND SOCIAL SECURITY

|  | 2009 Group £000 | 2009 Company £000 | 2008 Group £000 | 2008 Company £000 |
|---|---|---|---|---|
| Amounts owed to subsidiary undertakings of BSG Insurance Holdings Limited | 1,505 | 19,460 | 1,612 | 20,000 |
| Other | 68 | 68 | 74 | 74 |
|  | 1,573 | 19,528 | 1,686 | 20,074 |

## 17. GROUP CROSS GUARANTEE

A mutual undertaking exists between the Company and certain of its subsidiary undertakings whereby each indemnifies the other against any failure to meet obligations under contracts or policies of insurance.

Under the terms of the Group's arrangements with its principal banker, the bank has a right of set off between credit balances and any overdrawn balances.

## 18. PROVISION FOR OTHER RISK AND CHARGES

No provision has been made for administration and other costs estimated to be incurred during the period of the run-off because the Directors are of the opinion that these costs will be covered by future investment income. The estimated gross provision that would be required before offsetting future investment income is £49 million (2008: £53 million) reflecting the long tail nature of some of the Company's claims liabilities.

## 19. RELATED PARTY TRANSACTIONS

The Company has taken advantage of the exemption available under FRS 8 – Related Party Disclosures that no disclosure is required in the Financial Statements of related party transactions in relation to subsidiary undertakings for wholly owned subsidiaries whose voting rights are controlled within the group.

## 20. ULTIMATE PARENT UNDERTAKING

The Company's immediate parent undertaking at the balance sheet date was BSG Insurance Holdings Limited, which is registered in England and Wales. The Directors regard J P Morgan Chase & Co, a company incorporated in the USA, as its ultimate parent undertaking.
Copies of the financial statements of both companies can be obtained from the registered office of Minster Insurance Company Limited as shown in the Directors' Report.

# EXHIBIT B

**MALVERN INSURANCE COMPANY LIMITED**
**(Registered No: 529341)**
**FINANCIAL STATEMENTS**
**FOR THE YEAR ENDED 31 DECEMBER 2009**

# Contents

| | |
|---|---|
| Contents | 1 |
| Directors' Report | 2-4 |
| Independent Auditors' Report | 5 |
| Profit and Loss Account | 6 |
| Balance Sheet | 7 |
| Notes to the Financial Statements | 8-10 |

# Directors' Report

The Directors of Malvern Insurance Company Limited, a limited liability company incorporated and domiciled in the United Kingdom, present their Report and the audited Financial Statements of the Company for the year ended 31 December 2009.

## Principal activity and review of the business

The principal activity of the Company was the underwriting of general insurance business until the Company ceased to write any business in 2000. The technical liabilities and related assets were portfolio transferred to a then fellow group undertaking in 2003.

Investment income for the year was £17,474 and the net profit for the year was £17,474. The Directors do not propose a dividend in 2009 (2008: £nil ).

The Directors do not foresee the Company undertaking any activities in the future. However, in order to satisfy minimum capital requirements issued by the Financial Services Authority ('FSA'), the Company has held monies on deposit during the year and consequently has investment income arising from these deposits.

In order to bring finality to the Group's liabilities the Directors proposed during the year a Solvent Scheme of Arrangement ("Scheme") for each of its insurance companies, Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company Limited and Progress Insurance Company Limited. ("Scheme Companies")

In June 2009 the Scheme Companies advised all their policyholders that they were proposing a Solvent Scheme of Arrangement under Part 26 of the Companies Act 2006 to all their insurance and reinsurance creditors.

The objective of the Scheme is to finalise liabilities arising out of the business activities of the Scheme Companies and pay Scheme creditors in respect of such liabilities earlier than would be the case if claims were left to mature in the normal course.

The Directors believe that the Scheme is the most efficient and effective method of finalising their liabilities in the shortest practical time, offering Scheme creditors the advantage of achieving finality and certainty in relation to their claims in the Scheme.

On November 4 2009, the Scheme Companies were granted leave by the Royal Courts of Justice to convene Scheme meetings for the purpose of considering a solvent Scheme.

The Scheme Companies held meetings on 18 January 2010, following which votes were assessed by the Independent Vote Valuer, who concluded that each Scheme proposal was approved by the statutory majority of creditors for each of the Scheme Companies.

On 16 March 2009 the Scheme Companies applied for sanction of the Schemes by the Royal Courts of Justice. All of the proposed Schemes were sanctioned.

All Scheme creditors will be given an opportunity to submit their claims. Scheme claims will be agreed and paid in accordance with the terms and conditions of the Scheme documents. Disputed claim amounts will be subject to an independent adjudication process.

## Financial instruments

The Directors consider that there is no material exposure to price, credit, liquidity or interest rate risk for the financial instruments held by the Company. The Company does not hold equity instruments.

## Expenses

All contracts of employment of the UK Group are with fellow subsidiary undertakings. All expenses, including auditors' remuneration, are borne by Minster Management Services Limited, a fellow subsidiary undertaking.

# Directors' Report

### Going concern

The group's business activities, together with the factors likely to affect its future development, performance and position are set out in the Directors report above.

The Company has considerable liquid financial resources available, and as a consequence, the Directors believe that the company and the group are well placed to manage its business risks successfully despite the current uncertain economic outlook. After making enquiries, the Directors have a reasonable expectation that the Company has adequate resources to continue in operational existence for the foreseeable future. Accordingly, they continue to adopt the going concern basis in preparing the annual report and accounts.

### Directors

The Directors currently holding office are:

C. A. E. P. Gilroy                    Chairman
J.G. Madigan
P.B. Demong
I.R. Lyall
G.J. Meadows
J.L. Saitch

I.R.Lyall and T.Mozaria were appointed as directors on 21 May 2009 and 22 May 2009 respectively and G.J.Meadows was appointed as a director on 3 September 2009.

M.S Pearlman resigned as director on 19 June 2009 and T.Morzaria resigned on 3 September 2009.

None of the Directors were remunerated for their services to the Company during the year. All contracts of employment of the UK Group are with fellow subsidiary undertakings. All expenses, including auditors' remuneration, are borne by Minster Management Services Limited, a fellow subsidiary undertaking.

### Statement of Directors' responsibilities

The Directors are responsible for preparing the Annual Report and the financial statements in accordance with applicable law and regulations.

Company law requires the Directors to prepare financial statements for each financial year. Under that law the Directors have elected to prepare the financial statements in accordance with United Kingdom Generally Accepted Accounting Practice (United Kingdom Accounting Standards and applicable law). The financial statements are required by law to give a true and fair view of the state of affairs of the Company and of the profit or loss of the Company for that period. In preparing these financial statements, the Directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgments and estimates that are reasonable and prudent;
- state whether applicable UK Accounting Standards have been followed, subject to any material departures disclosed and explained in the financial statements and prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Company will continue in business.

The Directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the company and enable them to ensure that the financial statements comply with the Companies Act 2006. They are also responsible for safeguarding the assets of the Company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

# Directors' Report

**Auditors**

Each of the persons who is a Director at the date of approval of this report confirms that:

(1)     so far as each Director is aware, there is no relevant audit information of which the Company's auditors are unaware; and

(2)     the Director has taken all the steps that he ought to have taken as a Director in order to make himself aware of any relevant audit information and to establish that the Company's auditors are aware of that information.

This confirmation is given and should be interpreted in accordance with the provisions of s418 of the Companies Act 2006

The Directors expect Deloitte LLP to be reappointed as auditors for a further term at the next Annual General Meeting.

By Order of the Board

J. L. Saitch                                          125 London Wall
Director                                              London
25 March 2010                                         EC2Y 5AJ

# Independent Auditors' Report

**INDEPENDENT AUDITORS' REPORT TO THE MEMBERS OF MALVERN INSURANCE COMPANY LIMITED**

We have audited the financial statements of Malvern Insurance Company Limited for the year ended 31 December 2009 which comprise the Profit and Loss Account, the Balance Sheet, and the related notes 1 to 9. The financial reporting framework that has been applied in their preparation is applicable law and United Kingdom Accounting Standards (United Kingdom Generally Accepted Accounting Practice).

This report is made solely to the Company's members, as a body, in accordance with Chapter 3 of Part 16 of the Companies Act 2006. Our audit work has been undertaken so that we might state to the Company's members those matters we are required to state to them in an auditors' report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the company and the Company's members as a body, for our audit work, for this report, or for the opinions we have formed.

**Respective responsibilities of directors and auditors**
As explained more fully in the Directors' Responsibilities Statement, the Directors are responsible for the preparation of the financial statements and for being satisfied that they give a true and fair view. Our responsibility is to audit the financial statements in accordance with applicable law and International Standards on Auditing (UK and Ireland). Those standards require us to comply with the Auditing Practices Board's (APB's) Ethical Standards for Auditors.

**Scope of the audit of the financial statements**
An audit involves obtaining evidence about the amounts and disclosures in the financial statements sufficient to give reasonable assurance that the financial statements are free from material misstatement, whether caused by fraud or error. This includes an assessment of: whether the accounting policies are appropriate to the Company's circumstances and have been consistently applied and adequately disclosed; the reasonableness of significant accounting estimates made by the Directors; and the overall presentation of the financial statements.

**Opinion on financial statements**
In our opinion the financial statements:
- give a true and fair view of the state of the Company's affairs as at 31 December 2009 and of its profit for the year then ended;
- have been properly prepared in accordance with United Kingdom Generally Accepted Accounting Practice; and
- have been prepared in accordance with the requirements of the Companies Act 2006.

**Opinion on other matter prescribed by the Companies Act 2006**
In our opinion the information given in the Directors' Report for the financial year for which the financial statements are prepared is consistent with the financial statements.

**Matters on which we are required to report by exception**
We have nothing to report in respect of the following matters where the Companies Act 2006 requires us to report to you if, in our opinion:
- adequate accounting records have not been kept, or returns adequate for our audit have not been received from branches not visited by us; or
- the financial statements are not in agreement with the accounting records and returns; or
- certain disclosures of Directors' remuneration specified by law are not made; or
- we have not received all the information and explanations we require for our audit.

Colin Rawlings (Senior Statutory Auditor)
for and on behalf of Deloitte LLP
Chartered Accountants and Statutory Auditors
London
United Kingdom

25 March 2010

# Profit and Loss Account

**For the year ended 31 December 2009**

|  | Notes | 2009 £ | 2008 £ |
|---|---|---|---|
| **Non Technical Account** |  |  |  |
| Investment income |  | 17,474 | 166,170 |
| Other income (charges) |  | - | (47) |
| **Profit on ordinary activities before tax** |  | 17,474 | 166,123 |
| Tax charge on profit on ordinary activities |  | - | - |
| Tax adjustments in respect of prior years | 2 | - | 296,928 |
| **Retained profit for the year** |  | 17,474 | 463,051 |

All amounts are in respect of discontinued operations.

There were no recognised gains or losses for the current and preceding financial years other than the profit of £17,474 ( 2008: profit £463,051)

The Notes on pages 8 to 10 form an integral part of these Financial Statements.

Malvern Insurance Company Limited

Profit & Loss Account 6

# Balance Sheet

## As at 31 December 2009

| | Notes | 2009 £ | 2008 £ |
|---|---|---|---|
| **ASSETS** | | | |
| | | | |
| **Investments** | | | |
| Deposits with credit institutions | | 3,474,125 | 2,834,490 |
| | | | |
| **Debtors** | | | |
| Amounts owed by parent and fellow subsidiary undertakings | | 14,204,435 | 14,489,437 |
| Accrued income | | - | 40,231 |
| Other debtors | | - | 296,928 |
| **Total Assets** | | 17,678,560 | 17,661,086 |
| | | | |
| **LIABILITIES** | | | |
| | | | |
| **Capital and reserves** | | | |
| Called up share capital | 3 | 16,000,000 | 16,000,000 |
| Profit and loss account | 4 | 1,678,560 | 1,661,086 |
| | | | |
| **Total shareholders' funds** | 5 | 17,678,560 | 17,661,086 |
| | | | |
| **Creditors** | | | |
| Other creditors including taxation and social security | | - | - |
| | | | |
| **Total Liabilities** | | 17,678,560 | 17,661,086 |

The Financial Statements on pages 6 to 10 were approved by the Board of Directors on 25 March 2010 and signed on its behalf by

C. A. E. P. Gilroy
Chairman

Date 25 March 2010

Company Registration Number : 529341

The Notes on pages 8 to 10 form an integral part of these Financial Statements.

# Notes to the Financial Statements

1. **ACCOUNTING POLICIES**

   **Basis of presentation**

   The Financial Statements have been prepared in accordance with the provisions of s396 of the Companies Act 2006, together with those of the Large & Medium Sized Companies & Groups (Accounts & Reports) Regulations 2008 relating to insurance companies, the Statement of Recommended Practice on Accounting for Insurance Business issued by the Association of British Insurers ("the ABI SORP") in December 2005 (as amended in December 2006) and in accordance with applicable accounting standards.

   The Company is a wholly owned subsidiary and has elected to utilise the exemption provided in FRS1 (Revised) not to present a cash flow statement.

   The Financial Statements have been prepared on a going concern basis as noted in the Directors' report.

   **Investments**

   Investment return comprises interest receivable on deposits held with credit institutions and is recognised on an accruals basis.

   **Taxation**

   Corporation tax is recognised on taxable profits at the then current rate.
   Deferred taxation is recognised as an asset or liability if transactions have occurred at the balance sheet date that give rise to a right to pay less taxation in future or an obligation to pay more taxation in future. An asset is not recognised to the extent that the transfer of economic benefits in the future is uncertain.

2. **TAX ON PROFIT ON ORDINARY ACTIVITIES**

| | 2009 £ | 2008 £ |
|---|---|---|
| **(a) Current Tax** | | |
| UK Corporation Tax on current year profits/(losses) | - | - |
| Adjustments in respect of prior years | - | (296,928) |
| Total tax (credit) to profit and loss | - | (296,928) |
| **(b) Factors affecting the current tax (credit)/charge for the year** | | |
| Profit on ordinary activities before tax | 17,474 | 166,123 |
| Profit on ordinary activities multiplied by standard rate of UK corporation tax of 28%    (2008– 28.5%) | 4,893 | 47,345 |

# Notes to the Financial Statements

Effects of

| | | |
|---|---:|---:|
| Permanent differences | - | - |
| Group Relief | (4,893) | (47,345) |
| Adjustments in respect of prior periods | - | (296,928) |
| Current tax (credit) for the year | - | (296,928) |

### (c) Factors affecting future tax charges

To the extent that the Company continues to make profits in the future, the Company will claim group relief from its parent undertaking at no cost.

## 3. CALLED UP SHARE CAPITAL

| | 2009 | 2008 |
|---|---:|---:|
| | £ | £ |
| Allotted and fully paid | | |
| 16,000,000 ordinary shares of £1 each | 16,000,000 | 16,000,000 |

## 4. PROFIT AND LOSS ACCOUNT

| | 2009 | 2008 |
|---|---:|---:|
| | £ | £ |
| At 1 January | 1,661,086 | 1,198,035 |
| Retained profit/(loss) for the financial year | 17,474 | 463,051 |
| 31 December | 1,678,560 | 1,661,086 |

## 5. RECONCILIATION OF MOVEMENT IN SHAREHOLDERS' FUNDS

| | 2009 | 2008 |
|---|---:|---:|
| | £ | £ |
| Profit/(loss) for the financial year | 17,474 | 463,051 |
| Shareholders' funds at beginning of year | 17,661,086 | 17,198,035 |
| Shareholders' funds at end of year | 17,678,560 | 17,661,086 |

# Notes to the Financial Statements

6.  **AUDITORS' REMUNERATION**

    Auditors' remuneration is paid by a fellow subsidiary undertaking. The amount paid on behalf of the Company was £6,946 (2008: £6,919). There were no non- audit fees payable to the statutory auditors (2008: £Nil)

7.  **GROUP CROSS GUARANTEE**

    A mutual undertaking exists between the Company's parent company and certain of its subsidiary undertakings whereby each indemnifies the other against any failure to meet obligations under contracts or policies of insurance.

    Under the terms of the Group's arrangements with its principal banker, the bank has a right of set off between credit balances and any overdrawn balances.

8.  **RELATED PARTY TRANSACTIONS**

    The Company has taken advantage of the fact that no disclosure is required in the Financial Statements of related party transactions in relation to subsidiary undertakings for wholly owned subsidiaries whose voting rights are controlled within the group.

9.  **ULTIMATE PARENT UNDERTAKING**

    The Company's immediate parent undertaking at the balance sheet date was Minster Insurance Company Limited, which is registered in England and Wales. The Directors regard J P Morgan Chase & Co, a company incorporated in the USA, as its ultimate parent undertaking.
    Copies of the financial statements of both companies can be obtained from the registered office of Malvern Insurance Company Limited as shown in the Directors' Report.

# EXHIBIT C

THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt about what action you should take, you should consult your insurance broker or other professional adviser without delay. A copy of this document has been sent to brokers identified by the Scheme Companies as having placed business with or on behalf of any of the Scheme Companies in relation to Scheme Business or to have had dealings with any of the Scheme Companies so as to ensure that they are able to advise their clients in relation to this proposed Scheme.

Further copies of this document and other related documentation can be obtained from the Scheme Manager at Minster Management Services Limited, 18 Mansell Street, London E1 8AA, United Kingdom or from the Scheme website at www.minsterins.co.uk.

---

**Proposal in relation to separate**
**SCHEMES OF ARRANGEMENT**
**pursuant to Part 26 of the Companies Act 2006**
**between each of**

# MINSTER INSURANCE COMPANY LIMITED

**MALVERN INSURANCE COMPANY**
**LIMITED**

**THE CONTINGENCY INSURANCE**
**COMPANY LIMITED**

**PROGRESS INSURANCE COMPANY**
**LIMITED**

**GAN ASSURANCES**

**QBE INSURANCE (EUROPE) LIMITED**

**THE RELIANCE FIRE AND ACCIDENT**
**INSURANCE CORPORATION LIMITED**

**and their respective**
**SCHEME CREDITORS**
**(as defined in the Scheme)**

---

Meetings of each Scheme Company's Scheme Creditors to consider and, if thought fit, agree to each Scheme will be held on 18 January 2010 commencing at 11.00 a.m. (GMT) at Barlow Lyde & Gilbert LLP, Beaufort House, 15 St. Botolph Street, London EC3A 7NJ, United Kingdom.

The action you should take is set out on pages 14 and 15 of this document. Whether or not you intend to be present at the Meetings, you are requested to complete and return the Form of Proxy and Voting Form enclosed with this document in accordance with the instructions and notes contained therein as soon as possible and in any event by 5.00 p.m. (GMT) on 15 January 2010.

**For full details of the business included in the Schemes and the company names under which the business included in the Schemes was written, please refer to Part 2 of this document at pages 18 to 27.**

**4 November 2009**

# KEY DATES AND EXPECTED TIMETABLE

| | |
|---|---|
| Ascertainment Date | 31 December 2008 |
| Voting Forms and Forms of Proxy to be returned by 5.00 p.m. (GMT) | 15 January 2010 |
| Meetings of Scheme Creditors | 18 January 2010 |
| Court Hearing of the Petition to sanction the Schemes* | March 2010 |
| Effective Date of the Schemes* | March 2010 |
| Final Claims Submission Date* | October 2010 |
| Earliest anticipated payment date* | October 2010 |

\* The date of the Court Hearing of the Petition to sanction the Schemes has not yet been settled, although it is expected to take place on the date indicated. If this date changes, the Effective Date and the other dates following the Effective Date set out above will be affected.

# CONTACT DETAILS

Scheme Website: www.minsterins.co.uk Scheme e-mail address: minsterscheme@minsterins.co.uk

| **Scheme Manager** | **Scheme Advisers** |
|---|---|
| Minster Management Services Limited<br>18 Mansell Street<br>London E1 8AA<br>United Kingdom<br><br>Contact: Hilary Young or Brenda Payter<br>Tel: +44 (0) 20 7709 5654<br>Fax: +44 (0) 20 7709 5760<br>Email: minsterscheme@minsterins.co.uk | PricewaterhouseCoopers LLP<br>Plumtree Court<br>London EC4A 4HT<br>United Kingdom<br><br>Contact: Dan Schwarzmann, Kirsteen Hodge, Simon Hawkins<br>Tel: +44 (0) 20 7583 5000 Fax +44 (0) 20 7212 6316 Email: simon.w.hawkins@uk.pwc.com |
| **Scheme Actuarial Advisers** | **U.K. Legal Advisers** |
| PricewaterhouseCoopers LLP<br>Plumtree Court<br>London<br>EC4A 4HT<br>United Kingdom<br><br>Contact: Gregory Overton or Mark Allen<br>Tel: +44 (0) 20 7583 5000<br>Fax +44 (0) 20 7804 1002 | Barlow Lyde & Gilbert LLP<br>Beaufort House<br>15 St Botolph Street<br>London EC3A 7NJ<br>United Kingdom<br><br>Contact: Emily Cope or Jon Yorke<br>Tel: +44 (0) 20 7247 2277<br>Fax +44 (0) 20 7071 9000 |
| **Scheme Adjudicator** | **US Legal Advisers** |
| John Ryan<br>17 Highfields Grove<br>Fitzroy Park<br>London<br>N6 6HN<br><br>Tel: +44 (0) 20 8348 0195<br>email: johnryanactuary@yahoo.co.uk | Morrison & Foerster LLP<br>1290 Avenue of the Americas<br>New York<br>NY 10104-0050<br>United States of America<br><br>Contact: Gary Lee or Kathleen Schaaf<br>Tel: 001 212 468 8000<br>Fax: 001 212 468 7900 |

# CONTENTS

*Page*

Key Dates and Expected Timetable                                    2

Important Notice to Potential Scheme Creditors                      4

Section I:      Explanatory Statement                               5

Section II: The Scheme                                              54

Certain expressions used in this document are defined in clause 1.1 of the Scheme on pages 57 to 63.

# IMPORTANT NOTICE TO POTENTIAL SCHEME CREDITORS

This document has been prepared in connection with a proposal in relation to separate schemes of arrangement pursuant to Part 26 of the Companies Act 2006 between Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company Limited, Progress Insurance Company Limited, GAN Assurances, QBE Insurance (Europe) Limited and the Reliance Fire and Accident Insurance Corporation Limited (individually each is referred to as a "**Scheme Company**" and together as the "**Scheme Companies**") and their respective Scheme Creditors (as defined in the Scheme of Arrangement) (the "**Scheme**").

**The Scheme proposed by each Scheme Company is in law a separate scheme of arrangement. Since the Scheme proposed by each Scheme Company is similar in terms, the provisions have been set out in one document and all Schemes are referred to simply as "the Scheme".**

For the purposes of this Scheme, Minster Management Services Limited will act as Scheme Manager and is duly authorised by the Scheme Companies to take all and any necessary steps in connection with the promotion and implementation of the Scheme. The information contained in this document has been prepared by the Scheme Companies based upon information available to them.

The statements, opinions and information contained herein are made, held or given respectively as at the date of this document, unless some other time is specified in relation to them, and the sending of this document shall not give rise to any implication that there has been no change in the facts set forth herein since such date. Nothing contained herein shall constitute any admission of any fact or liability on the part of the Scheme Companies with respect to any right or asset to which they may be entitled or any claim against them.

The summary of the principal provisions of the Scheme and related matters in the Explanatory Statement is qualified in its entirety by reference to the Scheme itself, the full text of which is set out at pages 54 to 123 of this document. Each Scheme Creditor is advised to read and consider carefully the text of the Explanatory Statement, the Appendices thereto and the Scheme itself. Reading individual sections in isolation may be misleading.

No person has been authorised by the Scheme Companies to make any representations concerning the Scheme which are inconsistent with the statements contained herein and, if made, such representations may not be relied upon as having been so authorised.

**No estimate of the amount of any claim against a Scheme Company specified in the Voting Form returned to the Scheme Manager, or otherwise provided or used for voting purposes, will be binding upon the Scheme Creditor or the Scheme Company. Any such estimate will only be used for voting purposes at the Meetings of Scheme Creditors to consider the Scheme.**

**Scheme Creditors should not construe the contents of this document as legal, tax or financial advice. Scheme Creditors should consider consulting professional advisers as to the legal, tax, financial or other relevant implications of the Scheme before taking any action in connection with it.**

# SECTION I: EXPLANATORY STATEMENT

*(in compliance with Part 26 of the Companies Act 2006)*

in relation to the separate

### SCHEMES OF ARRANGEMENT
between each of

## MINSTER INSURANCE COMPANY LIMITED

**THE CONTINGENCY INSURANCE COMPANY LIMITED**

**MALVERN INSURANCE COMPANY LIMITED**

**PROGRESS INSURANCE COMPANY LIMITED**

**GAN ASSURANCES**

**QBE INSURANCE (EUROPE) LIMITED**

**THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION LIMITED**

and their respective

### SCHEME CREDITORS
(as defined in the Scheme)

**A list of the Scheme Companies' former names under which the business included in the Schemes was written is provided at part 2 of the Explanatory Statement at pages 18 to 27.**

# INDEX TO EXPLANATORY STATEMENT

|  |  |  |  | *Page* |
|---|---|---|---|---|
| PART 1: | | LETTER FROM THE SCHEME MANAGER | | 8 |
| PART 2: | | BACKGROUND TO AND BUSINESS INCLUDED IN THE SCHEME | | 18 |
| | 2.1 | Minster Insurance Company Limited | | 18 |
| | | 2.1.1 | Company history | 18 |
| | | 2.1.2 | Relationships with other Scheme Companies | 18 |
| | | 2.1.3 | Business included in the Minster Scheme | 20 |
| | | 2.1.4 | Business excluded from the Minster Scheme | 20 |
| | | 2.1.5 | Business not covered by the Minster Scheme | 20 |
| | | 2.1.6 | Financial position of Minster | 20 |
| | 2.2 | Malvern Insurance Company Limited | | 21 |
| | | 2.2.1 | Company history | 21 |
| | | 2.2.2 | Business included in the Malvern Scheme | 21 |
| | | 2.2.3 | Business not covered by the Malvern Scheme | 21 |
| | | 2.2.4 | Financial position of Malvern | 22 |
| | 2.3 | The Contingency Insurance Company Limited | | 23 |
| | | 2.3.1 | Company history | 23 |
| | | 2.3.2 | Business included in the Contingency Scheme | 23 |
| | | 2.3.3 | Business not covered by the Contingency Scheme | 23 |
| | | 2.3.4 | Financial position of Contingency | 23 |
| | 2.4 | Progress Insurance Company Limited | | 24 |
| | | 2.4.1 | Company history | 24 |
| | | 2.4.2 | Business included in the Progress Scheme | 24 |
| | | 2.4.3 | Business not covered by the Progress Scheme | 24 |
| | | 2.4.4 | Financial position of Progress | 24 |
| | 2.5 | GAN Assurances | | 25 |
| | | 2.5.1 | Company history | 25 |
| | | 2.5.2 | Business included in GAN IA Scheme | 25 |
| | | 2.5.3 | Business not covered by the GAN IA Scheme | 25 |
| | | 2.5.4 | Financial position of GAN IA | 25 |
| | 2.6 | QBE Insurance (Europe) Limited | | 26 |
| | | 2.6.1 | Company history | 26 |
| | | 2.6.2 | Business included in the QBE Scheme | 26 |
| | | 2.6.3 | Business not covered by the QBE Scheme | 26 |
| | | 2.6.4 | Financial position of QBE | 26 |
| | 2.7 | The Reliance Fire and Accident Insurance Corporation Limited | | 27 |
| | | 2.7.1 | Company history | 27 |
| | | 2.7.2 | Business included in Reliance Scheme | 27 |
| | | 2.7.3 | Financial position of Reliance | 27 |
| | 2.8 | Directors' Interests | | 28 |
| PART 3: | | SUMMARY OF KEY SCHEME FEATURES | | 29 |
| | 3.1 | Application of the Scheme | | 29 |
| | 3.2 | Proceedings by Scheme Creditors | | 29 |
| | 3.3 | Currency of Payment | | 29 |
| | 3.4 | Determination of Scheme Claims | | 29 |
| | 3.5 | The Scheme Adjudication Procedure | | 30 |

|  |  | *Page* |
|---|---|---|
| 3.6 Determination Notices | | 31 |
| 3.7 Extension of Time Limits | | 32 |
| 3.8 Provision of Assistance | | 32 |
| 3.9 Set Off and Security | | 33 |
| 3.10 Treatment of Agents, Underwriting Agents, Lloyd's Syndicates and Pools | | 33 |
| 3.11 Funding | | 33 |
| 3.12 Payment of Ascertained Claims | | 33 |
| 3.13 Scheme Office Holders | | 34 |
| 3.14 The Board | | 35 |
| 3.15 Reversion to Run-Off | | 35 |
| 3.16 Termination of the Scheme | | 36 |
| 3.17 Insolvency Event | | 36 |
| 3.18 General Scheme Provisions | | 36 |
| **PART 4: APPENDICES TO THE EXPLANATORY STATEMENT** | | 37 |
| APPENDIX 1: DOCUMENTS AVAILABLE FOR INSPECTION | | 37 |
| APPENDIX 2: CURRICULUM VITAE OF THE SCHEME ADJUDICATOR | | 38 |
| APPENDIX 3: CURRICULUM VITAE OF THE INDEPENDENT VOTE ASSESSOR | | 40 |
| APPENDIX 4: CURRICULUM VITAE OF THE SCHEME ADVISER | | 41 |
| APPENDIX 5: EFFECTS OF US CHAPTER 15 INJUNCTIVE RELIEF | | 42 |
| APPENDIX 6: BUSINESS INCLUDED IN THE MINSTER SCHEME | | 44 |
| APPENDIX 7: BUSINESS INCLUDED IN THE MALVERN SCHEME | | 47 |
| APPENDIX 8: BUSINESS INCLUDED IN THE CONTINGENCY SCHEME | | 49 |
| APPENDIX 9: BUSINESS INCLUDED IN THE PROGRESS SCHEME | | 50 |
| APPENDIX 10: BUSINESS TRANSFERRED FROM PROGRESS TO MINSTER | | 51 |
| APPENDIX 11: BUSINESS INCLUDED IN THE QBE SCHEME | | 52 |
| APPENDIX 12: BUSINESS INCLUDED IN THE RELIANCE SCHEME | | 53 |

# PART 1

# LETTER FROM THE SCHEME MANAGER

# MINSTER INSURANCE COMPANY LIMITED

| | |
|---|---|
| **THE CONTINGENCY INSURANCE COMPANY LIMITED** | **MALVERN INSURANCE COMPANY LIMITED** |
| **PROGRESS INSURANCE COMPANY LIMITED** | **GAN ASSURANCES** |
| **QBE INSURANCE (EUROPE) LIMITED** | **THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION LIMITED** |

4 November 2009

To all potential Scheme Creditors

## 1.1    Introduction

This Explanatory Statement, of which this letter forms part, explains the effect of the schemes of arrangement (the "**Scheme**") for which the Scheme Companies propose to seek the sanction of the High Court of Justice of England and Wales, subject to the necessary majorities having been obtained at Meetings of Scheme Creditors (as defined in the Scheme) convened to consider the Scheme.

The Scheme proposed by each Scheme Company is in law a separate scheme of arrangement. Since the Scheme proposed by each Scheme Company is materially identical, the provisions have been set out in one document, and all Schemes are referred to simply as "the Scheme".

We believe that you are or may be a Scheme Creditor of one or more of the Scheme Companies and accordingly entitled to vote on the Scheme at the forthcoming Meetings of Scheme Creditors at which the Scheme proposals will be formally submitted to Scheme Creditors for their approval. You should have received Notice of the Meetings under the covering letter which encloses this document. The Meetings are scheduled to take place on 18 January 2010 at Barlow, Lyde & Gilbert LLP, Beaufort House, 15 St. Botolph Street, London EC3A 7NK, United Kingdom at 11.00 a.m. (GMT).

This Explanatory Statement contains background information in relation to the Scheme Companies and the business to be included in the Scheme. It also contains background information about the Scheme, its main provisions and its key effects.

The Scheme itself is set out in full on pages 54 to 89 of this document. Unless otherwise indicated, capitalised terms defined in the Scheme have the same meaning when used in this letter and the Explanatory Statement. **Please note that the Explanatory Statement is a guide and should not be relied on in place of reading the Scheme itself.**

Based on each of the Scheme Companies' most recent audited balance sheets, each Scheme Company considers that it will be able to meet all of its liabilities in full as and when those liabilities become due and payable and that Scheme Creditors should be offered the opportunity of agreeing to a scheme of arrangement which will have the effect of concluding each Scheme Company's run-off of its business, and making payments accordingly, earlier than would otherwise be the case.

## 1.2 What is a Scheme of Arrangement?

Under English law, a scheme of arrangement of the kind proposed by each Scheme Company is a compromise or arrangement provided for by Part 26 of the Companies Act 2006, to take effect between a

company and its creditors (or any class of them), which becomes legally binding on the company and on all the creditors to whom it applies if:

- a majority in number representing not less than 75 per cent. in value of each class of creditors, present and voting in person or by proxy, vote in favour of it at meetings convened with the leave of the Court;

- the Court subsequently sanctions the compromise or arrangement; and

- an office copy of the order of the Court to that effect is delivered to the Registrar of Companies in England and Wales for registration.

Once a Scheme Company's Scheme becomes effective it will bind the Scheme Creditors of that Scheme Company, irrespective of whether or not they voted in favour of that Scheme, or at all.

### 1.3 Who will be Affected?

You have been sent this document because we believe that you may be affected by the proposed Scheme. The Scheme is proposed between each Scheme Company and its respective Scheme Creditors. The term "Scheme Creditor" is defined as a creditor of a Scheme Company in respect of any Liability in respect of Scheme Business as set out in Schedule 1 to the Scheme. Further detail of Scheme Business is given in Part 2 of this document.

**For the avoidance of doubt, if the Scheme is sanctioned all Scheme Creditors, including all those not domiciled in the United Kingdom, will be bound by the terms of the Scheme in the United Kingdom (and in the United States if Chapter 15 protection is obtained).**

### 1.4 Which Business is Included in the Scheme?

The Scheme relates to <u>all</u> of the insurance and reinsurance business of the following Scheme Companies (other than in respect of certain specific excluded business as detailed below):

- Minster Insurance Company Limited ("**Minster**")

- Malvern Insurance Company Limited ("**Malvern**")

- The Contingency Insurance Company Limited ("**Contingency**")

- Progress Insurance Company Limited ("**Progress**")

The Scheme also relates to <u>certain</u> business underwritten by the following Scheme Companies, which was placed via agency agreements with either Minster, Malvern, Robt. Bradford & Company Limited or Robt. Bradford & Company (Agencies) Limited and which is currently administered by Minster Management Services Limited:

- GAN Assurances ("**GAN IA**")

- QBE Insurance (Europe) Limited ("**QBE**")

- The Reliance Fire and Accident Insurance Corporation Limited ("**Reliance**")

Scheme Creditors should note that the following liabilities are <u>excluded</u> from the scope of the Scheme:

(a) Liabilities in relation to brokerage or legal and other costs owed by a Scheme Company (other than those for which a policyholder is entitled to claim pursuant to the terms of a policy included within the scope of the Scheme);

(b) Previously Agreed Liabilities, being Liabilities that are fixed or liquidated amounts which on or prior to the Effective Date have been agreed between the Scheme Creditor and the Scheme Company in the ordinary course of business and recorded in that Scheme Company's ledger as due and payable but which have not then been paid;

(c) Aviation business underwritten on behalf of Minster by Westminster Insurance Agencies Limited trading as Westminster Aviation Insurance Group ("WAIG") from 1993 to 1998;

(d) Non-proportional treaty reinsurance business underwritten on behalf of Minster by Donald Fox & Partners (Underwriting Management) Limited (now Ridgwell Fox & Partners (Underwriting Management) Limited) from 1978 to 1980;

(e) Business underwritten on behalf of Minster as an underwriting agent by Alexander Howden & Company Limited from 1946 to 1952;

(f) Marine business underwritten on behalf of Minster by The London Assurance from 1946 to 1983.

Scheme Creditors should be aware that Minster, GAN IA and QBE Insurance Company (UK) Limited ("**QBE UK**") (the company which originally accepted the QBE Scheme Business) were formerly known by other names, as set out in Part 2 of this document. Scheme Creditors' contracts of insurance, reinsurance and/or retrocession may therefore refer to any of those names.

**For a more detailed description of the Scheme Business and an explanation as to why certain business has been excluded from the ambit of the Scheme, we refer you to "Part 2: Background to and business included in the Scheme" on page 18 of this Document.**

To assist Scheme Creditors, the Scheme Manager has made policy information available to Scheme Creditors on the Website located at www.minsterins.co.uk. An explanation of how this policy information may be accessed is given below at paragraph 1.12 "The Website". You may also wish to ask your broker, who should have access to a copy of this document, for further details of your possible involvement with the Scheme Companies.

As Previously Agreed Liabilities are not within the scope of the Scheme, it is not *necessary* to notify the Scheme Companies of them on a Claim Form before the Final Claims Submission Date. Scheme Creditors are nevertheless urged to notify any Previously Agreed Liabilities and identify them as such on their Claim Forms, with a view to facilitating and accelerating the processing of those claims.

### 1.5 When do the Schemes Become Effective?

The Scheme of each Scheme Company will become effective only if a majority in number representing not less than 75 per cent. in value of its Scheme Creditors vote in favour of the Scheme at each of the Meetings, and the necessary Court order sanctioning the Scheme is then subsequently obtained and delivered for registration to the Registrar of Companies in England and Wales.

For the purposes of this letter, references to the "Scheme" assume that one or more of the Scheme Companies' Schemes becomes effective.

### 1.6 The Main Advantages of the Scheme

The Scheme Companies have discussed the main proposals of the Scheme with a number of Scheme Creditors and have taken account of their views along with those of their advisers and others experienced in schemes of arrangement. The Scheme has been drafted to take account of concerns raised where possible. Furthermore, a near-final draft of this Explanatory Statement and the Scheme was provided to the Wholesale Insurance Department at the Financial Services Authority (the "**FSA**"), which has confirmed that it does not object to the proposals contained in the Scheme.

The Scheme Companies consider that the Scheme will be advantageous to their Scheme Creditors for the following main reasons:

(1) *Early payment*

The Scheme should enable Scheme Creditors to have their Scheme Claims agreed or determined as Ascertained Claims and paid in full considerably sooner than if the run-off of the Scheme Companies were to continue and claims paid in the ordinary course. It is anticipated that payments to Scheme

Creditors with Ascertained Claims will commence within one month of the Final Claims Submission Date;

*(2)* *No discount for early payment*

As part of the Scheme, the Scheme Companies are committing to paying Scheme Claims which are finally agreed or determined under the Scheme without discount for the time value of money, except in situations where no risk or only limited risk is being passed back to the Scheme Creditor. In most cases, therefore, Scheme Creditors are expected to receive what is in effect a premium over and above the true value of their Scheme Claims in today's monetary terms;

*(3)* *Certainty and costs savings*

The Scheme will enable Scheme Creditors to achieve finality in respect of the Scheme Business. Any concerns which Scheme Creditors may have over the continuation of a Scheme Company's run-off or over the long-term future solvency of a Scheme Company will be removed. Scheme Creditors will also benefit from the reduced costs in administering their Scheme Claims against the Scheme Companies over a lengthy period.

The Scheme Companies have sought to expedite the claims submission and determination process in the following ways:

*(a)* *Practical claims submission process*

Scheme Creditors will have access to a password-protected Website which will provide details of known Insurance Contracts which relate to that Scheme Creditor (of which the Scheme Companies are aware having regard to their computer records). These policy details will be available to Scheme Creditors to assist them with the submission of a Claim Form under the Scheme;

*(b)* *Simplified claims agreement process*

The Scheme will provide a practical and cost-effective process for agreeing all present and future Scheme Claims. The Estimation Guidelines describe in detail the approach that the Scheme Manager and the Scheme Company would expect Scheme Creditors to follow in valuing Scheme Claims and are set out in Schedule 2 of the Scheme. In the event that agreement cannot be reached between the Scheme Manager and a Scheme Creditor in relation to a given Scheme Claim then the Scheme provides for the final determination of that Scheme Claim in accordance with the dispute resolution procedure in what is intended to be an independent and efficient manner. The determination of the Scheme Adjudicator will be binding so far as English law permits;

*(c)* *Proceedings*

The Scheme will enable Scheme Claims to be dealt with quickly without protracted litigation as it prohibits (without the prior written consent of the relevant Scheme Company) the commencement or continuation of any proceedings outside the mechanisms of the Scheme, where the purpose of such proceedings is to establish the existence or quantum of a Scheme Claim or to obtain payment of a Scheme Claim.

## 1.7 The Main Disadvantages of the Scheme

Scheme Creditors should also be aware of the following possible disadvantages in considering the Scheme:

(1) *Estimation*

The simplified claims agreement process has been designed to value Scheme Claims as accurately and fairly as possible. However, the process will result in Scheme Claims being estimated, which creates the risk that Scheme Creditors may receive a different amount (either more or less) in respect of their

Scheme Claims than would have been the case had the Scheme Business been run off in the traditional way;

(2) *Failure to submit a Claim Form by the Final Claims Submission Date*

The Scheme provides a mechanism for cutting off Scheme Claims. Scheme Claims notified after the Final Claims Submission Date will be deemed to have been satisfied in full and the Scheme Creditor concerned will have no further rights against the relevant Scheme Company in respect of them. The Final Claims Submission Date is necessary to enable each Scheme Company to conclude the run-off of the relevant business. To ensure as far as possible that Scheme Creditors have the opportunity to complete and lodge Claim Forms in time, the Final Claims Submission Date will be advertised, and notice of it will be posted on the Website and sent to (i) Scheme Creditors for whom contact details are available and (ii) brokers who (or whose predecessors) have been identified as having placed relevant business with the Scheme Companies;

(3) *Prohibition on Proceedings*

The Scheme prohibits the commencement or continuation of any Proceedings in order to obtain payment or establish the existence or amount of a claim in respect of Scheme Claims against the Scheme Companies without the relevant Scheme Companies' consent;

(4) *No future cover*

As a result of the Scheme, the Scheme Companies' Liability to Scheme Creditors in respect of Scheme Claims will cease and subsequent losses which may have resulted in a claim against the Scheme Companies in the ordinary course will not be covered.

These are the main advantages and possible disadvantages of the Scheme for Scheme Creditors identified by the Scheme Companies. It is impossible, however, to address each Scheme Creditor's individual circumstances, with the result that it is impossible to regard this list of advantages and disadvantages as exhaustive. Each Scheme Creditor is therefore advised to make its own assessment of how the Scheme would affect its own interests. The Scheme Companies consider that the main advantages referred to above outweigh the possible disadvantages.

## 1.8 What will happen after the Scheme becomes Effective?

Once the Scheme becomes effective, the Scheme Manager will, within 14 days of the Effective Date, send notice that the Scheme is effective together with a Claim Form by post to all those Scheme Creditors for which it has current address details and to Brokers at their last known addresses. Such notice will also confirm the Final Claims Submission Date and call for all Scheme Creditors to submit their Scheme Claims by the Final Claims Submission Date. Each known Scheme Creditor may download a copy of the Claim Form which will be made available on the Website within three Business Days after the Scheme has become effective.

To assist Scheme Creditors in identifying their possible involvement with the Scheme Companies, the Scheme Manager has endeavoured to list on the Website the Insurance Contracts which relate to that Scheme Creditor (of which the Scheme Companies are aware having regard to their computer records). For the avoidance of doubt, Scheme Creditors should not regard any list of Insurance Contracts provided by the Scheme Companies as an exhaustive list of their Insurance Contracts which may be affected by the Scheme. Scheme Creditors will be required to review their individual list of contracts, making such amendments or additions to the contract details as may be necessary, Scheme Creditors should also contact their insurance broker or other intermediary to obtain details of any further contracts under which they may have a Scheme Claim against a Scheme Company.

Scheme Creditors should submit the value of their Scheme Claims against the Scheme Companies arising in relation to Scheme Business on the Claim Form, together with appropriate supporting information as described in the Guidance Notes to the Claim Form and in the Estimation Guidelines. Scheme Creditors are requested to submit their Claim Forms via post, email or fax in accordance with the instructions set out in

the Guidance Notes to the Claim Form. Claim Forms will not be accepted unless they are signed where indicated.

The Scheme Companies will also place advertisements, calling for Scheme Creditors to complete and submit Claim Forms, in the same publications and newspapers in which the Meetings are being advertised.

To seek to ensure that all Scheme Creditors are notified of the Scheme and of the action which they are required to take, notification that the Scheme has become effective, together with details of the Final Claims Submission Date, will also be sent by post to brokers and agents at their last known addresses identified by the Scheme Companies as having placed Scheme Business with the Scheme Companies or known to be acting on behalf of Scheme Creditors.

### 1.9 Submission of Claim Forms

**Scheme Creditors should note that the deadline for submitting completed Claim Forms to the Scheme Companies is the Final Claims Submission Date, being 11.59 p.m. (U.K. time) on the first Business Day falling 180 days after (and not including) the Effective Date.**

The Scheme Companies will endeavour to agree all Scheme Claims properly submitted within 60 days of the Final Claims Submission Date. Any Scheme Claims which are not agreed or otherwise determined between the Scheme Creditor and Scheme Manager in the manner and within the times prescribed in the Scheme will be referred to an independent Scheme Adjudicator. The Scheme Adjudicator will make a final determination in respect of each Disputed Claim referred to him in accordance with the procedure set out in the Scheme. Insofar as the law allows, the Scheme Adjudicator's decision will be final and there will be no right of appeal from that decision.

Once the value of a Scheme Creditor's Agreed Claims has been assessed, the Scheme Manager will send the Scheme Creditor a Determination Notice setting out its Agreed Claims and any deductions which are to be made to the Agreed Claims under the Scheme (further details at page 69). The resulting value will be that Scheme Creditor's Ascertained Claim (or Liability due to a Scheme Company, if it is a negative value). Payment of Ascertained Claims will be made in full once substantially all a Scheme Company's Scheme Creditors' Scheme Claims have been determined, although the Scheme Company may in its absolute discretion make payments to Scheme Creditors earlier than this.

It is anticipated that payments to Scheme Creditors under the Schemes in respect of Ascertained Claims will commence during 2010.

### 1.10 **Reversion to Run-Off**

Any Scheme Company may terminate its Scheme at any time before payment is made in respect of a Scheme Claim, other than early payment as provided for in the Scheme, if it determines (in the judgement of the directors of the Scheme Company, acting reasonably and taking into account the level at which they reasonably consider Scheme Claims may ultimately be agreed or otherwise determined in accordance with the Scheme) that:

- the relevant Scheme Company has been notified of Scheme Claims which will become Ascertained Claims that are materially in excess of the relevant Scheme Company's assets; or

- the continuation of the Scheme in relation to the Scheme Company will jeopardise the recovery of monies due under reinsurance treaties relating to Scheme Claims; or

- (in relation only to Minster or Malvern) the United States Bankruptcy Court has refused to grant injunctive relief under Chapter 15 of the United States Bankruptcy Code substantially in the form requested.

If this happens, any Agreed Claims or Ascertained Claims under the Scheme which have not yet been paid shall no longer be binding upon the Scheme Company or the Scheme Creditors concerned and the parties shall be restored to the position they were in prior to the commencement of the Scheme – i.e. the Scheme Company will revert to run-off and claims will once again be adjusted in the usual way in the ordinary course

of business. Ascertained Claims which have already been paid by the time the Scheme is terminated shall not be disturbed where the Scheme Creditor and Scheme Company have agreed they should remain binding notwithstanding reversion to run off.

### 1.11 Permanent Injunction Order Under Chapter 15 of the United States Bankruptcy Code

Provided that the Court sanctions the Scheme, Minster and/or Malvern may apply for permanent injunctive relief from the United States Bankruptcy Court under Chapter 15 of the United States Bankruptcy Code. The Minster and/or Malvern Scheme will remain in force under English law irrespective of the outcome of the Chapter 15 application although it may revert to run off as noted above. The effects of this injunctive relief are described at Appendix 5 to this document.

### 1.12 The Website

The Website is already live and functional. Its principal functions are:

(1)   to make Scheme-related documentation available to Scheme Creditors; and

(2)   to provide each Scheme Creditor with details of those Insurance Contracts which relate to that Scheme Companies Scheme Creditor (of which the Scheme Companies are aware having regard to their computer records) as a guide. It is anticipated that the provision of such information will facilitate the completion of Voting Forms by Scheme Creditors for use at the Meetings and subsequent completion of Claim Forms.

Scheme Creditors may access their individual policy details on the Website by using an individual Login ID and password. Each Scheme Creditor should have received an individual Login ID with the letter sent to Scheme Creditors on 8 June 2009 to advise them that the Scheme is being promoted (the "**Practice Statement Letter**") and with the covering letter enclosing the Notice of Meetings and this and other documents.

In order to obtain its individual password, each Scheme Creditor will need to contact the Scheme Manager via email to minsterscheme@minsterins.co.uk and confirm in such email (a) the name of the Scheme Creditor; (b) the name and title of the person who will act as the contact for the Scheme Creditor; and (c) the Scheme Creditor's individual Login ID. The Scheme Creditor's password will be issued within two Business Days of the request being received.

Any Scheme Creditor who did not receive its individual Login ID with the Practice Statement Letter or with the covering letter enclosing the Notice of Meetings, this Document and other documents should contact the Scheme Manager via the same email address and confirm in such email (a) the name of the Scheme Creditor; (b) the name and title of the person who will act as the contact for the Scheme Creditor; and (c) that it did not receive its individual Login ID.

Any Scheme Creditor who, rather than use the Website, wishes to receive a paper version of Scheme-related documents by post or electronically may so request in writing to the Scheme Manager.

### 1.13 What should Scheme Creditors do Now?

**If you are a Scheme Creditor of one or more of the Scheme Companies, you are entitled to vote at the Meeting(s) of the Scheme Company or Scheme Companies against which you have Scheme Claims.**

Progress Insurance Company Limited is convening a single Meeting of Scheme Creditors to vote on its Scheme.

Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company Limited, GAN Assurances, QBE Insurance (Europe) Limited and The Reliance Fire and Accident Insurance Corporation Limited are each convening two Meetings of their Scheme Creditors to vote on their Scheme as follows:

(i)     for Scheme Creditors in relation to their Scheme Claims which are incurred but not reported ("**IBNR**") claims; and

(ii)    for Scheme Creditors in relation to their Scheme Claims which are Non-IBNR claims.

A Notice of the Meetings to be held on 18 January 2010 has been sent with this document. Scheme Creditors may attend the Meetings in person (or, if a corporation, by a duly authorised representative) or may vote by proxy. Returning the Form of Proxy will not prevent any Scheme Creditor from attending and voting in person should they wish to do so.

For the purposes of consulting upon the proposals in advance of the Meetings, those Scheme Creditors who wish to consult with other Scheme Creditors ("**Consulting Creditors**") are requested to send their contact details to the Scheme Manager at minsterscheme@minsterins.co.uk. The Scheme Manager will circulate a complete list of Consulting Creditors to other Consulting Creditors for this purpose on a weekly basis.

Enclosed with the Notice of the Meetings are a Form of Proxy and Voting Form to be used for voting at the Meetings. Details of the Insurance Contracts which relate to that Scheme Creditor (of which the Scheme Companies are aware having regard to their computer records) are available on the Website in order to assist Scheme Creditors in completing their Voting Forms. Even if Scheme Creditors intend to be present at the Meetings, they are requested to complete and sign the Form of Proxy and Voting Form in accordance with the instructions printed on the forms (and the guidance notes accompanying those forms). Returning a Form of Proxy will not prevent a Scheme Creditor from attending the Meetings in person (whereupon the Form of Proxy will be superseded), however, it does ensure that a Scheme Creditor's vote will be counted if, due to unforeseen circumstances, it is unable to attend. All Forms of Proxy and Voting Forms must be completed in English.

**Completed Forms of Proxy and Voting Forms and any supporting evidence should be returned as soon as possible, and in any event, so that they are received by 5.00 p.m. (GMT) time on 15 January 2010 by the Scheme Manager, marked for the attention of Hilary Young. Alternatively Scheme Creditors may also send their forms by email (in PDF format) of less than 5 megabytes in size to minsterscheme@minsterins.co.uk or by facsimile to +44 (0) 20 7709 5760 by 5.00 p.m. (GMT) time on 15 January 2010 provided that they are legible. A hard copy of any electronic email or facsimile must be sent to the Scheme Manager if any of the Scheme Companies or the Scheme Manager so requests. Forms of Proxy and Voting Forms may also be handed in at the registration desk prior to the commencement of the Meetings on 18 January 2010.**

### 1.14 How will the Creditors' Meetings and Vote be Conducted?

The value to be attributed for voting purposes to a Scheme Creditor's Scheme Claim will be determined by the chairman of the Meeting (the "**Chairman**"). The Chairman, who will be Jonathan Yorke, or failing him, Clive O'Connell (both partners of Barlow Lyde Gilbert LLP) will consider completed Voting Forms in order to determine the value of each Scheme Creditor's vote at the Meetings.

In addition, it is proposed that George Maher (the "**Independent Vote Assessor**") be appointed for the purposes of reviewing the values placed on Scheme Claims for voting purposes and preparing a report on the reasonableness of those values for submission to Court. If votes are received against the Scheme the Chairman will provide the Independent Vote Assessor with a list of, and certain details regarding, all votes submitted in relation to the Scheme. The direction of the vote cast will not be disclosed to the Independent Vote Assessor. The Chairman will indicate which votes, in his opinion, should be reviewed by the Independent Vote Assessor. This will include all votes against the Scheme and sufficient vote values submitted in favour of the Scheme to determine whether the necessary majority referred to in paragraph 1.5 above has been achieved along with any additional votes he requests. He will report his findings to the Chairman, who will review the values placed on the votes at each Meeting. Once the Independent Vote

Assessor has reviewed the Chairman's valuations of the estimated elements of Scheme Creditors' Scheme Claims, he shall report his findings in writing to the Chairman. The Independent Vote Assessor's report will be made available at the sanction hearing. Details of the Independent Vote Assessor's expertise are set out in his curriculum vitae at Appendix 3 to the Explanatory Statement.

The Chairman's determination shall be based on (i) the information provided by the Scheme Creditor; (ii) the information available to the Scheme Company from its existing records; (iii) advice provided to the Scheme Company by the Scheme Actuarial Adviser on the application of the principles described in the Estimation Guidelines; and (iv) the report of the Independent Vote Assessor. Account will also be taken of any known set-off, or cross-claim or deduction.

The Chairman has the power to reject a Scheme Claim, in whole or in part, for voting purposes only if he considers that it does not represent a reasonable assessment of the value of the liabilities to which it relates. The decision of the Chairman as to the value to be placed on a Scheme Claim for voting purposes is final and, where the Chairman has reduced or rejected a Scheme Creditor's assessment of the value of its Scheme Claims for voting purposes, he will, if possible, notify the relevant Scheme Creditor of such decision, and the reasons therefor, before the Meeting and, in any event, before the sanction hearing.

The amount of a Scheme Claim admitted for voting purposes will not constitute an admission of the existence or amount of any Scheme Claim and will not bind the Scheme Companies or the Scheme Creditor.

For the purposes of voting at the Meetings, Scheme Claims will be converted into Pounds Sterling at the closing mid-market rate of exchange for the relevant currency quoted by The Financial Times two Business Days prior to the Meetings.

Notification of the Schemes has also been given to those brokers and agents who have been identified by the Scheme Companies as having placed Scheme Business with the Scheme Companies or known to be acting on behalf of Scheme Creditors. The Scheme Companies urge those brokers and agents to inform their clients of the Schemes to ensure that all possible Scheme Creditors receive notice of the Schemes and of the action which they are required to take prior to and subsequent to the Meetings.

In order to assist Scheme Creditors in completing their Forms of Proxy and Voting Forms, the Scheme Manager has, in respect of each Scheme Creditor, provided details of the Insurance Contracts which relate to that Scheme Creditor (of which a Scheme Companies are aware, by reference to their computer records) on the Website. Details of how the Website may be accessed are set out above on page 14. Scheme Creditors should not regard any list of Insurance Contracts provided by the Scheme Companies as an exhaustive list of their policies which may be affected by the Scheme. Scheme Creditors should also contact their insurance broker or other intermediary to obtain details of any further contracts under which they may have a Scheme Claim against a Scheme Company.

**If you have any questions concerning your involvement with a Scheme Company or the action you are required to take, please contact the Scheme Manager or the Scheme Advisers using the contact details provided on page 2.**

### 1.15 Remuneration of the Scheme Adviser and Scheme Adjudicator

The first Scheme Adviser will be PricewaterhouseCoopers LLP and the first Scheme Adjudicator will be John Ryan, both of whom will be remunerated on a time cost basis. Neither will receive any remuneration which is referable in any way to the amounts which, under the Scheme, the Scheme Companies are required to pay in respect of Scheme Claims.

### 1.16 Recommendation for the Scheme

If a Scheme is not approved, the Scheme Business will remain in run-off and the advantages for Scheme Creditors outlined above will not arise. The Board of each Scheme Company considers that the Scheme is fair and reasonable and will be the most effective and economical method of making payment to all eligible Scheme Creditors in the shortest practicable time by permitting them to participate in the final settlement of all their Scheme Claims. Consequently, the Board of each Scheme Company considers that the Scheme is in

the best interests of both the Scheme Company and the Scheme Creditors. All Scheme Creditors who are entitled to vote are encouraged to do so.

Yours faithfully

Caspar Gilroy
*Chairman*
**Minster Management Services Limited**

# PART 2

# BACKGROUND TO AND BUSINESS INCLUDED IN THE SCHEME

## 2.1 Minster Insurance Company Limited

### 2.1.1 *Company History*

Minster Insurance Company Limited (company number 00361302) was incorporated on 18 May 1940.

Previously Minster was known by the following names:

| | |
|---|---|
| Minster Insurance Company Limited | from 18/05/1940 to 31/12/1991 |
| GAN Minster Insurance Company Limited | from 01/01/1992 to 31/12/1994 |
| GAN Insurance Company Limited | from 01/01/1995 to 31/05/2000 |
| Groupama Insurance Company Limited | from 01/06/2000 to 30/03/2003 |
| Minster Insurance Company Limited | from 31/03/2003 to present |

In 2000, Minster discontinued the underwriting of all remaining classes of business that are the subject of the proposed Scheme. Minster continued to underwrite various classes of personal and commercial business in the U.K. until March 2003. As part of an insurance business transfer in 2003, business written after 31 December 2000 was transferred to Groupama General Insurance Company Limited.

Minster was for many years a member of the Institute of London Underwriters (the "**ILU**"), a London-based market association through which member insurers transacted marine and aviation insurance and reinsurance business. Minster was required to procure the issue of a parent company guarantee to the ILU, under which the parent entity concerned would purport to guarantee the payment obligations of Minster under policies underwritten by it through the ILU. Such guarantee instruments were issued by Minster Assets Limited on 19 June 1970 and The Government of France on 23 October 1984 when it was the majority shareholder of Minster's parent company at that time. Minster Assets Limited was dissolved on 3 January 1998.

### 2.1.2 *Relationships with other Scheme Companies*

#### 2.1.2.1 *Malvern*

In 1961, Minster purchased Malvern Insurance Company Limited. Malvern remains a separate legal entity and as such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by Malvern should be submitted under the Malvern Scheme. Section 2.2 refers to business included within the Malvern Scheme.

#### 2.1.2.2 *Contingency*

In 1967, Minster purchased the parent company of The Contingency Insurance Company Limited. Contingency became a direct subsidiary of Minster in 1976. Contingency remains a separate legal entity and as such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by Contingency should be submitted under the Contingency Scheme. Section 2.3 refers to business included within the Contingency Scheme.

#### 2.1.2.3 *Progress*

In 1967, Minster purchased the parent company of Progress Insurance Company Limited. Progress became a direct subsidiary of Minster in 1977. On 1 January 1993, certain policies were transferred from Progress to Minster pursuant to Section 51 of The Insurance

Companies Act 1982 which are included in the Minster Scheme. The policies transferred are listed at Appendix 10 to the Explanatory Statement. All other policies remained with Progress.

Progress remains a separate legal entity and as such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by Progress that were not part of the transfer mentioned above should be submitted under the Progress Scheme. Section 2.4 refers to business included within the Progress Scheme.

### 2.1.2.4 *GAN IA*

Minster and Malvern provided underwriting and claims services through pooling arrangements and underwriting agreements for GAN Assurances. This included a joint stamp with Minster, a joint stamp with Malvern, joint stamps with Minster and Malvern, and an independent GAN IA stamp.

Effective from 31 March 1993, all rights and obligations under all policies co-written by Minster and GAN IA on a co-insurance basis and which were entered into prior to 31 December 1992 and impose on the insurers obligations the performance of which constitutes the carrying on of insurance business in the U.K. were transferred to Minster pursuant to Section 51 of The Insurance Companies Act 1982. This business is included within the Minster Scheme, as further described in 2.1.7 below.

All business accepted solely on behalf of GAN IA by Malvern or underwritten under a joint stamp with Malvern was reinsured 100 per cent. to Minster with effect from 31 March 1993. GAN IA remains a separate legal entity, and Scheme Creditors of GAN IA in relation to Scheme Business may not be Scheme Creditors of Minster for the same Scheme Claim. As such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by GAN IA that were not subject to the transfer listed above should be submitted under the GAN IA Scheme. Section 2.5 refers to business included within the GAN IA Scheme.

### 2.1.2.5 *QBE*

Robt. Bradford & Company Ltd and subsequently Robt. Bradford & Company (Agencies) Limited provided an underwriting and claims service through pooling arrangements and underwriting agreements for Iron Trades Mutual Insurance Company Limited (now QBE Insurance Company (UK) Limited) from 1952 to 1960 which service was later assumed by Minster. The QBE Scheme Business was transferred to QBE Insurance (Europe) Limited on 31 December 2005 under a transfer pursuant to Part VII of the Financial Services and Markets Act 2000. Although this business continues to be administered by Minster, QBE remains a separate legal entity and continues to settle claims in relation to this business. As such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by QBE under this arrangement should be submitted under the QBE Scheme. Section 2.6 refers to business included within the QBE Scheme.

### 2.1.2.6 *Reliance*

Robt. Bradford & Company Ltd and subsequently Robt. Bradford & Company (Agencies) Limited provided an underwriting and claims service through pooling arrangements and underwriting agreements for Reliance from 1952 to 1960 which service was later assumed by Minster.

Although this business continues to be administered by Minster and Minster settles claims in relation to this business, Reliance remains a separate legal entity. As such, for the purposes of the proposed Scheme, all Scheme Claims in relation to Scheme Business written by Reliance under this arrangement should be submitted under the Reliance Scheme. Section 2.7 refers to business included within the Reliance Scheme.

### 2.1.3 *Business included in the Minster Scheme*

**All insurance and reinsurance business remaining in Minster is included in the Minster Scheme, other than the excluded business referred to in paragraph 2.1.4 below.**

To assist creditors in identifying the relevant Insurance Contracts included in the Minster Scheme, a description of business written under each former company name to the knowledge of the Scheme Company is provided at Appendix 6.

### 2.1.4 *Business Excluded from the Minster Scheme*

The business summarised below is excluded from the Minster Scheme. This business is not administered by the Scheme Manager and has been reinsured by other companies who now handle the liabilities directly with the policyholders.

- Aviation business underwritten on behalf of Minster by Westminster Insurance Agencies Limited trading as Westminster Aviation Insurance Group ("WAIG") from 1993 to 1998;

- Non-proportional treaty reinsurance business underwritten on behalf of Minster by Donald Fox & Partners (Underwriting Management) Limited (now Ridgwell Fox & Partners (Underwriting Management) Limited) from 1978 to 1980;

- Business underwritten on behalf of Minster as an underwriting agent by Alexander Howden & Company Limited between 1946 to 1952;

- Marine business underwritten on behalf of Minster by The London Assurance from 1946 to 1983;

- All reinsurance of Reliance's business made under the contract between Minster and Reliance dated 22 August 1995.

### 2.1.5 *Business not Covered by the Minster Scheme*

For the avoidance of doubt, the business summarised below is not covered by the Minster Scheme as it has been previously transferred to other insurance companies, and therefore no longer represents a liability of Minster.

- Personal lines business and certain commercial insurance business of Minster, which was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama General Insurance Company Limited (company number 995253) on 21 March 2003. This covered all insurance business underwritten by Minster with the exclusion of:

    - London Market business;

    - General insurance business underwritten in an EEA state other than the United Kingdom;

    - All long term life assurance business transferred to Permanent Insurance Company Limited at 1 January 1982.

- The whole or part of a policy of insurance underwritten by Minster to the extent that it insures liabilities as set out in the glossary of the FSA handbook as at 24 August 2006 under "liability subject to compulsory insurance" to the extent that the state of risk in respect of each policy or part policy is the United Kingdom. This was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama Insurance Company Limited (company number 995253) on 30 January 2008.

### 2.1.6 *Financial Position of Minster*

The last audited financial statements of Minster were for the year ended 31 December 2008 in which the Board was of the opinion that Minster was solvent and would be able to meet its liabilities in full. The Board considers that this is still the case and will remain so following implementation of the Scheme. These financial statements are available for inspection (see Appendix 1).

## 2.2 Malvern Insurance Company Limited

### 2.2.1 *Company History*

Malvern Insurance Company Limited (company number 00529341) was incorporated on 18 February 1954. In December 1961, Malvern was purchased by Minster.

Previously Malvern was known by the following names:

| | |
|---|---|
| Malvern Insurance Company Limited | from 18/02/1954 to 31/12/1992 |
| Touchline Insurance Company Limited | from 01/01/1993 to 30/03/2003 |
| Malvern Insurance Company Limited | from 31/03/2003 to present |

By 2000, Malvern discontinued the underwriting of all remaining classes of business subject to the proposed Scheme. Therefore all Scheme Business of Malvern has effectively been in run-off since 2000.

Malvern was for many years a member of the Institute of London Underwriters (the "**ILU**"), a London-based market association through which member insurers transacted marine and aviation insurance and reinsurance business. Malvern was required to procure the issue of a parent company guarantee to the ILU, under which the parent entity concerned would purport to guarantee the payment obligations of Malvern under policies underwritten by it through the ILU. Such guarantee instruments were issued by Minster Assets Limited on 19 June 1970 and the Government of France on 23 October 1984. Minster Assets Limited was dissolved on 3 January 1998.

### 2.2.2 *Business included in the Malvern Scheme*

**All insurance and reinsurance business remaining in Malvern is included in the Malvern Scheme.**

To assist creditors in identifying the relevant Insurance Contracts included in the Malvern Scheme, a description of business written under each former company name to the knowledge of the Scheme Company is provided at Appendix 7.

### 2.2.3 *Business not Covered by the Malvern Scheme*

For the avoidance of doubt, the business summarised below is not covered by the Malvern Scheme as it has been previously transferred to other insurance companies, and therefore no longer represents a liability of Malvern.

- The whole or part of a policy of insurance underwritten by Malvern to the extent that it insures liabilities as set out in the glossary of the FSA handbook as at 24 August 2006 under "liability subject to compulsory insurance" to the extent that the state of risk in respect of each policy or part policy is the United Kingdom. This was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama Insurance Company Limited (company number 995253) on 30 January 2008.

- All motor insurance policies underwritten by Malvern where the state of risk is Ireland, which was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama Insurance Company Limited (company number 995253) on 30 January 2008.

- All contracts of insurance (excluding general insurance business underwritten in an EEA state other than the United Kingdom) effected by Malvern since 31 December 1992. This was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama Insurance Company Limited (company number 995253) on 21 March 2003.

- All assets and liabilities of Malvern relating to its activities in Belgium were transferred to GAN Belgium with effect from 1 January 1989.

### 2.2.4 *Financial Position of Malvern*

The last audited financial statements of Malvern were for the year ended 31 December 2008 in which the Board was of the opinion that Malvern was solvent and would be able to meet its liabilities in full. The Board considers that this is still the case and will remain so following implementation of the Scheme. These financial statements are available for inspection (see Appendix 1).

## 2.3 The Contingency Insurance Company Limited

### 2.3.1 *Company History*

The Contingency Insurance Company Limited (company number 00150422) was incorporated on 13 May 1918. In 1967, Minster purchased the parent company of Contingency. Contingency became a direct subsidiary of Minster in 1976 and remains a wholly owned subsidiary of Minster.

In 1969, Contingency discontinued the underwriting of new and renewal business in the U.K. The company continued to provide a reinsurance of fire and accident and aviation business underwritten by Minster until 1974, and underwrote non-U.K. business through various agencies as listed below until 1993. Contingency also continued to underwrite business through its branch in France until 2000, which was subsequently transferred to a third party. Contingency has therefore been in run-off since 1993.

### 2.3.2 *Business included in the Contingency Scheme*

**All insurance and reinsurance business remaining in Contingency is included in the Contingency Scheme.**

To assist creditors in identifying the relevant Insurance Contracts included in the Contingency Scheme, a description of business written under each former company name to the knowledge of the Scheme Company is provided at Appendix 8.

### 2.3.3 *Business not Covered by the Contingency Scheme*

For the avoidance of doubt, the business summarised below is not covered by the Contingency Scheme as it has been previously transferred to other insurance companies and therefore no longer represents a liability of Contingency.

- All life assurance business transferred to Permanent Insurance Company Limited at 1 January 1982.

- Business underwritten by Contingency's former Canadian branch, which was transferred to GAN Canada Insurance Company in 1988.

- Business underwritten by Contingency's former French branch, which was transferred to GAN Eurocourtage on 11 August 2000.

- The whole or part of a policy of insurance underwritten by Contingency to the extent that it insures liabilities as set out in the glossary of the FSA handbook as at 24 August 2006 under "liability subject to compulsory insurance" to the extent that the state of risk in respect of each policy or part policy is the United Kingdom. This which was transferred under Part VII of the Financial Services & Markets Act 2000 to Groupama Insurance Company Limited (company number 995253) on 1 January 2008.

### 2.3.4 *Financial Position of Contingency*

The last audited financial statements of Contingency were for the year ended 31 December 2008 in which the Board was of the opinion that Contingency was solvent and would be able to meet its liabilities in full. The Board considers that this is still the case and will remain so following implementation of the Scheme. These financial statements are available for inspection (see Appendix 1).

### 2.4 Progress Insurance Company Limited

#### 2.4.1 *Company History*

Progress Insurance Company Limited (company number 00330724), was incorporated on 14 August 1937. In 1967, Minster purchased the parent company of Progress. Progress became a direct subsidiary of Minster in 1977 and remains a wholly owned subsidiary of Minster.

In 1958, the directors of Progress discontinued the underwriting of new and renewal business, other than certain reinsurance cessions from other Minster group companies which carried on until 1974.

#### 2.4.2 *Business included in the Progress Scheme*

**Progress only underwrote reinsurance business, and all reinsurance business remaining in Progress is included in the Progress Scheme.**

To assist creditors in identifying the relevant Insurance Contracts included in the Progress Scheme, a description of business written under each former company name to the knowledge of the Scheme Company is provided at Appendix 9.

#### 2.4.3 *Business not Covered by the Progress Scheme*

For the avoidance of doubt, the business summarised in the table below is not covered by the Progress Scheme as it has been previously transferred to other insurance companies and therefore no longer represents a liability of Progress.

- Certain non-marine policies with outstanding losses at 1 January 1993 transferred to Minster (see Appendix 10) which are included in the Minster Scheme.

#### 2.4.4 *Financial Position of Progress*

The last statutory accounts of Progress were for the year ended 31 December 2008 in which the Board was of the opinion that Progress was solvent and would be able to meet its liabilities in full. The Board considers that this is still the case and will remain so following implementation of the Scheme. These financial statements are available for inspection (see Appendix 1).

## 2.5 GAN Assurances

### 2.5.1 *Company History*

GAN Assurances was incorporated in the Republic of France and registered at the Registre National du Commerce et des Sociétés with company registration number 542 063 797. It is authorised by the French Regulator to underwrite non-life insurance business.

Previously GAN IA was known by the following names:

| | |
|---|---|
| GAN Incendie Accidents | from pre-1982 to 29/06/2001 |
| GAN Assurances IARD | from 29/06/2001 to 31/12/2009 |
| GAN Assurances | from 31/12/2009 to present |

GAN IA was admitted as an Associate member of the Institute of London Underwriters ("**ILU**") in 1981.

### 2.5.2 *Business Included in the GAN IA Scheme*

- All business written by GAN IA through the ILU on a joint underwriting stamp with Malvern (apportioned 97 per cent. Malvern and 3 per cent. GAN) from 1982 to 1985.

- All business written by GAN IA through the ILU on an underwriting stamp in the name of GAN IA alone from 1982 to 1994.

### 2.5.3 *Business not Covered by the GAN IA Scheme*

For the avoidance of doubt, the GAN IA Scheme does not include GAN IA's interest in policies of insurance co-written by Minster and GAN IA on a co-insurance basis before 1 January 1993. Such business was previously transferred to Minster in 1993 and is included in the Minster Scheme.

### 2.5.4 *Financial Position of GAN IA*

The last audited financial statements of GAN IA were for the year ended 31 December 2008 in which the Board was of the opinion that GAN IA was solvent and would be able to meet its liabilities in full. The Company considers that this is still the case and will remain so following implementation of the Scheme. These financial statements are available for inspection (see Appendix 1).

## 2.6 QBE Insurance (Europe) Limited

### 2.6.1 *Company History*

QBE is an insurance company incorporated in England on 14 October 1983.

The QBE Scheme Business was transferred to QBE by QBE UK on 31 December 2005 under a transfer pursuant to Part VII of the Financial Services and Markets Act 2000.

QBE UK originally wrote the QBE Scheme Business and was previously known by the following names:

| | |
|---|---|
| Iron Trades Mutual Insurance Company Limited | 14/01/1946 to 31/12/1989 |
| Iron Trades Insurance Company Limited | 31/12/1989 to 31/10/2003 |
| QBE Insurance Company (UK) Limited | 31/10/2003 to present |

### 2.6.2 *Business included in the QBE Scheme*

All general non-marine insurance business written on behalf of QBE UK jointly with Minster and Reliance by Robt. Bradford & Company Limited and Robt. Bradford & Company (Agencies) Limited from 1952 to 1960.

### 2.6.3 *Business not Covered by the QBE Scheme*

For the avoidance of doubt, the QBE Scheme does not relate to any business underwritten by The Chester Street Employers Association Limited (formerly The Iron Trades Employers Insurance Association Limited) or Chester Street Insurance Holdings Limited (formerly Iron Trades Holdings Limited).

### 2.6.4 *Financial Position of QBE*

The last audited financial statements of QBE were for the year ended 31 December 2008 in which the Board was of the opinion that QBE was solvent and would be able to meet its liabilities in full. The Company considers that this is still the case and will remain so following implementation of the Scheme. The financial statements are available for inspection (see Appendix 1).

### 2.7 The Reliance Fire and Accident Insurance Corporation Limited

#### 2.7.1 *Company History*

The Reliance Fire and Accident Insurance Corporation Limited (company number 00089255) was incorporated in England on 25 June 1906.

Robt. Bradford & Company Limited and subsequently Robt. Bradford & Company (Agencies) Limited provided an underwriting and claims service through pooling arrangements and underwriting agreements for The Reliance Fire and Accident Insurance Corporation Limited from 1952 to 1960 which service was later assumed by Minster.

#### 2.7.2 *Business included in the Reliance Scheme*

All insurance and reinsurance business written on behalf of Reliance jointly with Minster and QBE UK (formerly Iron Trades Mutual Insurance Company and Iron Trades Insurance Company Limited) by Robt. Bradford & Company Limited and Robt. Bradford & Company (Agencies) Limited from 1952 to 1960.

#### 2.7.3 *Financial Position of Reliance*

The last audited financial statements of Reliance were for the year ended 31 December 2008 which state that Reliance's capital resources are less than its minimum Capital Resource Requirement, and this is being monitored by the Directors who keep the FSA appraised of the financial position as appropriate. The financial statements are available for inspection (see Appendix 1).

## 2.8 Directors' Interests

James Saitch, Chief Executive Officer of all of the Minster Group Companies except Progress, has an interest in the outcome of the Scheme as he is entitled to a fixed financial bonus payable upon completion of certain stages of the Scheme process. Mr. Saitch will not receive any remuneration which is referable in any way to the amounts which, under the Scheme, the Scheme Companies are required to pay in respect of Scheme Claims.

Caspar Gilroy is a director of the Minster Group Companies. Mr. Gilroy owns 0.99 per cent. of Minster and companies controlled by Mr. Gilroy ultimately own a further 6.67 per cent. of the beneficial interest in the Minster Group Companies. Mr. Gilroy does, therefore, have an interest in the final scheme outcome in that any surplus funds remaining in Minster or its subsidiary Scheme Companies following completion of the Schemes is intended to be released upwards to each company's shareholder, either Mr. Gilroy or a company of which he is a director or indirect shareholder.

# PART 3

# SUMMARY OF KEY SCHEME FEATURES

The Scheme is set out in full in Section II of this document at pages 54 to 89. Its key features are explained below. Defined terms are the same as those used in the Scheme and are set out on pages57 to 63 of this document. This Explanatory Statement should not be relied upon as a substitute for reading the Scheme provisions themselves.

3.1 **Application of the Scheme**

The Scheme will apply to any claim against the Scheme Company that is a Scheme Claim (a Liability owed by a Scheme Company to a Scheme Creditor in respect of Scheme Business). Excluded Liabilities (which are liabilities of the Scheme Company to its legal and professional representatives, Previously Agreed Liabilities, and Liabilities in respect of business not included in the Scheme), and the Scheme Company's Liabilities other than Scheme Claims, are not subject to the Scheme. **(Clause 2.1)**

3.2 **Proceedings by Scheme Creditors**

3.2.1 Following implementation of the Scheme, Scheme Creditors will not be permitted to institute or continue any proceedings against the Scheme Company or its property in respect of any Scheme Claim. If a Scheme Creditor breaches the prohibitions on proceedings it shall be treated as having received an advance payment from the Scheme equal to the value of the benefit it derived from those proceedings. If the benefit derived from those proceedings is greater than any payment due under the Scheme the balance will become a debt due for immediate payment by the Scheme Creditor and will carry interest. **(Clauses 2.2 and 2.3)**

3.2.2 The Scheme does not prevent the Scheme Company from instituting or continuing any proceedings against a Scheme Creditor. **(Clause 2.2.3)**

3.2.3 For limitation purposes time will stand still in respect of Scheme Claims from the Effective Date, recommencing should the business of the Scheme Company revert to run-off or an insolvency event occur in respect of the Scheme Company. **(Clause 2.2.6)**

3.3 **Currency of Payment**

Scheme Creditors will be paid in the Relevant Currency (Euros, Pounds Sterling or U.S. Dollars) of their Scheme Claim. If their Scheme Claim is in another currency it will be paid in the Relevant Currency in which the largest aggregate of the Scheme Creditor's Agreed Claims is denominated and converted at the Exchange Rate (the rate applying at the month end preceding the date of the Determination Notice). **(Clause 2.6)**

3.4 **Determination of Scheme Claims**

3.4.1 Scheme Claims will be valued as at 31 December 2008. **(Clause 3.1)**

3.4.2 The Scheme will become effective on the date the court order sanctioning the Scheme is delivered to the Registrar of Companies. **(Clause 10.1)**

3.4.3 The Scheme Manager will notify Scheme Creditors and place adverts in the same publications as advertisements of the Meetings are being placed that the Scheme has become effective within 14 days thereof. The notices and adverts will confirm the Final Claims Submission Date (approximately 180 days after the Scheme becomes effective) and the notice will enclose a Claim Form and instructions on how to complete it. The advert will give instructions as to how Claim Forms can be accessed via the Website or obtained in hard copy. **(Clauses 3.2.1 and 3.2.2)**

3.4.4 Using an individual login ID and password, Scheme Creditors will be able to access the Scheme, additional copies of the Claim Form, and other documents on the Website, and to view the Insurance Contracts which relate to that Scheme Creditor of which the Scheme Company is aware (such

information being a guide only). The Scheme Manager will send a hardcopy of any of the documents available on the Website to any Scheme Creditor upon written request. Claim Forms will not be capable of being submitted on the Website. Completed Claim Forms will need to be submitted by Post, fax or email as detailed in the Guidance Notes to the Claim Form. **(Clauses 3.2.3 to 3.2.6, and 3.3.1)**

3.4.5 Each Scheme Creditor must submit with its Claim Form information relating to its Scheme Claims, details of brokers who placed the business and the specific amount claimed for each Non-IBNR Claim and IBNR Claim including any Admissible Interest claimed. **(Clause 3.3.3)**

3.4.6 Claim Forms and supporting information must be returned to the Scheme Manager on or before the Final Claims Submission Date. Revised Claim Forms and supporting information may be submitted at any time before the Final Claims Submission Date and the last Claim Form received prior to that date shall be considered for the purposes of agreeing Scheme Claims **(Clauses 3.3.4 and 3.3.5)**

3.4.7 Any Scheme Claim not submitted by a Scheme Creditor on a Claim Form in accordance with the terms of the Scheme by the Final Claims Submissions Date shall be deemed to be fully satisfied and that Scheme Creditor shall have no further rights against the Scheme Company in respect of that Scheme Claim. **(Clause 3.4)**

3.4.8 The Scheme Manager will consider the information regarding Scheme Claims submitted by each Scheme Creditor applying the principles that are set out in the Estimation Guidelines and the Risk Loading terms as set out in the Schedules to the Scheme and deduct any sums paid in respect of that Scheme Claim since the Ascertainment Date. The Scheme Company will not be bound by or follow any unreasonable settlement between the Scheme Creditor and another insurer or reinsurer. **(Clauses 3.5.1 to 3.5.3)**

3.4.9 Within 60 days of the Final Claims Submission Date the Scheme Manager shall notify each Scheme Creditor whether it agrees with any of its Scheme Claims, in which case a Determination Notice shall be issued, or disagrees with any of its Scheme Claims, in which case the Scheme Manager will provide reasons for failing to agree the Scheme Claims and may request additional information, comments on the reasons and further information which should be supplied within 28 days of request. Once comments and any additional information requested have been supplied, the Scheme Manager will endeavour to agree the Scheme Claims within a further 28 days but may refer the Scheme Claims as Disputed Claims for determination by the Scheme Adjudicator. **(Clauses 3.5.5 and 3.5.6)**

3.4.10 If a Scheme Creditor fails to comment or supply any information requested by the Scheme Manager within 28 days then the Scheme Manager shall make a determination of the Scheme Claims as it sees fit on the available information and issue a Determination Notice. **(Clause 3.5.7)**

3.4.11 Where a Scheme Creditor's Scheme Claim has not been agreed within the timeframe at 3.4.9 above, the Scheme Manager will refer the Scheme Claim to the Scheme Adjudicator as a Disputed Claim within 14 days thereafter. **(Clause 3.5.8)**

3.4.12 As part of the Scheme, the Scheme Companies are committing to paying Scheme Claims which are finally agreed or determined under the Scheme without discount for the time value of money, except in situations where no risk or only limited risk is being passed back to the Scheme Creditor. In most cases, therefore, Scheme Creditors are expected to receive what is in effect a premium over and above the true value of their Scheme Claims in today's monetary terms. **(Schedule 3)**

## 3.5 The Scheme Adjudication Procedure

3.5.1 The Scheme Manager shall send a notice of dispute to the Scheme Adjudicator, copied to the Scheme Creditor, enclosing a copy of the relevant Claim Form and a list of any supporting evidence and any correspondence. The Scheme Adjudicator will have full access to all evidence and the Scheme Company's records and information. **(Clause 3.6.2)**

3.5.2 The Scheme Adjudicator has 21 days to notify the parties to the dispute if he requires further information or evidence or any of the parties to attend a meeting with him, such evidence or information to be supplied or such meeting held within a further 21 days of the request, failing which the Scheme Adjudicator can make his determination on the information he has available to him. **(Clauses 3.6.3 and 3.6.4)**

3.5.3 The parties to a dispute can themselves request a meeting with the Scheme Adjudicator. **(Clause 3.6.5)**

3.5.4 The Scheme Adjudicator has discretion to consult advisers including legal advisers (ordinarily the costs will be met by the Scheme Companies but the Scheme Creditor can be made to meet these costs – see 3.5.9 below). **(Clause 3.6.6)**

3.5.5 If the Scheme Adjudicator considers that he has a conflict in relation to a Disputed Claim an alternate Scheme Adjudicator can be appointed to deal with that Disputed Claim or the conflict can be waived with the consent of all parties. **(Clause 3.6.7)**

3.5.6 If any party to a dispute considers that the Scheme Adjudicator has a conflict relating to a Disputed Claim, that party has 14 days to notify the other parties and the Scheme Adjudicator of such. The Scheme Adjudicator will consider whether a conflict exists having regard to the Professional Conduct Standards of the Institute of Actuaries. If the Scheme Adjudicator considers that such a conflict exists, the Scheme Manager and relevant Scheme Creditor will attempt to agree the identity of an alternate Scheme Adjudicator. If such agreement is not reached, the Chairman of the Association of Run-off Scheme Companies will appoint an alternate Scheme Adjudicator to deal with that Disputed Claim. **(Clause 3.6.8)**

3.5.7 In determining a Disputed Claim, the Scheme Adjudicator will apply the Estimation Guidelines. **(Clause 3.6.10)**

3.5.8 Written notice of the Scheme Adjudicator's final and binding determination (to the extent permitted by law and subject to any mathematical or other manifest error) of any Disputed Claim shall be sent to the relevant parties within 28 days after the later of the referral of the Disputed Claim to him, the receipt or failure to receive further information or evidence requested or the attendance or failure to attend any meeting requested. No party shall have any right to appeal such determination except in circumstances of the Scheme Adjudicator's negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty. **(Clause 3.6.11)**

3.5.9 The Scheme Adjudicator's remuneration (calculated on a time cost basis) and other costs incurred by him in the determination of a Disputed Claim will ordinarily be met by the Scheme Company, except where the Scheme Adjudicator in his absolute discretion determines that the Scheme Creditor should reimburse some or all of those costs, which will be deducted from the Scheme Creditor's Agreed Claim with any outstanding balance being a Liability from that Scheme Creditor to the Scheme Company. **(Clauses 3.6.12 and 3.6.13)**

### 3.6 Determination Notices

3.6.1 Following the determination of a Scheme Creditor's Scheme Claims, the Scheme Manager will send a Determination Notice to the Scheme Creditor showing the Scheme Creditor's Agreed Claims and calculating the Scheme Creditor's Ascertained Claim by applying any applicable set-off (see 3.9 below), deducting any costs of determination of dispute payable by the Scheme Creditor and deducting the amount of any applicable Security or Letter of Credit from the Scheme Creditor's Agreed Claims. **(Clauses 3.7.1 and 3.7.2)**

3.6.2 Once the Scheme Manager has issued a Determination Notice to a Scheme Creditor it has 28 days from the date thereof in which to notify the Scheme Manager of:

- any objection to the amount of any Agreed Claim;

- any objection to the amount of any deduction for Scheme Adjudication costs or Security or Letter of Credit;

- any objection to any currency conversion;

but may not object to any amount that was either:

- an Agreed Claim determined by the Scheme Adjudicator;

- previously agreed by the Scheme Creditor;

- calculated by reference to Agreed Claims;

- included in a Determination Notice and the Scheme Creditor did not object to that amount at that time as provided for in the Scheme. **(Clauses 3.7.3 and 3.7.4)**

3.6.3 Where no objection at all to a Determination Notice is received within 28 days as set out at 3.6.6 and any Unagreed Liabilities have been agreed (as set out at 3.6.6 below), the Scheme Creditor's Ascertained Claim or Liability as shown on the Determination Notice shall be fixed at that amount and all parties shall be bound by this. **(Clause 3.7.5)**

3.6.4 Where an objection is received with which the Scheme Manager agrees, the Scheme Manager shall send an amended Determination Notice. **(Clause 3.7.6)**

3.6.5 Where an objection is received with which the Scheme Manager does not agree, such dispute, except for any disagreement relating to an Unagreed Liability (as defined below), shall be referred for determination by the Scheme Adjudicator (subject to any Unagreed Liability yet to be agreed) within 14 days by written notice which shall be final and binding on all parties to the extent permitted by law and subject to any mathematical or other manifest error. No party shall have right to appeal such determination except in circumstances of the Scheme Adjudicator's negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty. **(Clause 3.7.7)**

3.6.6 The Scheme Creditor must, within 28 days of the date of the Determination Notice, confirm in writing whether it agrees or disagrees with any Liability applied by way of set-off which was either not previously agreed, or not calculated by reference to Agreed Claims (an **"Unagreed Liability"**). In the event of disagreement with an Unagreed Liability, the Scheme Manager will attempt to agree the amount with the Scheme Creditor, following which a further amended Determination Notice will be sent. The Scheme Manager may recalculate the amount of an Unagreed Liability at any time prior to agreement of it and notify the Scheme Creditor of this by sending a further amended Determination Notice. **(Clauses 3.7.8 and 3.7.9)**

3.6.7 The above objection and agreement process applies to any further Determination Notice sent out by the Scheme Manager except that in such circumstances a Scheme Creditor will not be entitled to object to any item which has already been determined by the Scheme Adjudicator or which appeared in a previous Determination Notice with which it did not previously object. **(Clause 3.7.10)**

## 3.7 Extension of Time Limits

3.7.1 The Scheme Manager, in consultation with the Scheme Adviser, has absolute discretion to extend any time period relating to the determination of Scheme Claims or the payment of Ascertained Claims, except for those relating to the Scheme Adjudication Process which the Scheme Adjudicator has an absolute discretion to extend for any or all Scheme Creditors and/or Scheme Claims. The Final Claims Submission Date cannot be extended. **(Clause 3.8)**

## 3.8 Provision of Assistance

3.8.1 Scheme Creditors will provide all reasonable assistance requested in connection with the Scheme or the recovery of any Property of or owed to the Scheme Company, including enforcing obligations owed to the Scheme Company. The Scheme Company shall also provide all reasonable assistance

requested by the Scheme Adviser, Scheme Actuarial Adviser or Scheme Adjudicator in connection with the Scheme. **(Clause 3.9)**

## 3.9 Set-Off and Security

3.9.1 Set-off shall be applied in respect of mutual credits, mutual debts or other mutual dealings between the Scheme Company and any Scheme Creditor to set-off its aggregate Agreed Claims against its Liabilities to the Scheme Company. **(Clause 3.10.1)**

3.9.2 The Scheme shall not prevent a Scheme Creditor from obtaining payment under any Security or Letter of Credit, so long as this is done strictly in accordance with any contract establishing the terms of that Security or the terms of such Security. Any Scheme Creditor who obtains or receives payment by enforcing any Security or Letter of Credit in excess of its relevant Agreed Claim shall hold such excess on trust for and pay it to the relevant Scheme Company. **(Clauses 3.10.3 and 3.10.4)**

3.9.3 The Scheme does not affect the rights of the Scheme Company against any person in respect of any wrongful drawdown or enforcement of any Security or Letter of Credit. **(Clause 3.10.5)**

## 3.10 Treatment of Agents, Underwriting Agents, Lloyd's Syndicates and Pools

3.10.1 A Scheme Creditor may appoint an Agent to act on its behalf, although the Scheme Manager may at any point require evidence of the Agent's authority and scope. **(Clause 3.11.1)**

3.10.2 Scheme Creditors authorise the Scheme Company and the Scheme Manager at their discretion to treat any underwriting agent as a single Scheme Creditor in respect of the Scheme Claims of its principal(s) and as a single debtor in respect of the Liabilities its principal(s) and to apply set-off accordingly. **(Clause 3.11.2)**

3.10.3 Members of a Lloyd's Syndicate which have a Scheme Claim or Liability arising or incurred during the Syndicate's 1992 and prior years of account shall be treated as a single Scheme Creditor or single debtor. Members of a Lloyd's Syndicate which have a Scheme Claim or Liability arising or incurred during the Syndicate's 1993 and subsequent underwriting years shall be treated as a single Scheme Creditor or single debtor. In each case the effect of closing a year of account by means of reinsurance to close into a later year is that the rights and liabilities of the members of the syndicate in such closing year become the rights and liabilities of the members of the successor syndicate(s) in such later year. **(Clause 3.11.3)**

## 3.11 Funding

3.11.1 Brokers who have funded Scheme Claims shall not constitute Scheme Creditors in respect of these unless: (i) they have either an acceptable assignment of the funded Scheme Claim or acceptable written confirmation from the beneficiaries of the funding of the Broker's entitlement to submit such claim, or (ii) the funding took place pursuant to a contractual obligation of the Broker to the Scheme Company or the Scheme Company is liable to indemnify or reimburse the Broker. A Broker must complete and return a Claim Form in respect of a funded Scheme Claim in accordance with the Scheme, with the supporting information to include a copy of the assignment or written confirmation where relevant. Any disagreement as to whether a funded Scheme Claim falls within the Scheme shall be referred to the Scheme Adjudicator as a Disputed Claim, with any amount thereby determined as due being the Agreed Claim and will be binding on all parties to the extent permitted by law and subject to any mathematical of other manifest error. No party shall have right to appeal such determination except in circumstances of the Scheme Adjudicator's negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty. **(Clause 3.12)**

## 3.12 Payment of Ascertained Claims

3.12.1 When substantially all Ascertained Claims against a Scheme Company have been determined and the Scheme Company is satisfied that if payment of these were made that it would have sufficient reserves

to pay all other Liabilities in full, payment of those Scheme Claims that are Ascertained Claims shall be made by that Scheme Company. **(Clause 4.1.1)**

3.12.2 Ascertained Claims determined after payment described at 3.12.1 above will be paid as soon as reasonably practicable provided the Scheme Company is satisfied as set out at 3.12.1 above. **(Clause 4.1.2)**

3.12.3 The Scheme Company has an absolute discretion to pay any Scheme Creditor prior to the above payments where the Scheme Company is satisfied that it will be able to pay all Ascertained Claims in full without prejudicing the position of all of its creditors under the Scheme or otherwise. **(Clause 4.2)**

3.12.4 A Scheme Creditor's Ascertained Claim shall constitute the Scheme Company's entire Liability to that Scheme Creditor in respect of its Scheme Claims and payment in full of the Ascertained Claim shall constitute full and final settlement of all and any Scheme Claim(s) of that Scheme Creditor against the Scheme Company. **(Clause 4.3)**

3.12.5 All payments shall be made by cheque sent to the last known address of the Scheme Creditor except where full bank details are provided when payment shall be made by telegraphic transfer. Payments shall be deemed made on the date telegraphic transfer instructions are given or the cheque is sent. Such deemed payment shall be good discharge and satisfaction of the Ascertained Claim or Scheme Claim in respect of which the payment was made. **(Clause 4.4)**

3.12.6 Following the Termination Date, the Scheme Company on its own account shall use reasonable endeavours to pay any Unclaimed Balance to the Scheme Creditors entitled thereto. Any Unclaimed Balance remaining 6 months after the Termination Date shall be paid to the Scheme Company and no Scheme Creditor shall thereafter be entitled to any payment from any Unclaimed Balance. **(Clause 4.5)**

3.13 **Scheme Office Holders**

| Office Holder | First Appointee | Function | Clauses |
|---|---|---|---|
| Scheme Adviser | PricewaterhouseCoopers LLP | To provide advice to the Scheme Manager and/or the Scheme Company | 5.1.1 to 5.1.3 |
| Scheme Manager | Minster Management Services Limited | To assist the Scheme Company in the administration of Scheme Claims, and with such other functions as may be agreed | 5.2.1 and 5.2.2 |
| Scheme Actuarial Adviser | PricewaterhouseCoopers LLP | To provide advice to the Scheme Manager in relation to Scheme Claims and information to the Scheme Adjudicator | 5.3.1 and 5.3.2 |
| Scheme Adjudicator | John Ryan | Valuation of Disputed Claims and their determination as Agreed Claims | 5.4.1 and 5.4.2 |

3.13.1 There may be more than one of any Office Holder acting either jointly or severally. The Scheme Companies may request that the Chairman for the time being of the Association of Run-Off Companies, in consultation with the Scheme Adviser, appoint up to two additional Scheme Adjudicators who shall have the same powers and duties as the Scheme Adjudicator, and the Scheme

Adviser shall direct which Scheme Adjudicator shall deal with which Disputed Claim to avoid conflicts of interest. **(Clauses 5.1.5, 5.2.3, 5.3.3, 5.4.5 and 5.4.9)**

3.13.2 Any Office Holder may resign at any time giving at least three months' written notice (unless otherwise agreed) to the Scheme Manager or, in the case of the Scheme Manager, to the Scheme Company, and shall vacate office if they are subject to an Individual or Corporate Termination Event as appropriate. **(Clauses 5.1.6, 5.1.7, 5.2.4, 5.2.5, 5.3.4, 5.3.5, 5.4.6, and 5.4.7)**

3.13.3 If the office of the Scheme Adviser or Scheme Actuarial Adviser is vacated, the Scheme Manager is entitled to appoint a replacement. If the office of the Scheme Manager is vacated, the Scheme Company is entitled to appoint a replacement. In the case of a replacement for the Scheme Adjudicator, the Scheme Company shall ask the chairman of the Association of Run-Off Companies to nominate a suitable replacement. **(Clauses 5.1.8, 5.2.6, 5.3.6, and 5.4.8)**

3.13.4 The Office Holders (except the Scheme Adjudicator) shall have full access to all required information and other documents in the possession or control of the Scheme Company, and in the case of the Scheme Adviser, also of the Scheme Manager. The Scheme Adjudicator shall have access to such records and information as he considers he needs to resolve a Disputed Claim. **(Clauses 5.1.9, 5.2.7, 5.3.7 and 3.6.2)**

3.13.5 The Scheme Adjudicator will be remunerated on a time cost basis as may be agreed with the Scheme Company. **(Clause 5.4.4)** His remuneration is not conditional in any way upon the values which he adjudicates as being the proper values of Disputed Claims referred to him.

3.13.6 In order to prevent litigation on matters dealt with under the Scheme there are various limitations on actions that Scheme Creditors may bring. Also, Office Holders and their Associated Companies and other relevant persons are entitled to an indemnity from the Property of the Scheme Company against any expenses and liabilities incurred in performing their services and any liability (including costs) incurred in relation to defending any Proceedings which may be brought against them by anyone other than the Scheme Company in relation to their actions under the Scheme save where a court of competent jurisdiction holds that the Office Holders' actions to have been negligent, in wilful default, in wilful breach of trust or duty, fraudulent or dishonest. **(Clause 5.6)**

### 3.14 **The Board**

3.14.1 The powers of the board of directors of the Scheme Company shall remain in place during the Scheme unless and until any Insolvency Event occurs to the Scheme Company. No Scheme Creditor will be entitled to challenge the validity of any action of any of the directors of the Scheme Company in relation to the Scheme undertaken in good faith and with due care and diligence. **(Clauses 6.1 and 6.2)**

### 3.15 **Reversion to Run-Off**

3.15.1 If, at any time prior to any payment (other than early payment) of Ascertained Claims, the Scheme Company, in consultation with the Scheme Advisers, believes that it is no longer in the interest of the Scheme Company and its Scheme Creditors for the Scheme to continue, it may, subject to the criteria below, terminate the Scheme by written notice to all Scheme Creditors following which all Scheme Claims will be run-off in the ordinary course of business. **(Clause 7.1.1 and 7.1.2)**

3.15.2 The Scheme Company may only terminate the Scheme where:

    (a)    the board of directors has confirmed in writing that the Scheme Company has been notified of Scheme Claims which will become Ascertained Claims that are materially in excess of the relevant Scheme Company's assets; or

    (b)    the board of directors has concluded that the Scheme will jeopardise recovery of monies due under reinsurance treaties relating to Scheme Claims; or

(c)    (in respect only of Minster or Malvern) the United States Bankruptcy Court has refused to grant injunctive relief under Chapter 15 of the United States Bankruptcy Code in the requested form. **(Clause 7.1.3)**

3.15.3 Should the business of the Scheme Company revert to run-off, a Scheme Creditor and the Scheme Company can agree that the Scheme Creditor's Ascertained Claim should remain binding, in which case payment shall constitute full and final settlement of all and any Scheme Claim(s) of that Scheme Creditor against the Scheme Company. Failing such agreement the rights and obligations of Scheme Creditors and the Scheme Company in relation to Scheme Claims shall be as they would have been had the Scheme never become effective. **(Clause 7.2)**

### 3.16 **Termination of the Scheme**

3.16.1 The Scheme shall terminate on the date on which either:

(a)    the last cheque or telegraphic transfer is deemed to have been sent to Scheme Creditors;

(b)    the Scheme Company gives notice to its Scheme Creditors that the Scheme has reverted to run-off; or

**(c)**    an Insolvency Event occurs in respect of the Scheme Company (see 3.17 below). **(Clause 8.1)**

3.16.2 Within three Business Days of termination the Scheme Company shall give notice of the termination of the Scheme on the Website and write to all Scheme Creditors who have submitted a claim. Certain provisions of the Scheme will survive termination. **(Clauses 8.2 to 8.3)**

### 3.17 **Insolvency Event**

3.17.1 Should any reorganisation measures be adopted or any winding-up proceedings be opened in relation to the Scheme Company, this will have various effects on the Scheme, including termination of the Scheme. **(Clauses 9.1 and 9.2)**

### 3.18 **General Scheme Provisions**

3.18.1 All expenses and costs of the Scheme Companies will be paid by the Scheme Companies in proportions to be agreed between themselves. **(Clause 10.2)**

3.18.2 At any Court hearing to sanction the Scheme the Scheme Company may consent on behalf of the Scheme Creditors to any modification or addition to the Scheme or any terms or conditions the Court may impose, which would not materially adversely affect the rights of any Scheme Creditors. **(Clause 10.3)**

3.18.3 Notices or written communication under the Scheme will be given in writing and delivered by hand or sent by Post or fax to Scheme Creditors at their last known addresses or fax numbers or, where appropriate details have been provided, sent by electronic communication. Contact details for the Scheme Companies, Scheme Manager and Scheme Adviser are detailed in the Scheme. **(Clauses 10.4 and 10.5)**

3.18.4 The Scheme is governed by the laws of England and Wales and the High Court of England and Wales has exclusive jurisdiction in respect of the Scheme and Scheme Creditors irrevocably submit to that jurisdiction. However, this does not affect the validity of any governing law clauses contained in any Insurance Contract or otherwise between the Scheme Companies and any of their Scheme Creditors. The Scheme Companies retain the right to bring proceedings in the courts of any other country which has jurisdiction in respect of such proceedings. **(Clause 10.7)**

# PART 4

# APPENDICES TO THE EXPLANATORY STATEMENT

### APPENDIX 1: DOCUMENTS AVAILABLE FOR INSPECTION

(1)     Orders of the Court dated 4 November 2009 summoning the Scheme Meetings;

(2)     The latest annual financial statements of the Scheme Companies.

These documents or copies of them will be available for inspection on reasonable notice by Scheme Creditors (until the close of the Business Day before the Meetings) at the following locations during ordinary business hours on any Business Day. They will also be available for inspection at the Meetings and on the Company's website www.minsterins.co.uk.

| **Minster Management Services Limited** | |
| --- | --- |
| 18 Mansell Street | Contact: Hilary Young or Brenda Payter |
| London E1 8AA | Tel: +44 (0) 20 7709 5654 |
| United Kingdom | Fax: +44 (0) 20 7709 5760 |
| | Email: minsterscheme@minsterins.co.uk |
| **PricewaterhouseCoopers LLP** | |
| Plumtree Court | Contact: Dan Schwarzmann, Kirsteen Hodge or |
| London | Simon Hawkins |
| EC4A 4HT | Tel: +44 (0) 20 7583 5000 |
| United Kingdom | Fax +44 (0) 20 7212 6316 |
| | Email: simon.w.hawkins@uk.pwc.com |
| **Barlow Lyde & Gilbert LLP** | |
| Beaufort House | Contact: Emily Cope or Jon Yorke |
| 15 St. Botolph Street | Tel: +44 (0) 20 7247 2277 |
| London EC3A 7NJ | Fax +44 (0) 20 7071 9000 |
| United Kingdom | |

## APPENDIX 2: CURRICULUM VITAE OF THE SCHEME ADJUDICATOR

## CURRICULUM VITAE: JOHN P. RYAN

John Ryan is a Fellow of the Institute of Actuaries, a Member of the American Academy of Actuaries, an Associate of the Casualty Actuarial Society, a Member of the Society of Investment Analysts and a Fellow of the Institute of Risk Management.

He is a consulting actuary principally in the non-life insurance area and often where there are significant claims reserving issues. He has some 30 years experience in this area and has analysed some of the most complex books of business in the London Market. He also acts as an expert witness in assignments involving actuarial expertise especially in the non-life insurance area. He also acts as an independent consultant on actuarial and financial transactions.

John Ryan was Managing Director of the A.R.T. Division (Hybrid Solutions) of Heath Lambert Group from October 2001 until February 2004. As such he was responsible for a Division that is involved in the sourcing, analysing and placing of a wide variety of hard to evaluate risks. This included using modern financing and risk management methodology including the use of (re)insurance as a source of capital. The work involved extensive use of actuarial analysis as well as using banking and insurance techniques to provide a financial solution to complex risk situations. He is the author of a study for the E.U. Commission on the A.R.T. market.

Prior to his position at Heath Lambert, John Ryan was a Principal of Tillinghast, which he joined in 1976, where he was responsible for developing the London office's property/casualty service. He built this up from its beginning to become one of the largest U.K. non-life actuarial practices including much work in the London and Lloyd's markets. He has also been heavily involved in capital management issues, including not only financial management for insurance companies but also aspects of banking including operational risk.

His consulting work included claim reserving and rating, general product design, risk financing and quantification, retention policy and capital requirements. In particular, he has considerable experience in U.S. casualty business written in London as well as unusual risks such as political risks in South Africa. He was responsible for the Tillinghast work for the Corporation of Lloyd's on the Equitas project. Mr. Ryan has also been responsible for a number of projects evaluating acquisitions, both of specific companies and looking at an acquisition as an alternative to forming a new company. He has had extensive experience with companies going into "run off" including the Weaver companies. He worked extensively with the Irish Government over the ICI and PMPA insolvencies. He has also undertaken a wide variety of expert witness work.

Prior to joining the London office of Tillinghast, he was a shareholder in James Capel & Co., a leading firm of London stockbrokers which he joined in 1968. There he was an investment analyst and the partner responsible for research into financial shares including insurance companies, insurance brokers and banking shares, both in the U.K. and throughout Europe. This work included analysis of insurance and banking market prospects for growth and future profit outlook and subsequently assessing the impact on the relative stock market valuations in the U.K. and throughout Europe.

He is actively involved in the professional affairs of the Actuarial Profession. He is a co-editor of the Astin Bulletin. He is a member of the General Insurance Practice Executive Committee (formerly the General Insurance Board) and a former Chairman of the Professional Standards and Guidance Committee of the General Insurance Board. He was a former member of the Council and a former Vice President of the Institute of Actuaries and a former member of FIMC (the profession's management committee). He is also a member of the joint working group on Risk Management with the Institute of Civil Engineers.

He is a frequent speaker at conferences, with particular reference to A.R.T. business and generally maintains a high profile. His publications to the Institute of Actuaries include a joint paper with Ken Larner on the Appraisal Value of Non-Life Insurance Companies and the Chairmanship of a Working Party Report on Financial Condition Reporting. His publications to the Casualty Actuarial Society include submissions on political risks and also on reserving issues. He was also a member of the working party that produced an actuarial paper on longevity risks. He is also a Member of Operational Risk Research Forum which

submitted a report to the Basle Committee on the use of insurance to financial operational risk. He has written a chapter on Operational Risk in the book published by the LSE on Risk Management.

John Ryan qualified as a Fellow of the Institute of Actuaries in 1968 with the Guardian Royal Exchange where he had experience in the investment, life and pensions departments. He graduated in Mathematics at Queens' College Cambridge.

## APPENDIX 3: CURRICULA VITAE OF THE INDEPENDENT VOTE ASSESSOR

## CURRICULUM VITAE: GEORGE MAHER

George Maher is a consulting actuary with the Tillinghast business of Towers Perrin in the firm's London office. He is a principal of Towers Perrin. Mr. Maher read Mathematics at Trinity College, Dublin and is a Fellow of the Institute of Actuaries, a Member of the American Academy of Actuaries and a Fellow of the Society of Actuaries in Ireland. He is a holder of a Lloyd's Signing Actuary Certificate from the Institute of Actuaries and a Signing Actuary Certificate from the Society of Actuaries in Ireland.

George Maher joined Tillinghast in 1987 and specialises in general insurance. He has extensive experience reserving in the U.K. including Lloyd's Marine and Non-Marine syndicates. He has led projects for non-U.K. clients, including insurers and reinsurers writing in Continental Europe, the Middle East and the United States. A number of these projects have been associated with the merger or acquisition of insurers and transfer of business. He also has assisted clients in their evaluation of capital adequacy for transaction, rating and regulatory purposes and in their development of Enterprise Risk Management frameworks.

George Maher served as a Claims Adjudicator or Vote Valuer for several Scheme of Arrangement engagements. They include the Schemes of Arrangement for M&G, Reliance, Oslo, Deutsche Ruck UK, ING Re UK and NRG.

George Maher has assisted self-insureds in their review of insurance buying, captive feasibility and broker selection. Industries covered include oil and gas, property, transportation, security, marine, food retail, bloodstock and fine art.

Significant projects in which he has been involved include the demutualisation of the Norwich Union, the privatisation of the Italian national insurer INA and the restructuring of SASRIA, the South African riot and terrorism insurer. He was a member of the actuarial team that produced the first actuarial review of the Weavers pool. George Maher was part of the Equitas actuarial review team as part of Lloyd's R&R. He assisted the Irish Insurance Federation in its review of the Irish insurance market as part of a government commissioned study of the market and presented his findings to a committee of the joint houses of the Irish Parliament. He worked with the International Group of P&I clubs in their review of Marine large loss exposures.

He has been a member of various working parties of the General Insurance Study Group and co-authored "Some Aspects of Reserving in the London Market" which was presented to the Casualty Actuarial Society. In 1995 he presented a sessional paper to the Institute of Actuaries entitled "Loss Reserves in the London Market".

George Maher is a member of the Institute of Actuaries Working Party on Individual Capital Assessments. He is a frequent speaker at conferences on capital requirements. Mr. Maher has been a tutor and assistant examiner for the professional examinations of the Institute of Actuaries. He is a former member of the Council of the Society of Actuaries in Ireland and former chairman of its General Insurance Committee.

## APPENDIX 4: CURRICULUM VITAE OF THE SCHEME ADVISER

## CURRICULUM VITAE: PRICEWATERHOUSECOOPERS LLP

PricewaterhouseCoopers LLP (PwC) is a leading provider of accelerated exit advice to the solvent and insolvent insurance market.

These include solvent schemes for:

- ARIG Insurance Company Limited
- City General Insurance Company Limited
- Dunedin Pool of Companies (Tower Insurance Limited, Continental Management Services Limited, Cornhill Insurance Public Limited Company, and Dowa Insurance Company (Europe) Limited) in relation to their underwriting through Dunedin Underwriters (HMT) Limited
- The Dutch Aviation Pool (which comprises 18 Dutch companies, including DAP Holdings)
- Europaische Ruckversicherungs-Gesellschaft in Zurich (European Reinsurance Company of Zurich)
- FIGRE Limited
- The GLM Pool (acting as advisers to Ecclesiastical Insurance Office Plc, Global General And Reinsurance Company Limited, MMA IARD Assurances Mutuelles, and Swiss Reinsurance Company in relation to their underwriting through V.J. Wright "Underwriting" Limited and, subsequently, by GLOBAL London Market Limited)
- Global General and Reinsurance Company Limited
- Great Lakes Reinsurance (UK) plc
- Hassneh Insurance Company (UK) Limited
- La Metropole S.A.
- Ludgate Insurance Company Limited
- Marlon Insurance Company Limited
- Mercantile & General Reinsurance Company Limited
- La Mutuelle du Mans Assurances IARD
- The National Insurance and Guarantee Corporation Limited
- Pearl Assurance plc
- The Prudential Assurance Company Limited
- Riverstone (Stockholm) Insurance Corporation (PUBL)
- Scottish Eagle Insurance Company Limited
- Unione Italiana (UK) Reinsurance Company Limited
- Various subsidiaries of ING Group ("The Seven Provinces" Insurance Company Limited, "Transatlantica" Herverzekering Maatschappij NV, Nationale-Nederlanden Schadeverzekering Maatschappij NV, Nationale-Nederlanden Internationale Schadeverzekering Maatschappij NV and Mercantile Mutual Insurance (Australia) Limited)
- The WFUM Pools (acting as advisers to Allianz Insurance Plc, Allianz Global Corporate & Specialty (France), Continental Reinsurance Corporation International Limited, Mitsui Sumitomo Insurance Company (Europe), Limited, The Ocean Marine Insurance Company Limited and Tokio Marine Europe Insurance Limited)
- Compagnie Européenne d'Assurances Industrielles S.A.
- European Reinsurance Company of Zurich

## APPENDIX 5: EFFECTS OF US CHAPTER 15 INJUNCTIVE RELIEF

Minster and/or Malvern may commence a case under Chapter 15 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court") seeking, among other things, permanent injunctive relief to aid in the implementation of the Scheme (the "Chapter 15 Case"). In which case Minster and/or Malvern will seek an order from the Bankruptcy Court in substantially the following form:

1.  that the Scheme be given full force and effect and be binding on and enforceable against all Scheme Creditors of Minster and/or Malvern in the United States;

2.  that all claims of Scheme Creditors of Minster and/or Malvern be adjudicated pursuant to the terms of the Scheme;

3.  except as provided in the Scheme, that all Scheme Creditors of Minster and/or Malvern are permanently enjoined and restrained from:

4.  (a)  taking or continuing any act to obtain possession of, or exercise control over, any of Minster and/or Malvern or any of the property of Minster and/or Malvern in the United States, and its territories or any proceeds thereof ("Property"), and transferring, relinquishing, or disposing of any Property of Minster and/or Malvern;

    (b)  commencing or continuing any action or legal proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim (each individually, an "Action"), against any of Minster and/or Malvern or any Property of Minster and/or Malvern and seeking discovery of any nature against any of Minster and/or Malvern;

    (c)  commencing or continuing any act or Action to create, perfect or enforce any lien, set off, or other claim against Minster and/or Malvern or any of Minster and/or Malvern's Property including, without limitation, rights under reinsurance or retrocession contracts;

    (d)  invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state, or local law or regulation requiring Minster and/or Malvern to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any Action and such statute, rule or requirement shall not apply to Minster and/or Malvern as party to any Action; provided, however, that nothing in the order shall in any respect affect any Security in existence at the Effective Date or the replacements for such Security; and

    (e)  withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which Minster and/or Malvern has an interest in excess of amounts expressly authorized by the terms of the contract and any related trust, or other agreement pursuant to which such trust, escrow or similar arrangement has been established;

5.  except as provided in the Scheme, all Scheme Creditors of Minster and/or Malvern are required to turn over and account to the Foreign Representative for any Property of Minster and/or Malvern of which they have possession, custody or control;

6.  that nothing in the order would prevent the continuance or commencement of an Action against any insurer other than Minster and/or Malvern, provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than Minster and/or Malvern, such settlement or judgment shall not be binding on or enforceable against Minster and/or Malvern;

7.  that the Bankruptcy Court would retain jurisdiction with respect to the enforcement, amendment, or modification of the order or requests for any additional relief in the Chapter 15 Case and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of the Bankruptcy Court;

8.  that no action taken by Minster and/or Malvern, the Foreign Representative, their successors, agents, representatives or counsel, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Scheme, the order, the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings in connection therewith will be deemed to constitute a waiver of the immunity afforded to Minster and/or Malvern, the Foreign Representative or their successors, agents, attorneys or representatives pursuant to section 1510 of the Bankruptcy Code; and

9.  that the order be served:

    (a)  by United States mail, first class postage prepaid, on the date prescribed by the United States Bankruptcy Court upon all known Scheme Creditors of Minster and/or Malvern of whose address Minster and/or Malvern is aware (or their counsel, if known to Minster and/or Malvern); and

    (b)  by publication in The Wall Street Journal (US Edition) and Insurance Day, the U.K. and international editions of the Financial Times on the date prescribed by the United States Bankruptcy Court (or as soon as reasonably practicable thereafter);

10.  and that such service will be good and sufficient service and adequate notice for all purposes.

## APPENDIX 6: BUSINESS INCLUDED IN THE MINSTER SCHEME

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Marine business | Minster Insurance Company Limited or GAN Minster Insurance Company Limited or GAN Insurance Company Limited or Groupama Insurance Company Limited | 1940 to 2000 | None (all marine business written by The London Assurance is excluded from the Scheme. See 1.5 for details). |
| Non-marine business | Minster Insurance Company Limited (either on its own or written jointly with Iron Trades Mutual Insurance Company (transferred to QBE Insurance (Europe) Limited) and The Reliance Fire and Accident Insurance Corporation Limited) | 1951 to 1963 | |
| Non-marine business | Minster Insurance Company Limited or GAN Minster Insurance Company Limited or GAN Insurance Company Limited or Groupama Insurance Company Limited | 1975 to 2000 | |
| Non-proportional insurance and reinsurance | Minster Insurance Company Limited | 1963 to 1968 | General Reinsurance Syndicate Limited (for reinsurance business) and its subsidiary Heywood & Partners Limited (for direct and facultative reinsurance business) |
| Non-Marine Business | Progress Insurance Company Limited as shown in Appendix 10 | 1949 to 1958 | |
| Aviation business | Minster Insurance Company Limited or GAN Minster Insurance Company Limited | 1958 to 1992 | |
| Accident business | GAN Incendie Accidents (written jointly with Minster Insurance Company Limited or Minster Insurance Company Limited and GAN Incendie Accidents) | 1979 to 1991 | |

44

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Fire business | GAN Incendie Accidents (written jointly with Minster Insurance Company Limited or Minster Insurance Company Limited and Kyoei Fire & Marine Insurance Co. (U.K.) Limited) | 1978 to 1991 | |
| Non-marine and aviation treaty reinsurance | Minster Insurance Company Limited or GAN Minster Insurance Company Limited or GAN Insurance Company Limited | 1979 to 2000 | |
| Non-Marine treaty reinsurance | GAN Incendie Accidents (written jointly with Minster Insurance Company Limited) | 1979 to 1991 | |
| Accident & health insurance | Minster Insurance Company Limited or GAN Minster Insurance Company Limited or GAN Insurance Company Limited or Groupama Insurance Company Limited | 1991 to 2003 | |
| Accident & health insurance and reinsurance | GAN Minster Insurance Company Limited or GAN Insurance Company Limited | 1993 to 2000 | LDG Worldwide Limited |
| Yacht business | Minster Insurance Company Limited | 1987 to 1988 | Groves, John & Westrup (Underwriting) Limited |
| Yacht business | Minster Insurance Company Limited or GAN Minster Insurance Company Limited | 1989 to 1994 | K C Powell & Partners Limited |
| Cargo business | Minster Insurance Company Limited | 1987 to 1991 | Hogg Robinson Limited/Hogg Insurance Company Limited |
| Fire business | Minster Insurance Company Limited | 1963 to ca1970 | Les Provinces Réunies Compagnie d'Assurances Vie, Accidents, Incendie |
| Fire and Accident business | Minster Insurance Company Limited | 1983 to ca1989 | Knight Schippers Assuradeuren b.v/Knight & Co. B.V. |
| Accident business | Minster Insurance Company Limited | 1981 to 1983 | |
| Marine business | GAN Incendie Accidents on a joint stamp with either Minster Insurance Company Limited or Minster Insurance Company Limited and Malvern Insurance Company Limited | 1982 to 1991 | |

Business written through various overseas agents:

| Country | Underwriting agent (if applicable) |
|---|---|
| Belgium | • Les Provinces Réunies Compagnie d'Assurances Vie, Accidents, Incendie |
| Netherlands | • Schermer Assuradeuren B.V.<br>• Knight & Co B.V.<br>• Knight Schippers Assuradeuren B.V.<br>• Orobio Mees Herman B.V. |
| USA | • T.W. Rice & Co. Inc. |

## APPENDIX 7: BUSINESS INCLUDED IN THE MALVERN SCHEME

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Marine business | Malvern Insurance Company Limited on its own or written jointly with GAN Incendie Accidents | 1957 to 1987 | |
| Marine business | Malvern Insurance Company Limited | 1957 to 1991 | Martroye & baugniet & Varlez (1974 – 1975) Yves Chegaray (1974 – 1980) GAN Incendie Accidents (1981 – 1987) Brauer & Heye (1972 – 1978) Orobio de Castro & Zoon (1972) H. Mees Herman B.V. (1973 – 1987) Prosperity Insurance Company Limited (1974 – 1989) Cosmos Fire Insurance Company Limited (1990 – 1991) T.W. Rice & Co. Inc. (1972 – 1986) |
| Marine business | Malvern Insurance Company Limited | 1973 to 1976 | GP Turner & Company Limited |
| Marine business | Malvern Insurance Company Limited | 1977 to 1991 | Cuthbert Service & Jackson Limited |
| Aviation | Malvern Insurance Company Limited | 1958 to 1974 and 1976 to 1987 | |
| Non-Marine Business | Malvern Insurance Company Limited | 1955 to 1963 | |
| Fire & Accident business | Malvern Insurance Company Limited | 1957 to 1974 | |
| Yacht | Malvern Insurance Company Limited | 1981 to 1986 | Groves, John & Westrup (Underwriting) Limited |
| Fire & Accident | Malvern Insurance Company Limited | 1990 to 1991 | Cosmos Fire Insurance Company Limited |
| Fire & Accident | Malvern Insurance Company Limited | 1974 to 1989 | Prosperity Insurance Company Limited |

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Non-marine business | Touchline Insurance Company Limited | 1995 to 1997 | |
| Non-proportional reinsurance and non-marine | Malvern Insurance Company Limited | 1988 to 1995 | |

Business written through various overseas agents:

| Country | Underwriting agent (if applicable) |
|---|---|
| Belgium | •     Martroye Baugniet & Varlez |
| Netherlands | •     Orobio de Castro & Zoon<br>•     H Mees Assurandeur<br>•     Orobio Mees Herman B.V. |
| France | •     Monsieur Yves Chegaray<br>•     GAN Incendie Accidents |
| Germany | •     Brauer & Heye |
| Hong Kong | •     Prosperity Insurance Company Limited<br>•     Cosmos Fire Insurance Company Limited |
| USA | •     T.W. Rice & Co Inc |

## APPENDIX 8: BUSINESS INCLUDED IN THE CONTINGENCY SCHEME

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Marine business | The Contingency Insurance Company Limited | 1943 to 1967 | William & Martin & Co (1961 to 1966) |
| Aviation business | The Contingency Insurance Company Limited | 1963 to 1975 | |
| Fire & Accident business | The Contingency Insurance Company Limited | 1931 to 1993 | |
| Non-motor business | The National Motor and Accident Insurance Union Ltd | 1931 to 1959 | |

Business written through various overseas agents:

| Description | Underwriting agent (if applicable) |
|---|---|
| Australia | • Douglas & Co (Ins) Pty Ltd |
| Belgium | • J Haenecour & Co<br>• Martroye / Martroye & Baugniet & Varlez & Marx / Martroye & Baugniet & Varlez |
| Canada | • J.E. Clement Group / J.E. Clement Inc<br>• Robt. Bradford du Canada Limitée / Robt. Bradford of Canada Ltd<br>• Simcoe Erie Investors Limited / Simcoe & Erie General Insurance Company |
| Denmark | • Edward Preisler<br>• Klee & Schack |
| France | • A Perrichon |
| Germany | • Jungius & Boldt |
| Greece | • Compagnie Hellénique d'Assurances S.A. Ilios |
| Netherlands | • Schrameier Verbrugge's Assurantie Bedrijf N.V.<br>• Langeveldt Schröder<br>• Gebrs. Van Buren |
| Hong Kong | • Asia Insurance Co. Ltd |
| Jamaica | • Lister Mair (Insurance) Ltd<br>• Dennis Lalor (Insurance Ltd) |
| Morocco | • A Chercauoi Brothers<br>• Al Wataniya<br>• Jack Sabah<br>• L Sabah |
| Singapore | • Malayan Motor and General Underwriters Ltd |

**APPENDIX 9: BUSINESS INCLUDED IN THE PROGRESS SCHEME**

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

Certain non-marine policies with outstanding losses at 1 January 1993 were transferred to Minster and are included in the Minster Scheme. These are set out at Appendix 10.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Fire business | Progress Insurance Company Limited | 1938 to 1974 | |
| Marine business | Progress Insurance Company Limited | 1949 to 1958 | |
| Accident business | Progress Insurance Company Limited | 1948 to 1974 | |
| Aviation business | Progress Insurance Company Limited | 1948 to 1974 | |

## APPENDIX 10: BUSINESS TRANSFERRED FROM PROGRESS TO MINSTER

Certain non-marine policies with outstanding losses at 1 January 1993 were transferred to Minster and are included in the Minster Scheme. These are set out at Appendix 10.

| Name of insured/reinsured | Risk number | Date | Line per cent. |
|---|---|---|---|
| Andrew Weir Insurance Co Ltd Bevis Marks | TX000549 | 12 mos at 1/7/49 | 4.000000 |
| Andrew Weir Insurance Co Ltd Bevis Marks | TX000650 | 1/3/51 to 30/6/51 | 0.500000 |
| Andrew Weir Insurance Co Ltd Bevis Marks | TX000650A | 1/7/50 to 28/2/51 | 100.000000 |
| Lloyds Syndicate 002 | TX000254 | 12 mos at 1/7/54 | 33.333000 |
| Lloyds Syndicate 130 | TX000149 | 12 mos at 1/7/49 | 100.000000 |
| Lloyds Syndicate 130 | TX000250 | 8 mos at 1/7/50 | 100.000000 |
| Lloyds Syndicate 130 | TX000250A | 4 mos at 1/3/51 | 51.624000 |
| Lloyds Syndicate 130 | TX000452 | 12 mos at 1/7/52 | 2.170000 |
| Lloyds Syndicate 130 | TX000851 | 12 mos at 1/7/51 | 3.230000 |
| Lloyds Syndicate 629RWR | TX000453 | 12 mos at 1/1/53 | 29.090000 |
| Lloyds Syndicate 629RWR | TX000454 | 12 mos at 1/1/54 | 29.070000 |
| Lloyds Syndicate 629RWR | TX000655 | 12 mos at 1/1/55 | 20.830000 |
| Lloyds Syndicate 761 | TX000451 | 12 mos at 1/1/51 | 43.400000 |
| Lloyds Syndicate 761 | TX000652 | 12 mos at 1/1/52 | 43.240000 |
| Lloyds Syndicate 059 | TX000755 | 12 mos at 1/1/55 | 0.088000 |
| Lloyds Syndicate 212 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 442 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 507JDP | TX000755 | 12 mos at 1/1/55 | 0.088000 |
| Lloyds Syndicate 507JDP | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 849 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 854 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 860 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 924 | TX000755 | 12 mos at 1/1/55 | 0.088000 |
| Lloyds Syndicate 970 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Lloyds Syndicate 971 | TX000953 | 12 mos at 1/1/53 | 3.512000 |
| Travellers Insurance Co Hartford Connecticut | RC078986 | 12 mos at 5/4/56 | 4.900000 |
| Travellers Insurance Co Hartford Connecticut | RC086487 | 15/7/54 to 1/1/56 | 35.000000 |

## APPENDIX 11: BUSINESS INCLUDED IN THE QBE SCHEME

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Non-marine business | Iron Trades Mutual Insurance Company Limited (written jointly with Minster Insurance Company Limited and The Reliance Fire and Accident Insurance Corporation Limited) | 1952 to 1960 | Robt. Bradford & Company Limited or Robt. Bradford & Company (Agencies) Limited |

## APPENDIX 12: BUSINESS INCLUDED IN THE RELIANCE SCHEME

This table has been prepared to the best of the Scheme Company's knowledge. It is only intended to be a guide to business included in the Scheme. Scheme Business is defined in the Scheme. If you are unsure whether your business is included in Scheme Business you should contact the Scheme Manager.

| Description | Name on policy | Underwriting years | Underwriting agent (if applicable) |
|---|---|---|---|
| Non-marine business | The Reliance Fire and Accident Insurance Corporation Limited (written jointly with Minster Insurance Company Limited and Iron Trades Mutual Insurance Company Limited) | 1952 to 1960 | Robt. Bradford & Company Limited and Robt. Bradford & Company (Agencies) Limited |

## SECTION II

## THE SCHEME OF ARRANGEMENT

### SCHEME OF ARRANGEMENT
(Pursuant to Part 26 of the Companies Act 2006)

between each of

**MINSTER INSURANCE COMPANY LIMITED**
(formerly Gan Minster Insurance Company Limited, Gan Insurance Company Limited and Groupama Insurance Company Limited)

**MALVERN INSURANCE COMPANY LIMITED**
(formerly Touchline Insurance Company Limited)

**THE CONTINGENCY INSURANCE COMPANY LIMITED**

**PROGRESS INSURANCE COMPANY LIMITED**

**GAN ASSURANCES**
(formerly Gan Incendie Accidents and GAN Assurances IARD)

**QBE INSURANCE (EUROPE) LIMITED**
(in respect of business transferred to it which was written by Iron Trades Mutual Insurance Company Limited and Iron Trades Insurance Company Limited)

**THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION LIMITED**

and their respective

**SCHEME CREDITORS**
(as defined in the Scheme of Arrangement)

# Barlow Lyde & Gilbert LLP

Beaufort House 15 St Botolph Street London EC3A 7NJ Telephone +44 [0] 20 7247 2277 Fax +44 [0] 20 7071 9000
Website www.blg.co.uk DX 155 London CDE

# CONTENTS

*Page*

PART 1: PRELIMINARY     57

    1.1    Definitions     57

    1.2    Interpretation     64

PART 2:    1.3    Participation in the Scheme     64

INTRODUCTORY PROVISIONS     65

    2.1    Application of the Scheme     65

    2.2    Proceedings by Scheme Creditors     65

    2.3    Effect of Acts Prohibited by Clause 2.2     65

    2.4    Interest     66

    2.5    Currency of Payment     66

PART 3: DETERMINATION OF CLAIMS     67

    3.1    Ascertainment Date     67

    3.2    Notice of Effective Date and Distribution of Claim Forms     67

    3.3    Completing Claim Forms     68

    3.4    Failure to Return Claim Form     69

    3.5    Review of Claim Forms and Determination of Agreed Claims     69

    3.6    Scheme Adjudication Procedure     70

    3.7    Determination Notice     72

    3.8    Extension of Time Limits     74

    3.9    Scheme Creditors to Provide Assistance     74

    3.10   Set-Off and Security     74

    3.11   Treatment of Agents, Underwriting Agents, Lloyd's Syndicates and Pools     75

    3.12   Funding     76

PART 4: PAYMENT OF ASCERTAINED CLAIMS     77

    4.1    Timing of Payment     77

    4.2    Early Payment     77

    4.3    Effect of Payment of Ascertained Claims     77

    4.4    Method of Payment     77

    4.5    Unclaimed Balances     78

PART 5: SCHEME OFFICE HOLDERS     79

    5.1    The Scheme Adviser     79

    5.2    The Scheme Manager     79

    5.3    The Scheme Actuarial Adviser     80

    5.4    Scheme Adjudicator     80

    5.5    Notification of Change of Office Holder     81

    5.6    Limit on Actions and Indemnity     81

PART 6: THE BOARD     83

    6.1    Powers of the Board     83

    6.2    Responsibility of the Board     83

PART 7: REVERSION TO RUN-OFF     84

    7.1    Reversion to Run-Off     84

    7.2    Effects of Reversion to Run-Off     84

|  |  | *Page* |
|---|---|---|
| PART 8: TERMINATION OF THE SCHEME | | 85 |
| 8.1 Termination of the Scheme | | 85 |
| 8.2 Notice of Termination | | 85 |
| 8.3 Provisions Surviving Termination | | 85 |
| PART 9: INSOLVENCY EVENT | | 86 |
| 9.1 Insolvency Event | | 86 |
| 9.2 Effects of an Insolvency Event | | 86 |
| PART 10: GENERAL SCHEME PROVISIONS | | 87 |
| 10.1 Effective Date | | 87 |
| 10.2 Pre-Scheme Expenses and Scheme Costs | | 87 |
| 10.3 Modifications of the Scheme | | 87 |
| 10.4 Notices | | 87 |
| 10.5 Electronic Communications | | 88 |
| 10.6 Calculation of Time Periods | | 88 |
| 10.7 Governing Law and Jurisdiction | | 88 |
| SCHEDULE | | |
| 1 | SCHEME BUSINESS | 90 |
| 2 | ESTIMATION GUIDELINES | 91 |
| 3 | RISK LOADING | 106 |
| 4 SUPPORTING EVIDENCE TO SCHEME CLAIMS SUBMITTED | | |
| USING THE ESTIMATION GUIDELINES | | 107 |
| 5 PROPOSED FORM OF CHAPTER 15 ORDER | | 119 |

# PART 1

# PRELIMINARY

**1.1**      **Definitions**

1.1.1      In this Scheme, unless the context otherwise requires or otherwise expressly provides, the following expressions shall bear the following meanings:

**Act:** the Companies Act 2006;

**Admissible Interest:** any interest provided for in a relevant Insurance Contract or any relevant statute or any other relevant law or judgment;

**Agent:** any person other than a broker who is authorised whether actually or ostensibly to act as an agent, attorney or representative for any Scheme Company or Scheme Creditor;

**Agreed Claim:** the amount determined as being due from the Scheme Company in respect of a Scheme Creditor's Scheme Claim(s) pursuant to clauses 3.7.5 or 3.6.11 following the deduction of any sum paid by or on behalf of the Scheme Company to the relevant Scheme Creditor in full or partial satisfaction of any such Scheme Claim since the Ascertainment Date and application of the Estimation Guidelines and Risk Loading;

**Ascertained Claim:** the balance, if any, calculated as remaining due from the Scheme Company to a Scheme Creditor following the application of set-off pursuant to clauses 3.7.1 and 3.7.2;

**Ascertainment Date:** 31 December 2008;

**Associated Company:** any subsidiary company or any parent company or any subsidiary of the parent company;

**Board:** the board of directors of the Scheme Company from time to time;

**Broker:** any broker who placed Scheme Business with or on behalf of the Scheme Company, or, if applicable, any successor to such a broker;

**Business Day:** any day other than Saturday, Sunday or any other day on which banks in the City of London are not open for business;

**Claim Form:** the document entitled Claim Form made available to Scheme Creditors pursuant to clause 3.2.1 in which Scheme Creditors are to insert details of their Scheme Claims;

**Contingency:** The Contingency Insurance Company Limited a company incorporated in England and Wales under company number 00150422;

**Court:** the High Court of Justice of England and Wales;

**Corporate Termination Event:** in relation to a corporate Office Holder means that Office Holder:

(a)      becomes unable to pay its debts within the meaning of Section 123 of the Insolvency Act; or

(b)      takes or becomes subject to any steps, actions, legal proceedings or other procedure (other than such steps, actions, legal proceedings or other procedures which are unmeritorious and are dismissed within 28 days of the relevant corporate Office Holder becoming aware of them) in relation to:

       (i)      a moratorium on or suspension of payment of debts, winding up, dissolution, administration or re-organisation;

(ii)     a composition or arrangement with any creditor;

    (iii)   the appointment of a liquidator, receiver, administrative receiver, administrator or other similar officer in relation to it or its assets;

(iv)    the enforcement of any security held over any of its assets; or (c)takes or

becomes subject to any similar or analogous steps or procedures in any jurisdiction;

**Determination Notice:** a notice sent by the Scheme Manager to a Scheme Creditor pursuant to clauses 3.5.5, 3.5.6, 3.5.7, 3.5.9, 3.7.2, 3.7.6, 3.7.8 or 3.7.9 setting out the amount the Scheme Manager determines or the Scheme Adjudicator has determined to be the Scheme Creditor's Agreed Claim(s);

**Direct Insurance:** the cover provided by an insurer to a non-insurer policyholder, as opposed to any Reinsurance cover provided to cover insurance risks written by another insurer;

**Disputed Claim:** a Scheme Claim referred to a Scheme Adjudicator in accordance with clauses 3.5.8, 3.5.9, 3.7.7, or 3.12.1;

**Effective Date:** the date on which an office copy of the order of the Court sanctioning the Scheme is delivered for registration to the Registrar of Companies;

**Estimation Guidelines:** the actuarial guidelines for use in valuing Scheme Claims set out in Schedule 2 to the Scheme including the Supporting Evidence Guidelines;

**Euro** or **€:** the single currency adopted by participating Member States in furtherance of economic and monetary union under Article 109 of the Treaty of the European Union;

**Exchange Rate:** the closing mid-market rate of exchange applying to a particular currency as quoted by The Financial Times on the last Business Day of the month preceding the date of the Determination Notice;

**Excluded Liability:** any Liability of the Scheme Company:

- arising to an attorney, lawyer, counsel or other legal or professional representative in respect of legal or other costs and/or disbursements ("Costs") unless such Costs are recoverable by a Creditor pursuant to the terms of an Insurance Contract;

- that is a Previously Agreed Liability;

- to a broker, intermediary or agent in respect of brokerage, commission, fees, costs or disbursements;

- in relation to Minster, under aviation business underwritten on its behalf by Westminster Insurance Agencies Limited trading as Westminster Aviation Insurance Group ("WAIG") from 1993 to 1998;

- in relation to Minster, under non-proportional treaty reinsurance business underwritten on its behalf by Donald Fox & Partners (Underwriting Management) Limited (now Ridgewell Fox & Partners (Underwriting Management) Limited) from 1978 to 1980;

- in relation to Minster, under business underwritten on its behalf as an underwriting agent by Alexander Howden & Company Limited between 1946 to 1952;

- in relation to Minster, in respect of marine business underwritten on its behalf by The London Assurance from 1946 to 1983;

- in relation to Minster, in respect of all reinsurance of Reliance's business made under the contract between Minster and Reliance dated 22 August 1995.

**Explanatory Statement:** the statement dated 4 November 2009 explaining the effect of the Scheme;

**Facultative Reinsurance:** a method of reinsurance under which an insurer (ceding insurer) obtains reinsurance for each risk individually where:

(a)     there is no obligation on the ceding insurer to reinsure any particular risk;

(b)     it is the ceding insurer's choice as to how much it will cede and how much it will retain for itself on each risk; and

(c)     the prospective reinsurer is under no obligation to write any particular risk i.e. it can decline any risk and fix its share of any risk as agreed with the ceding insurer for that risk;

**Facultative Retrocession:** a method of reinsurance under which a reinsurer (the retrocedant) obtains reinsurances (retrocessions) for each risk individually where:

(a)     there is no obligation on the retrocedant to retrocede any particular risk;

(b)     it is the retrocedant's choice as to how much it will retrocede and how much it will retain for itself on each risk; and

(c)     the prospective reinsurer providing such retrocession (the retrocessionaire) is under no obligation to write any particular risk i.e. it can decline any risk and fix its share of any risk as agreed with the retrocedant for that risk;

**Final Claims Submission Date:** 11.59 p.m. in England on the day 180 days after (and not including) the Effective Date, or, if such day is not a Business Day, on the Business Day next following;

**GAN IA:** GAN Assurances, a company incorporated in France and registered at the Registre National du Commerce et des Sociétés with company number 542 063 797;

**IBNR Claim:** an incurred but not reported Scheme Claim, being a Scheme Claim for an amount payable by the Scheme Company in respect of losses which have been incurred but have not been reported to the Scheme Creditor and which have not subsequently become a Previously Agreed Liability plus the amount payable in respect of a general excess of Non-IBNR Claims, to the extent that the current estimates of claims included as Non-IBNR Claims may prove to be inadequate;

**Individual Termination Event:** in relation to an individual Office Holder means that Office Holder:

(a)     dies;

(b)     becomes bankrupt or subject to an individual voluntary arrangement or takes or becomes subject to any similar or analogous step or procedure in any jurisdiction;

(c)     is admitted to hospital because of mental disorder or is the subject of an order in matters concerning his mental disorder made by a court having jurisdiction in England or elsewhere in such matters;

(d)     is disqualified from acting as a director under the Company Directors Disqualification Act 1986;

(e)     becomes unable to perform his duties by reason of illness or any other reason;

(f)     is convicted of an indictable offence;

**Insolvency Act:** the Insolvency Act 1986;

**Insolvency Event:** one of the events listed in clause 9.1.1;

**Insurance Contract:** a contract or a policy of Direct Insurance, Reinsurance or Retrocession of any kind whatsoever entered into by or on behalf of any Scheme Company or in relation to which any Scheme Company has assumed liability to the extent (but only to the extent) that such contract, policy or liability comprises part of Scheme Business;

**Letter of Credit:** any valid letter of credit issued to or for the benefit of a Scheme Creditor in respect of any Insurance Contract giving rise to a Scheme Claim;

**Liability:** any debt or liability (being a liability to pay money or money's worth) of a person whether it is present or future, certain or contingent, whether its amount is fixed or liquidated or is capable of being ascertained by fixed rules or as a matter of opinion, including any liability under any enactment (in England and Wales or in any other jurisdiction) and any liability in contract, tort or bailment or arising out of an obligation to make restitution or in any other manner whatsoever provided that such expression does not include any debt or liability which is barred by statute under English law or the law of any other jurisdiction which applies to that liability or is otherwise unenforceable. For the avoidance of doubt, where any contract or policy is void or, being voidable, has been duly avoided, no obligation or liability shall arise in respect of such contract or policy;

**LIBOR:** London Interbank Offered Rate:

(a) on the date on which the relevant Scheme Creditor's Ascertained Claim is established and on the first day of each calendar month falling during the Scheme Period, the rate published as the British Bankers' Association Interest Settlement Rate for the relevant currency for periods of one month at or about 11.00 a.m. in England on that date (or, if such a day is not a Business Day, the rate so published in respect of the preceding Business Day); and

(b) if LIBOR cannot be ascertained, that rate shall be replaced by a rate and a source of quotations which the Scheme Adjudicator shall specify to be, in its opinion, an appropriate substitute;

**Lloyd's:** the society incorporated by the Lloyd's Act 1871 in the name of Lloyd's and situated at One Lime Street, London EC3M 7HA, United Kingdom;

**Lloyd's Syndicate:** a group of underwriting members of Lloyd's, to which a number is assigned by the Council of Lloyd's and which either received an Equitas Premium Indication for a year or years of account in connection with the Reconstruction and Renewal Plan at Lloyd's or did not write any business prior to the 1993 year of account;

**Meetings:** the meetings of Scheme Creditors convened by the Scheme Company with the leave of the Court for the purpose of considering and, if thought fit, approving the Scheme;

**Minster:** Minster Insurance Company Limited a company incorporated in England and Wales under company number 00361302;

**Malvern:** Malvern Insurance Company Limited a company incorporated in England and Wales under company number 00529341;

**MMS:** Minster Management Services Limited, a company incorporated in England with company number 04252145;

**Non-IBNR Claim:** a Scheme Claim:

(a) in respect of losses incurred by a Scheme Creditor of which the Scheme Creditor has notice or Liabilities of a Scheme Creditor in respect of losses which have been notified to it in each case being losses which are not yet certain in amount and which have not yet become a Previously Agreed Liability; and/or

(b) in respect of losses incurred by a Scheme Creditor which are certain in amount, or Liabilities of a Scheme Creditor in respect of losses which are certain in amount and which

either have been paid or are due and payable by the Scheme Creditor and which have not yet become a Previously Agreed Liability;

**Office Holder:** each of the Scheme Adviser, the Scheme Manager, the Scheme Actuarial Adviser and the Scheme Adjudicator;

**Post:** delivered by hand (including by a generally recognised commercial courier service), pre-paid first or second class post, or airmail;

**Pounds Sterling** or **GBP £:** pounds sterling, being the lawful currency of the United Kingdom;

**Practice Statement Letter:** in respect of all Scheme Companies except Reliance, the letter dated 8 June 2009, and in respect of Reliance, the letter dated 27 October 2009 (copies of which are also available on the Website) sent jointly by the Scheme Companies to the Scheme Creditors notifying them that each Scheme is being promoted;

**Pre-Scheme Expenses:** all costs, charges, expenses and disbursements reasonably incurred by the Scheme Companies in connection with the promotion and preparation of the Scheme, including the costs of holding the Meetings and the costs of obtaining the sanction of the Court to the Scheme;

**Previously Agreed Liability:** a Liability being a fixed or liquidated amount which on or prior to the Effective Date has been agreed between the Scheme Creditor and the Scheme Company in the ordinary course of business and recorded in the Scheme Company's ledger as due and payable but which has not then been paid;

**Proceedings:** any form of proceedings in any jurisdiction or forum including, without limitation, any legal proceedings, demand, arbitration, alternative dispute resolution procedure, judicial review, adjudication, mediation, execution, seizure, distraint, forfeiture, re-entry, enforcement of judgment or enforcement of any Security or any step taken for the purpose of creating or enforcing a lien;

**Progress:** Progress Insurance Company Limited a company incorporated in England and Wales under company number 00330724;

**Property:** all forms of property (including money, goods, things in action, land and every description of property wherever situated) and of obligations and every description of interest, whether present, future, vested or contingent arising out of or incidental to, property and including, for the avoidance of doubt, all contributions to the assets of the Scheme Company not falling within the meaning of the Scheme Company's property under the Insolvency Act;

**QBE:** QBE Insurance (Europe) Limited, a company incorporated in England and Wales under company number 01761561;

**Registrar of Companies:** the registrar or other officer performing under the Act (and any provisions of the Companies Act 1985 which remain in force) the duty of registration of companies in England and Wales;

**Reinsurance:** Facultative Reinsurance, Treaty Reinsurance and Retrocession, save that references in Sections 5 and 6 of Schedule 2 to **"Reinsurance"** shall not include Facultative Reinsurance of Direct Insurance;

**Relevant Currency:**

(a)   for Scheme Claims incurred in US Dollars, US Dollars;

(b)   for Scheme Claims incurred in Pounds Sterling, Pounds Sterling;

(c)   for Scheme Claims incurred in Euros, Euros; and

(d)   for Scheme Claims incurred in all other currencies, US Dollars;

**Reliance:** The Reliance Fire And Accident Insurance Corporation Limited a company incorporated in England and Wales under company number 00089255;

**Reorganisation Measures:** reorganisation measures within the meaning given to that term in the Winding-Up Directive provided such measures are implemented by the authorities having jurisdiction in accordance with the Winding-Up Directive and in circumstances where the relevant Scheme Company is unable to pay its Liabilities in full;

**Retrocession:** Treaty Retrocession and Facultative Retrocession;

**Risk Free Rate:** means the yield as at the Final Claims Submission Date on government securities of the country in whose currency the Liability is payable of an appropriate term to the overall nature of the Scheme Business;

**Risk Loading:** means the procedure set out in Schedule 3;

**Scheme:** the scheme of arrangement as set out in this document and approved by the requisite majorities of Scheme Creditors with or subject to any modification, addition or condition approved or imposed by the Court;

**Scheme Adjudicator:** the person appointed as Scheme Adjudicator pursuant to clause 5.4;

**Scheme Adjudication Procedure:** the procedure for valuation of Disputed Claims set out in clause 3.6;

**Scheme Actuarial Adviser:** the person or entity appointed as Scheme Actuarial Adviser pursuant to clause 5.3;

**Scheme Adviser:** the person or entity appointed as Scheme Adviser pursuant to clause 5.1;

**Scheme Business:** all business set out in Schedule 1;

**Scheme Claim:** any Liability of the Scheme Company in respect of Scheme Business to which the Scheme Company is subject at the Effective Date or may become subject after the Effective Date by reason of an obligation incurred before that date including any claim for Admissible Interest;

**Scheme Company:** Minster, Malvern, Contingency, Progress, GAN IA, QBE or Reliance as applicable;

**Scheme Companies:** each of Minster, Malvern, Contingency, Progress, GAN IA, QBE and Reliance in respect of which the Scheme is effective;

**Scheme Costs:**

(a)    all costs, charges, expenses, disbursements and other debts incurred by the Scheme Companies in the course of implementing and carrying out the Scheme and of complying with the provisions of the Act; and

(b)    insofar as they do not fall within (a), all costs, charges, expenses and disbursements incurred by, and the remuneration of, the Scheme Adviser, the Scheme Manager, the Scheme Actuarial Adviser and the Scheme Adjudicator to the extent that such costs, charges, expenses, disbursements and remuneration are referable to the implementation of the Scheme;

**Scheme Creditor:** a person having a Scheme Claim(s);

**Scheme Manager:** the person appointed as Scheme Manager pursuant to clause 5.2;

**Scheme Period:** in relation to the Scheme Company the period beginning on the Effective Date and ending on the Termination Date;

**Security:**

(a)    any deposit or reserve of funds or assets established by the Scheme Company; or

(b)    any guarantee provided by a third party; or

(c)    any Letter of Credit; or

(d)    any funds held or otherwise retained by a Scheme Creditor,

in each case to secure payment of any Scheme Claim;

**Tax:** any form of taxation, levy, duty, charge, contribution, withholding, or impost of whatever nature (including any related fine, penalty, surcharge or interest) imposed, collected or assessed by or payable to a Tax Authority;

**Tax Authority:** any government, state, municipality, or any local, state, federal or other fiscal, revenue, customs or excise authority, body or official anywhere in the world (including in the United Kingdom, without limitation, HM Revenue and Customs);

**Termination Date:** the day upon which the Scheme terminates in accordance with Part 8 of the Scheme;

**Treaty Reinsurance:** a method of reinsurance which is automatic and is an arrangement between one insurer (the ceding insurer) and one or a number of other insurers (the reinsurers) who agree to accept, automatically, any reinsurances falling within the terms of the treaty, where:

(a)    the treaty sets out the various terms and conditions that are to govern the acceptance of cessions by the reinsurer; and

(b)    the treaty is legally binding on both parties and both parties undertake obligations to each other that go beyond the mere ceding of individual risks or policies under the treaty;

**Treaty Retrocession:** a method of reinsurance which is automatic and is an arrangement between one reinsurer (the retrocedant) and one or a number of other reinsurers (the retrocessionaires) who agree to accept, automatically, any retrocessions (cessions) falling within the terms of the treaty, where

(a)    the treaty sets out the various terms and conditions that are to govern the acceptance of cessions by the retrocessionaire; and

(b)    the treaty is legally binding on both parties and both parties undertake obligations to each other that go beyond the mere ceding of individual risks or policies under the treaty;

**Unclaimed Balance:** amounts represented by any cheque issued in settlement of an Ascertained Claim not presented for payment by its payee or any telegraphic transfer payment made in settlement of an Ascertained Claim and returned to the Scheme Company;

**U.S. Dollars** or **U.S.$:** United States Dollars, being the lawful currency of the United States of America;

**Website:** the internet website with the address www.minsterins.co.uk;

**Winding-Up Directive:** directive 2001/17/EC on the reorganisation and winding-up of insurance undertakings;

**Winding-Up Proceedings:** winding-up proceedings within the meaning given to that term in the Winding-Up Directive provided such proceedings are opened by the authorities having jurisdiction in accordance with the Winding-Up Directive and are founded on the insolvency of the Scheme Company.

## 1.2 Interpretation

1.2.1 In the Scheme, unless the context otherwise requires or the Scheme expressly provides otherwise:

(a) references to parts, clauses, sub-clauses and schedules are references to the parts, clauses, sub-clauses and schedules respectively of the Scheme;

(b) references to a "person" include an individual, firm, partnership, limited liability partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c) references to a statute or a statutory provision or to a statutory instrument or provision of a statutory instrument include the same as subsequently modified, amended or re enacted from time to time;

(d) the singular includes the plural and *vice versa* and words importing one gender shall include all genders; and

(e) headings to parts, clauses, sub-clauses and schedules are for ease of reference only and shall not affect the interpretation of the Scheme.

## 1.3 Participation in the Scheme

1.3.1 The Scheme Company has authorised the Scheme Manager to execute or do or to procure to be executed or done all documents, acts or things as may be necessary or as the Court may order to be executed or done by the Scheme Company or on its behalf to implement and to give effect to the Scheme.

1.3.2 The Scheme Manager, the Scheme Adviser, the Scheme Actuarial Adviser and the Scheme Adjudicator have each consented to act in relation to and agreed to be bound by the Scheme from the Effective Date.

# PART 2

# INTRODUCTORY PROVISIONS

**2.1 Application of the Scheme**

2.1.1 The Scheme shall apply to all Scheme Claims. Excluded Liabilities and any Liabilities of the Scheme Company other than Scheme Claims, are not subject to any restriction on enforcement contained in this Scheme.

2.1.2 Following the Effective Date, the Scheme Company shall continue to pay claims in respect of Previously Agreed Liabilities (to the extent that they have not become time barred under the provisions of the Limitation Act 1980) and such Previously Agreed Liabilities shall not be affected by the provisions of clause 3.4. For the avoidance of doubt, Previously Agreed Liabilities do not include Scheme Claims that have been presented by the Scheme Creditor to its broker or to the Scheme Company but have not been agreed by the Scheme Company and such Scheme Claims should be included in the Claim Form returned to the Scheme Manager pursuant to clause 3.3.1.

**2.2 Proceedings by Scheme Creditors**

2.2.1 Without prejudice to clause 2.2.3 and save with the consent of the Scheme Company to whom Proceedings relate or will relate, no Scheme Creditor shall be permitted to institute or continue any Proceedings whatsoever against the Scheme Company or its Property in any jurisdiction to establish the existence or quantum of a Scheme Claim.

2.2.2 Save to the extent that the Scheme Company has failed to perform any obligation to make a payment to a Scheme Creditor under the provisions of the Scheme, no Scheme Creditor shall be permitted to institute or continue any Proceedings whatsoever against the Scheme Company to whom Proceedings relate or will relate or its Property in any jurisdiction whatsoever to enforce payment in whole or in part of any Scheme Claim.

2.2.3 Nothing in the Scheme shall preclude the Scheme Company from instituting or continuing any Proceedings against a Scheme Creditor. For the avoidance of doubt, the relevant Scheme Creditor shall be entitled to assert and prosecute a Scheme Claim against the Scheme Company in such Proceedings.

2.2.4 For the purposes of this clause 2.2.4, the Scheme Company shall be deemed not to be continuing any Proceedings which commenced before the Effective Date and in which the Scheme Company is not actively prosecuting its claims against such Scheme Creditor.

2.2.5 For limitation purposes, time shall stand still in respect of Scheme Claims from the Effective Date. Should the Scheme terminate pursuant to clause 8.1.1(b) or 8.1.1(c), the Scheme Company shall not be entitled to reject a claim on the basis that any limitation period, whether contractual or statutory, has expired since the Effective Date and time will begin to run again from the date of termination.

**2.3 Effect of Acts Prohibited by Clause 2.2**

2.3.1 If, and to the extent that, a Scheme Creditor obtains an order, judgment, decision or award of a court or tribunal against the Scheme Company in relation to a Scheme Claim in contravention of clauses 2.2.1 and/or 2.2.2, such order, judgment, decision or award shall not give rise to an Agreed Claim and shall be disregarded when determining the Liability of the Scheme Company in respect of the relevant Scheme Claim.

2.3.2 If any Scheme Creditor takes any action after the Effective Date which is prohibited by clauses 2.2.1 and/or 2.2.2 it shall, without prejudice to any other rights of the Scheme Company, be treated as having received an advance distribution on account of its Scheme Claim(s) equal to the amount

or gross value of any money, Property, benefit or advantage obtained by it at the expense of the Scheme Company as the result of such action, and the extent to which it is entitled to participate in any distribution under the Scheme shall be determined accordingly.

2.3.3    For the purpose of clause 2.3.2, the gross value of any money, Property, benefit or advantage obtained by a Scheme Creditor shall be conclusively determined by the Scheme Manager and, without limitation, may include such amount as the Scheme Manager may consider to be appropriate by way of interest, costs, charges or expenses incurred by the Scheme Company as a consequence of the relevant Scheme Creditor acting in a manner prohibited by clause 2.2.

2.3.4    If the amount of advance distribution which a Scheme Creditor is treated as having received pursuant to clause 2.3.2 exceeds the total amount the relevant Scheme Creditor would otherwise be entitled to receive from the Scheme Company pursuant to the Scheme, then without prejudice to any other rights of the Scheme Company, the Scheme Creditor shall immediately repay the excess to the Scheme Manager as agent for the Scheme Company, failing which interest shall accrue on such excess for the period from and including the date upon which the Scheme Creditor's Ascertained Claim is established under the Scheme to the date of repayment of such excess, at the rate for which LIBOR is in force at such time. Interest shall be calculated on the basis of the actual number of days elapsed and on the basis of a 365 day year if the amount concerned is denominated in Pounds Sterling, but otherwise on the basis of a 360 day year and shall be payable immediately. Such excess and any interest thereon shall be held on trust for the Scheme Company by the relevant Scheme Creditor until paid.

## 2.4    Interest

2.4.1    For the purpose of paying or providing for distributions under the Scheme, where a Scheme Claim includes an element of Admissible Interest such Admissible Interest shall be payable for the period from the date provided for in the relevant Insurance Contract, judgment or statute to the day immediately preceding the date on which payment is made in respect of that Scheme Claim.

2.4.2    No distribution shall be paid under the Scheme in respect of any part of a Scheme Claim which represents interest which is not Admissible Interest.

2.4.3    Any payment made under the Scheme in respect of any part of a Scheme Claim which represents Admissible Interest shall be made net of any deduction or withholding for or on account of Tax.

## 25    Currency of Payment

2.5.1    Any amounts payable to a Scheme Creditor shall be paid in a Relevant Currency.

2.5.2    If the Scheme Company incurred Liabilities to a Scheme Creditor in more than one Relevant Currency the Scheme Manager shall aggregate all of the Scheme Creditor's Agreed Claims in each Relevant Currency and the Agreed Claims shall be converted at the Exchange Rate into the Relevant Currency with the largest aggregate balance and paid in that Relevant Currency.

2.53    Where the currency of a Liability or other sum to be applied by way of set-off or deducted pursuant to clause 3.10 or 3.6.13 from an Agreed Claim is not the same as the Relevant Currency of that Agreed Claim, the sum to be applied in set-off or deducted shall be converted into the Relevant Currency in which Agreed Claims are to be paid as determined by clause 2.5.2 at the same Exchange Rate as used in clause 2.5.2.

# PART 3

# DETERMINATION OF CLAIMS

**3.1**      **Ascertainment Date**

All Scheme Claims shall be valued as at the Ascertainment Date.

**3.2**      **Notice of Effective Date and Distribution of Claim Forms**

3.2.1      The Scheme Manager shall, within 14 days of the Effective Date, send by Post to each known Scheme Creditor for whom the Scheme Company has contact details which it does not believe are incorrect and Brokers at their last known addresses (and, in the case of any Scheme Creditor of which the Scheme Company becomes aware prior to the Final Claims Submission Date, within 5 Business Days of becoming aware of such Scheme Creditor, and in any event if practicable prior to the Final Claims Submission Date):

     (a)      notice that the Scheme has become effective and confirmation of the Final Claims Submission Date;

     (b)      a Claim Form and instructions on how to complete the Claim Form; and

     (c)      a request for Scheme Creditors to submit Claim Forms by the Final Claims Submission Date.

3.2.2      In addition, the Scheme Manager shall within 14 days of the Effective Date or as soon as may be practicable thereafter cause to be published in the same newspapers and publications in which the Meetings were advertised or, if this should not prove reasonably practicable, in such other publications as they shall deem appropriate, notice of the details at 3.2.1(a) and 3.2.1(c) above and instructions on how a Scheme Creditor can access a Claim Form on the Website or request a Claim Form to be sent by Post.

3.2.3      The Scheme Manager shall, within three Business Days of the Effective Date, make available on the Website:

     (a)      the full text of the Explanatory Statement;

     (b)      the full text of the Scheme;

     (c)      all other documents referred to in the Explanatory Statement and the Scheme; and

     (d)      additional copies of the Claim Form.

3.2.4      In order to access certain facilities on the Website a password is required. To obtain its individual password, a Scheme Creditor will need to contact the Scheme Manager via e-mail to minsterscheme@minsterins.co.uk and confirm in such e-mail:

     (a)      the name of the Scheme Creditor;

     (b)      the name and title of the person who will act as the contact for the Scheme Creditor; and

     (c)      the Scheme Creditor's individual login ID, which appears on the Practice Statement Letter and the covering letter accompanying the Notice of Meetings.

The Scheme Manager will then issue an individual password to that Scheme Creditor within 2 Business Days of the request being received.

3.2.5    Any Scheme Creditor who has not received its individual login ID should make contact via the email address referred to in clause 3.2.4 and confirm in such email:

(a)    the name of the Scheme Creditor;

(b)    the name and title of the person who will act as the contact for the Scheme Creditor; and

(c)    that it did not receive its individual login ID.

The Scheme Manager will then issue an individual login ID and password to that Scheme Creditor within 2 Business Days of the request being received.

3.2.6    The Scheme Manager will send a hardcopy of any of the documents available on the Website to any Scheme Creditor upon written request.

## 3.3    Completing Claim Forms

3.3.1    Each Scheme Creditor shall submit a Claim Form made available to it pursuant to clause 3.2 in accordance with its accompanying instructions and the provisions of this clause 3.3.

3.3.2    The Scheme Manager shall endeavour to provide a list of those Insurance Contracts which relate to each Scheme Creditor (of which the Scheme Company is aware having regard to its computer records) to assist that Scheme Creditor to complete its Claim Form. Each Scheme Creditor's list will only be able to be accessed by that Scheme Creditor. For the avoidance of doubt, Scheme Creditors should not regard any list of Insurance Contracts provided by the Scheme Manager pursuant to this clause as an exhaustive list of their Insurance Contracts with the Scheme Company.

3.3.3    Scheme Creditors shall provide with their Claim Forms in respect of each Scheme Claim:

(a)    the specific amount the Scheme Creditor seeks to claim in respect of that Scheme Claim;

(b)    whether the Scheme Claim is either a Non-IBNR Claim or an IBNR Claim;

(c)    whether there is any Admissible Interest payable in respect of the Scheme Claim;

(d)    details of the Broker(s) who placed the relevant business, where available; and

(e)    evidence to support the reasonableness of the Scheme Claim in accordance with the instructions contained in the Estimation Guidelines and Supporting Evidence Guidelines.

3.3.4    Claim Forms and all supporting information must be returned so as to reach the Scheme Manager at the address specified for that purpose in the instructions accompanying the Claim Form at any time on or before the Final Claims Submission Date.

3.3.5    Each Scheme Creditor shall be entitled to complete and submit a new or revised Claim Form in

accordance with clause 3.3 and the instructions accompanying the Claim Form and to provide revised or further information in respect of its Scheme Claims, together with any relevant supporting documentation, to the Scheme Manager so as to reach the Scheme Manager at any time before the Final Claims Submission Date as set out at clause 3.3.4. The last Claim Form received before the Final Claim Submission Date shall be the Claim Form which the Scheme Manager will consider pursuant to clause 3.5. No revisions to the quantum of any Scheme Claim will be accepted after the Final Claims Submission Date or the date on which the relevant Scheme Creditor's Agreed Claims are established (whichever is the earlier) and no revised or further information will be accepted after that date unless sent in response to a request by the Scheme Manager pursuant to clauses 3.5.4 or 3.5.6 or the Scheme Adjudicator pursuant to clause 3.6.3(a).

**3.4**     **Failure to Return Claim Form**

3.4.1     Subject to clause 2.1.2, no Scheme Creditor shall be entitled to receive any payment from the Scheme Company under the Scheme in respect of a Scheme Claim other than a Previously Agreed Liability unless that Scheme Claim has been notified to the Scheme Manager by the Scheme Creditor on a Claim Form completed in accordance with clause 3.3.1 to 3.3.3 and submitted with the supporting evidence required by clause 3.3.3, such Claim Form being received by the Scheme Manager no later than the Final Claims Submission Date. Any Scheme Claim not so notified shall be deemed to have been satisfied in full and the Scheme Creditor shall have no further rights against the Scheme Company in respect of that Scheme Claim.

**3.5**     **Review of Claim Forms and Determination of Agreed Claims**

3.5.1     The Scheme Manager will consider the information concerning a Scheme Creditor's Scheme Claims contained in its Claim Form including, but not limited to, consideration of whether any Scheme Claims are adequately supported with relevant documentation, whether any estimates in relation to IBNR Claims are reasonable, having taken account of the principles set out in the Estimation Guidelines, and whether there is any applicable Security, Letter of Credit or set-off.

3.5.2     The Scheme Company will not be bound by, or prepared to follow, any settlement made between the Scheme Creditor and another insurer or reinsurer if it believes that settlement to be unreasonable.

3.5.3     As part of the process of determining the Agreed Claims pursuant to clauses 3.5.1 and 3.5.5 to 3.5.10 and 3.7, the Scheme Manager shall apply the principles set out in the Estimation Guidelines and Risk Loading and shall deduct any sum paid by or on behalf of the Scheme Company to the relevant Scheme Creditor since the Ascertainment Date other than in respect of a Previously Agreed Liability.

3.5.4     The Scheme Manager shall be entitled at any time, by written notice to the Scheme Creditor concerned, to request the production of such further information or such documentation or other evidence as it may reasonably require to assist it in agreeing a Scheme Claim. The Scheme Creditor must produce such information within 28 days of receipt of such notice, failing which the provisions of clause 3.5.7 will apply.

3.5.5     If the Scheme Manager agrees with the Scheme Creditor's estimate of the value of any of its Scheme Claims as set out in the Claim Form it shall, within 60 days of the Final Claims Submission Date, notify the relevant Scheme Creditor of such agreement by sending a Determination Notice to that Scheme Creditor as set out in clause 3.7.

3.5.6     If the Scheme Manager does not agree with some or all of the information provided on or with a Claim Form in respect of a Scheme Creditor's Scheme Claim, it shall, within 60 days of the Final Claims Submission Date, by notice in writing to the relevant Scheme Creditor specify those matters which are not agreed, the reasons for failing to agree such matters and any additional information and/or documentation or other evidence that the Scheme Manager may require. Within 28 days of the date of such notice the Scheme Creditor shall submit written comments on those matters that are not agreed by the Scheme Manager and the reasons provided by the Scheme Manager for not agreeing them and/or shall provide any additional information and/or documentation or other evidence as requested. The Scheme Manager will then endeavour to agree the disputed matters and the relevant Scheme Claim within a further 28 days and in the event that the Scheme Claim is so agreed, the Scheme Manager shall notify the Scheme Creditor of its agreement by sending a Determination Notice to that Scheme Creditor as set out in clause 3.7.

3.5.7     If a Scheme Creditor fails:

(a)     to provide its written comments within the 28 day deadline imposed by clause 3.5.6; or

(b)     to provide any additional information and/or documentation or other evidence requested by the Scheme Manager within the 28 day deadline imposed by clause 3.5.4 or 3.5.6,

the Scheme Manager shall be entitled to make such determination as to the value of the Scheme Creditor's Scheme Claim as it sees fit on the basis of the information available to it and shall send a Determination Notice to the relevant Scheme Creditor as set out in clause 3.7.

3.5.8 In the event that a Scheme Creditor's Scheme Claim is not agreed within the deadline for agreeing Scheme Claims laid down by clause 3.5.6 the Scheme Manager shall within a further 14 days from the date on which the deadline for agreement of Scheme Claims expired refer the Scheme Creditor's Scheme Claim to the Scheme Adjudicator as a Disputed Claim.

3.5.9 At any time after the return of a Claim Form, the Scheme Manager may, either:

(a) refer a Scheme Claim to the Scheme Adjudicator as a Disputed Claim for determination by him in accordance with clause 3.6; or

(b) send a Determination Notice to the relevant Scheme Creditor as set out in clause 3.7.

3.5.10 For the avoidance of doubt, the views of any of the Scheme Company, Scheme Manager, Scheme Adviser, Scheme Actuarial Adviser and/or Scheme Adjudicator (and/or any of their employees, members, partners, delegates, alternates, agents or advisers) as to the appropriate methodology, principles or assumptions to be applied in determining the value of any Scheme Claim, whether express or implied and whether contained in the Scheme, the Estimation Guidelines or any other document or communication, are provided only for the purpose of determining the Scheme Claim owed by the Scheme Company to the Scheme Creditor (if any) and may not be relied upon for any other purpose. Further, no such methodology, principle or assumption shall be construed as advice being given by the Scheme Company, Scheme Manager, Scheme Adviser, Scheme Actuarial Adviser, and/or Scheme Adjudicator (and/or any of their employees, members, partners, delegates, alternates, agents or advisers) to the Scheme Creditor or any other person for any purpose.

## 3.6 Scheme Adjudication Procedure

3.6.1 Subject to clause 5.4.9 except where the Scheme Manager and the Scheme Creditor agree otherwise, any dispute or other issue requiring determination relating to a Scheme Claim shall be referred to the Scheme Adjudicator.

3.6.2 In referring a Scheme Claim to the Scheme Adjudicator as a Disputed Claim in accordance with clauses 3.5.8, 3.5.9, 3.7.7 or 3.12.1, the Scheme Manager shall send written notice of the dispute to the Scheme Adjudicator by Post with a copy to the relevant Scheme Creditor which notice shall enclose a copy of the Claim Form and a list of any supporting schedules or evidence accompanying such Claim Form and of any notice, statement or correspondence sent or received by the Scheme Manager in connection with the Disputed Claim in the course of attempting to determine the Scheme Creditor's Agreed Claim under the Scheme. The Scheme Adjudicator shall have access to all of the documents referred to in the notice sent to him pursuant to this clause 3.6.2 and to the Scheme Company's records and information in the possession of or under the control of the Scheme Company which the Scheme Adjudicator considers he needs to resolve the dispute concerning such Scheme Claim.

3.6.3 The Scheme Adjudicator shall within 21 days of the date of the notice referring the Disputed Claim to him, notify the Scheme Company, the Scheme Manager and/or the relevant Scheme Creditor if he requires:

(a) any additional documentation and/or information which the relevant person shall provide within 21 days of receipt of such notice along with a copy to any other party to the dispute; and/or

(b) the Scheme Creditor, the Scheme Manager, and/or the Scheme Company to attend a meeting with him, either in person or by telephone, to discuss any matter he shall determine, which the relevant person(s) (or its or their duly authorised representative) shall attend on

such date, which shall be within a further 21 days of receipt of such notice as agreed, and at such place as the Scheme Adjudicator shall prescribe.

3.6.4    If any Scheme Creditor, the Scheme Company or the Scheme Manager fails to provide any additional information, documentation and/or other evidence in accordance with clause 3.6.3(a) or fails to attend a meeting with the Scheme Adjudicator in accordance with clause 3.6.3(b), the Scheme Adjudicator shall be entitled to make such determination as he sees fit in relation to the relevant Disputed Claim on the basis of the information available to him.

3.6.5    The Scheme Creditor, the Scheme Manager and the Scheme Company shall each be entitled to request a meeting with the Scheme Adjudicator for the purpose of discussing the Disputed Claim and supporting evidence at any time prior to the Scheme Adjudicator's determination of the Disputed Claim.

3.6.6    The Scheme Adjudicator shall be entitled to consult with such advisers, including legal advisers and experts, as he may deem appropriate in determining any Disputed Claim.

3.6.7    If a conflict of interests arises in respect of any Disputed Claim such that the Scheme Adjudicator is not able to act in relation to that Disputed Claim, he will immediately notify the relevant Scheme Creditor and the Scheme Manager of such conflict. In such circumstances, unless the relevant Scheme Creditor and the Scheme Manager agree within 14 days of receiving notice of the conflict to permit the Scheme Adjudicator to act and the Scheme Adjudicator himself is willing to act notwithstanding such conflict, an alternate Scheme Adjudicator, being a person qualified to act pursuant to clause 5.4.2, shall be appointed pursuant to clause 5.4.9 to determine the relevant Disputed Claim. Any waiver of a conflict pursuant to this clause 3.6.7 will only be made after the Scheme Adjudicator has provided sufficiently detailed disclosure of the details and nature of the conflict to the Scheme Creditor and the Scheme Manager to enable each of them to make an informed decision on whether the conflict may be waived without prejudicing any party. Where a matter is referred to an alternate Scheme Adjudicator he shall adjudicate on that matter only.

3.6.8    If a Scheme Creditor with a Disputed Claim or the Scheme Manager considers that the Scheme Adjudicator has a conflict of interests in relation to that Disputed Claim, the Scheme Creditor or Scheme Manager shall within 14 days of the date of the notice of referral of the Scheme Claim to the Scheme Adjudicator notify the other party to the Disputed Claim and the Scheme Adjudicator of such conflict. The Scheme Adjudicator shall consider whether he has a conflict of interests having regard to the Professional Conduct Standards of the Institute of Actuaries. In the event that the Scheme Adjudicator considers that he does have a conflict of interests the Scheme Manager and the Scheme Creditor shall attempt to agree the identity of an alternate Scheme Adjudicator and if no agreement can be reached, an alternate Scheme Adjudicator shall be appointed by the chairman (for the time being) of the Association of Run-Off Companies.

3.6.9    Where an alternate Scheme Adjudicator is appointed pursuant to clause 3.6.7 or 3.6.8 the conflicted Scheme Adjudicator's appointment, shall, subject to clause 5.4.7, continue during the appointment of an alternate Scheme Adjudicator, and he shall continue to act in relation to all other Disputed Claims referred to him under clauses 3.5.8, 3.5.9, 3.7.7 or 3.12.1 unless a conflict shall arise in respect of any of those Disputed Claims, in which case clause 3.6.7 or clause 3.6.8 as applicable shall apply.

3.6.10  In reaching a determination in relation to any Disputed Claim, the Scheme Adjudicator shall act as an expert and not as an arbitrator and shall apply the Estimation Guidelines.

3.6.11  The Scheme Adjudicator shall notify the relevant Scheme Creditor, the Scheme Adviser, and the Scheme Manager of his determination in respect of the relevant Disputed Claim and of the resulting amount of the Scheme Creditor's Agreed Claim by notice sent by Post within 28 days after the later of the date of the notice referring the Disputed Claim to him in accordance with clause 3.6.1, the provision of any additional documentation and/or information to him pursuant to clause 3.6.3(a), the conclusion of any meeting with him pursuant to clause 3.6.3(b), or the failure

71

of the relevant party to provide such additional documentation and/or information in accordance with clause 3.6.3(a) or to attend a meeting with him in accordance with clause 3.6.3(b). Any such determination shall, to the extent permitted by law and subject to any mathematical or other manifest error, be final and binding on the Scheme Company and the relevant Scheme Creditor who shall have no right to appeal therefrom or to make any claim against the Scheme Adjudicator in respect of such determination save in respect of his negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty.

3.6.12 Any remuneration (including the Scheme Adjudicator's own remuneration calculated on a time cost basis), costs, charges and expenses incurred by the Scheme Adjudicator in respect of a Disputed Claim including the fees and expenses of any adviser or expert consulted by him pursuant to clause 3.6.6, shall be paid by the Scheme Company. However, the Scheme Adjudicator may determine in his absolute discretion that the relevant Scheme Creditor should reimburse the Scheme Company in respect of some or all of those costs in which case such costs shall be paid by the Scheme Creditor in accordance with clause 3.6.13.

3.6.13    Any costs, charges and expenses incurred by the relevant Scheme Creditor shall be borne by the Scheme Creditor himself. The amount of the relevant Scheme Creditor's share of any remuneration, costs, charges and expenses as determined by the Scheme Adjudicator pursuant to clause 3.6.12 shall be deducted from the amount of the Scheme Creditor's Agreed Claim(s) pursuant to clause 3.7.1. For the avoidance of doubt, any amount by which the total of such remuneration, costs, charges and expenses to be borne by the Scheme Creditor exceeds such Agreed Claim(s) shall be paid to the Scheme Company and shall constitute a Liability of the Scheme Creditor to the Scheme Company.


**3.7        Determination Notice**

3.7.1    Following the determination of a Scheme Creditor's Scheme Claims pursuant to clauses 3.5.5, 3.5.6, 3.5.7, 3.5.9 and/or 3.6.11 the Scheme Manager shall:

(a)    apply any applicable set-off pursuant to clauses 3.10.1 to 3.10.2; and then

(b)    deduct any sum due pursuant to clause 3.6.13; and then

(c)    deduct the amount of any applicable Security or Letter of Credit in respect of any remaining balance in favour of the Scheme Creditor.

3.7.2    Following completion of the steps set out in clause 3.7.1 in relation to a Scheme Creditor, the Scheme Manager shall send by Post to that Scheme Creditor a Determination Notice setting out:

(a)    the Agreed Claim(s) of that Scheme Creditor;

(b)    the amount of any Liability of the Scheme Creditor which has been applied in set-off pursuant to clauses 3.10.1 to 3.10.2;

(c)    the amount of any sum which has been deducted pursuant to clause 3.6.13;

(d)    the amount of any Security or Letter of Credit which has been deducted;

(e)    details of any currency conversions undertaken pursuant to clause 2.5; and

(f)    the resultant amount that the Scheme Manager calculates to be the Scheme Creditor's Ascertained Claim, or Liability due to the Scheme Company from the Scheme Creditor.

In addition, the Scheme Companies shall provide a schedule setting out how the amount of any Liability applied in set-off pursuant to clauses 3.10.1 to 3.10.2 was calculated.

3.7.3   Subject to clause 3.7.4, each Scheme Creditor may, by notice in writing to be received by the Scheme Manager within 28 days of the date of the Determination Notice sent to that Scheme Creditor, object to:

(a)   the amount of any Agreed Claim set out therein unless it has been determined by the Scheme Adjudicator pursuant to clause 3.6.11;

(b)   the amount of any set-off applied pursuant to clauses 3.10.1 to 3.10.2;

(c)   the amount of any sum which has been deducted pursuant to clause 3.6.13 set out therein;

(d)   the amount of any Security or Letter of Credit which has been deducted as set out therein; or

(e)   any currency conversions undertaken pursuant to clause 2.5 set out therein.

3.7.4   No Scheme Creditor may object to any amount:

(a)   of any Agreed Claim determined by the Scheme Adjudicator pursuant to clause 3.6.11;

(b)   of any Liability of the Scheme Creditor applied in set-off which has been agreed by the Scheme Creditor or has been calculated by reference to Agreed Claims determined under the Scheme; or

(c)   previously included in a Determination Notice, other than a Liability to which clause 3.7.8 applies, to which the Scheme Creditor did not object within 28 days of the date of that Determination Notice as provided for in clause 3.7.3.

3.7.5   If the Scheme Creditor does not notify the Scheme Manager of an objection in accordance with the provisions of clause 3.7.3 and, if relevant, has agreed any Liability to which clause 3.7.8 applies, the amount shown in the Determination Notice as the Scheme Creditor's Ascertained Claim or Liability to the Scheme Company shall be fixed as the amount of that Scheme Creditor's Ascertained Claim or Liability to the Scheme Company as applicable and shall be final and binding on the relevant Scheme Creditor and the Scheme Company, to the extent permitted by law.

3.7.6   If the Scheme Manager agrees with the objections of a Scheme Creditor notified in accordance with clause 3.7.3, the Scheme Manager shall send a further Determination Notice by Post to the Scheme Creditor setting out the information referred to in clauses 3.7.2(a) to 3.7.2(f) as amended in light of such objections.

3.7.7   If the Scheme Manager does not agree with the objections of a Scheme Creditor notified in accordance with clause 3.7.3, the disputed matters, except insofar as they relate to a Liability of the Scheme Creditor to which clause 3.7.8 applies and which has yet to be agreed, shall be referred to the Scheme Adjudicator by notice sent by Post. The Scheme Adjudicator shall give his determination in respect of the disputed matters and (unless any Liability of the Scheme Creditor to which clause 3.7.8 applies has yet to be agreed) of the resultant amount of the Scheme Creditor's Ascertained Claim or Liability to the Scheme Company within 14 days of the date of such notice. The Scheme Adjudicator's determination of the disputed matter shall be fixed as the relevant Scheme Creditor's Ascertained Claim or Liability. Any such determination shall, to the extent permitted by law and subject to any mathematical or other manifest error, be final and binding on the Scheme Company, and the relevant Scheme Creditor who shall have no right to appeal therefrom or to make any claim against the Scheme Adjudicator in respect of such determination save in respect of his negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty.

3.7.8   Each Scheme Creditor must, by notice in writing to be received by the Scheme Manager within 28 days of the date of the Determination Notice sent to that Scheme Creditor, confirm whether or not it agrees the amount of any Liability of the Scheme Creditor applied in set-off which has not been agreed by the Scheme Creditor or has not been calculated by reference to Agreed Claims

determined under the Scheme. If the Scheme Creditor does not agree the amount of such Liability, the Scheme Manager shall attempt to agree the amount with the Scheme Creditor and, following agreement, shall dispatch a further Determination Notice to that Scheme Creditor setting out the information referred to in clauses 3.7.2(a) to 3.7.2(f) as amended in light of such agreement and, where relevant, in light of any determination by the Scheme Adjudicator pursuant to clause 3.7.7.

3.7.9 The Scheme Manager shall be entitled to recalculate the amount of any Liability to which clause 3.7.8 applies at any time prior to the agreement of that Liability. If it does so it shall send a further Determination Notice to the relevant Scheme Creditor setting out the information referred to in clauses 3.7.2(a) to 3.7.2(f) as amended in light of such recalculation.

3.7.10 The provisions of clause 3.7 shall apply to any further Determination Notice dispatched by the Scheme Manager pursuant to clause 3.7.6, 3.7.8, or 3.7.9, except that the Scheme Creditor concerned shall not be entitled to object to any item in the further Determination Notice:

(a) which appeared in any previous Determination Notice sent to it and to which it did not object in accordance with clause 3.7.3 following receipt of such previous Determination Notice; or

(b) in relation to which the Scheme Adjudicator has made a determination pursuant to clause 3.7.7.

## 3.8 Extension of Time Limits

3.8.1 Subject to clause 3.8.2, the Scheme Manager, in consultation with the Scheme Adviser, may, at its absolute discretion, extend any time period referred to in this Part 3 or in Part 4, other than the time limits in clause 3.6 and the Final Claims Submission Date, whether for any one or more or all Scheme Creditors and whether in respect of any one or more or all of a Scheme Creditor's Scheme Claims.

3.8.2 The Scheme Adjudicator may in his absolute discretion extend any of the time periods referred to in clause 3.6 whether for any one or more or all Scheme Creditors and whether in respect of any one or more or all of a Scheme Creditor's Scheme Claims.

## 3.9 Scheme Creditors to Provide Assistance

3.9.1 During the Scheme Period, Scheme Creditors shall provide to the Scheme Manager, Scheme Company, Scheme Adviser, Scheme Actuarial Adviser and Scheme Adjudicator all reasonable assistance required by any of them in connection with the Scheme and shall provide such assistance as any of them may reasonably require in connection with the recovery of any Property, including for the avoidance of doubt any surplus Security or any surplus collateral held in respect of a Letter of Credit, or the enforcement of any obligations owed to the Scheme Company.

3.9.2 The Scheme Company shall provide the Scheme Adviser, Scheme Actuarial Adviser and Scheme Adjudicator with all reasonable assistance required by any of them in connection with the Scheme.

## 3.10 Set-Off and Security

3.10.1 Where there have been mutual credits, mutual debts or other mutual dealings between the Scheme Company and any Scheme Creditor arising as a consequence of Scheme Business or under the Scheme, an account shall be taken of:

(a) the Agreed Claim of the Scheme Creditor pursuant to the terms of the Scheme which, for the avoidance of doubt, shall include IBNR Claims against the Scheme Company in respect of which an Agreed Claim has been determined pursuant to the terms of the Scheme; and

(b) all Liabilities of the Scheme Creditor to the Scheme Company arising as a consequence of Scheme Business or under the Scheme which, for the avoidance of doubt, shall include Liabilities of a Scheme Creditor to the Scheme Company the amount of which have either

been agreed between the Scheme Creditor and the Scheme Company, have otherwise become due and payable or have been calculated by the Scheme Manager by reference to Agreed Claims determined under the Scheme;

and the sums due from one party shall be set off against the sums due from the other.

3.10.2 For the avoidance of doubt, the Scheme Company will not exercise any right of set-off under the Scheme where the exercise of that right would conflict with or constitute an extension of any of the Scheme Company's rights under a set-off regime established by any applicable statutory provision or rule of law which is binding on the Scheme Company and the relevant Scheme Creditor and by which they cannot as a matter of law agree not to be bound.

3.10.3 Nothing in the Scheme shall prevent a Scheme Creditor from obtaining payment by means of its Security at any time, provided that this is done strictly in accordance with the terms of the contract pursuant to which such Security was established and the terms (if any) of the Security.

3.10.4 Any Scheme Creditor who shall obtain or receive payment by enforcing, drawing down, withdrawing or calling on any Security or Letter of Credit in an amount which exceeds either its Agreed Claim arising under the contract or each of the contracts for which that Security or Letter of Credit was issued or established or, if lower, the amount which it is contractually entitled to receive from that Security or Letter of Credit at the time when it receives or obtains payment, shall hold the amount of such excess on trust for the Scheme Company to apply the same in accordance with the terms of the Scheme, and shall forthwith pay the same to the Scheme Company without set-off, deduction, retention, abatement or counterclaim. The proceeds of any enforcement, drawdown or withdrawal under or call on a Security or Letter of Credit established in respect of an Insurance Contract, shall only be applied to an Agreed Claim arising under that contract, or to any other Agreed Claim to which the Scheme Creditor is contractually entitled to apply it. Any surplus remaining after discharge of such Agreed Claim(s) shall not be applied in satisfaction or reduction of any other Liability, but shall be held on trust for the purposes of the Scheme and shall be paid to the Scheme Company as aforesaid.

3.10.5 Nothing in the Scheme shall affect the rights of the Scheme Company under any applicable law against any person in respect of any wrongful drawdown or enforcement of any Security or Letter of Credit.

## 3.11 Treatment of Agents, Underwriting Agents, Lloyd's Syndicates and Pools

3.11.1 In any of a Scheme Creditor's dealings with the Scheme Company, the Scheme Manager, the Scheme Adjudicator or the Scheme Adviser under the Scheme, it may appoint an Agent to act on its behalf. The Scheme Manager may, at its absolute discretion, require the Agent or the Scheme Creditor to provide evidence of the Agent's authority and its scope, before dealing or continuing to deal with the Agent under the Scheme.

3.11.2 The Scheme Creditors authorise the Scheme Company and the Scheme Manager at their discretion to treat any underwriting agent (including, but not limited to a manager of an underwriting pool, managing general agent, a holder of a line-slip or binding authority) as a single Scheme Creditor of the Scheme Company in respect of the Scheme Claims of its principal(s) and as a single debtor of the Scheme Company in respect of the Liabilities owed to the Scheme Company by its principal(s) and to set off such Scheme Claims and Liabilities against each other or any other applicable Scheme Claims or Liabilities.

3.11.3 The Scheme Company and the Scheme Manager shall be obliged to treat the members of a Lloyd's Syndicate which have:

(a)     Scheme Claims arising out of obligations incurred through the Lloyd's Syndicate during its 1992 and prior years of account as a single Scheme Creditor of the Scheme Company in respect of those Scheme Claims and the members of a Lloyd's Syndicate which owe Liabilities to the Scheme Company as a result of obligations to the Scheme Company

undertaken during its 1992 and prior years of account as a single debtor of the Scheme Company in respect of those Liabilities; and

(b)   Scheme Claims arising out of obligations incurred by the Lloyd's Syndicate during its 1993 and subsequent underwriting years as a single Scheme Creditor of the Scheme Company in respect of those Scheme Claims and the members of a Lloyd's Syndicate which owes Liabilities to the Scheme Company in respect of obligations to the Scheme Company incurred during its 1993 and subsequent underwriting years as a single debtor of the Scheme Company in respect of those Liabilities;

in each case on the basis that the effect of closing a year of account by means of reinsurance to close into a later year is that the rights and liabilities of the members of the syndicate in such closing year become instead the rights and liabilities of the members of the successor syndicate or syndicates in such later year.

### 3.12    Funding

3.12.1   Brokers who have funded Scheme Claims shall not constitute Scheme Creditors for the purposes of advancing such Scheme Claims in the Scheme unless:

(a)   they have acquired an assignment of the funded Scheme Claim, or written confirmation from the beneficiaries of such funding that the Broker is entitled to submit a claim in the Scheme in the place of such beneficiaries in respect of the funded Scheme Claim, such assignment or confirmation being in a form acceptable to the Scheme Manager; or

(b)   such funding took place pursuant to a contractual obligation of the Broker to the Scheme Company in circumstances where, as a matter of law, the Scheme Company is liable to indemnify or reimburse such Broker.

For the purpose of determining whether funding falls within this sub-clause 3.12.1, in the absence of agreement between the Scheme Manager and the relevant Broker, the matter shall be referred to the Scheme Adjudicator as a Disputed Claim for determination in accordance with clause 3.6 (in which case all references in that clause to the Scheme Creditor shall be read as references to the relevant Broker). The amount determined as being due in respect of that Disputed Claim shall be the amount of the Broker's Agreed Claim. Any such determination shall, to the extent permitted by law and subject to any mathematical or other manifest error, be final and binding on the Scheme Company, and the relevant Scheme Creditor and neither a Scheme Creditor nor the Scheme Company shall have any right to appeal therefrom or to make any claim against the Scheme Adjudicator in respect of such determination save in respect of his negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty.

3.12.2  For the avoidance of doubt, any Broker claiming in respect of a funded Scheme Claim shall complete and return a Claim Form in respect of such Scheme Claim in accordance with the provisions of clauses 3.1 to 3.4. The supporting information to be provided pursuant to clause 3.3.3 shall, unless the Broker is claiming pursuant to clause 3.12.1(b), include a copy of the assignment or written confirmation required pursuant to clause 3.12.1(a).

# PART 4

# PAYMENT OF ASCERTAINED CLAIMS

**4.1**     **Timing of Payment**

4.1.1     When, in the reasonable determination of the Scheme Manager, substantially all Scheme Creditors' Ascertained Claims against the Scheme Company have been determined in accordance with clause 3.4 or 3.7 and have become binding on the Scheme Company and the Scheme Creditors, and the Scheme Company is satisfied that if payment were to be made in full of the Ascertained Claims as have been determined at that time there should remain sufficient reserves to pay all remaining Scheme Claims of its Scheme Creditors and all Liabilities of the Scheme Company in full, the Scheme Company shall make payment in full to its Scheme Creditors in· respect of those Ascertained Claims relating to it in accordance with clause 4.3.

4.1.2     Where, following any payment under clause 4.1.1, any Scheme Claims become binding Ascertained Claims, provided the Scheme Company is satisfied that if payment were to be made in full of those Ascertained Claims as have been determined and remain unpaid at that time there should remain sufficient reserves to pay all remaining Scheme Claims of its Scheme Creditors and all Liabilities of the Scheme Company in full, the Scheme Company shall, as soon as reasonably practicable, make payment in full to Scheme Creditors in respect of those Ascertained Claims relating to it in accordance with clause 4.3.

**4.2**     **Early Payment**

The Scheme Company may, in its absolute discretion, make payment of an Ascertained Claim at any time before the time specified in clause 4.1 provided that the Scheme Company is satisfied, in its absolute discretion, that it will be able without prejudicing the position of its creditors (including for the avoidance of doubt creditors in respect of Liabilities not arising from Scheme Business) to pay all of its Ascertained Claims and all Liabilities in full once they have been determined.

**4.3**     **Effect of Payment of Ascertained Claims**

The amount of a Scheme Creditor's Ascertained Claim under the Scheme as determined pursuant to clause 3.4 or 3.7 shall constitute the Scheme Company's entire liability to the relevant Scheme Creditor in respect of its Scheme Claim(s) and payment in full of such Ascertained Claim in accordance with clause 4.1 or 4.2 regardless of whether such sum becomes an Unclaimed Balance pursuant to clause 4.5 shall be in full and final settlement of all and any Scheme Claim(s) of that Scheme Creditor against the Scheme Company in respect of Scheme Business.

**4.4**     **Method of Payment**

4.4.1     Where a Scheme Creditor provides the Scheme Manager with full details of the bank account into which payment should be made, payments may be made by telegraphic transfer. Such payment shall be at the Scheme Creditor's own risk, cost, and expense.

4.4.2     Subject to clause 4.4.1, all payments to Scheme Creditors under the Scheme shall be made by way of cheque in favour of the Scheme Creditor concerned or in favour of such other person as the Scheme Creditor may notify the Scheme Manager in writing. Cheques shall be sent by Post at the risk of the relevant Scheme Creditor to the last known address of such Scheme Creditor or to such other address as the Scheme Creditor may notify the Scheme Manager in writing.

4.4.3     Payment under the Scheme in respect of an Ascertained Claim including any early payment pursuant to clause 4.2 shall be deemed to have been made on the day that the telegraphic transfer instructions were given to the relevant bank pursuant to clause 4.4.1 or the relevant cheque is sent

by Post pursuant to clause 4.4.2 (as the case may be) and such deemed payment shall be a good discharge and satisfaction of the Ascertained Claim.

## 4.5 Unclaimed Balances

4.5.1 The Scheme Company shall, from the Termination Date, retain any Unclaimed Balance and will use its reasonable endeavours to make payments out of the Unclaimed Balance to the Scheme Creditors entitled thereto according to their respective entitlements. At the expiry of six months from the Termination Date the remaining amount of any Unclaimed Balance shall be paid over to the Scheme Company who shall be entitled to it absolutely provided that the Scheme Adviser is satisfied that the Scheme Company has complied with its obligations under this clause 4.5.1.

4.5.2 No Scheme Creditor shall be entitled to any payment from an Unclaimed Balance after the expiry of six months from the Termination Date.

# PART 5

# SCHEME OFFICE HOLDERS

**5.1** **The Scheme Adviser**

5.1.1    The first Scheme Adviser shall be PricewaterhouseCoopers LLP.

5.1.2    The Scheme Adviser shall provide advice to the Scheme Manager and/or the Scheme Company as may reasonably be requested to facilitate the implementation of the Scheme when requested and agreed in writing.

5.1.3    For the avoidance of doubt, the Scheme Adviser will provide only those advisory services specifically agreed by it and will not perform any other services including exercising managerial powers, rights or functions.

5.1.4    The Scheme Adviser will be remunerated on a time cost basis.

5.1.5    There may be more than one Scheme Adviser in which case they may carry out their duties and functions under the Scheme either jointly or severally.

5.1.6    A Scheme Adviser may resign its appointment at any time by giving no less than three months' notice in writing to the Scheme Manager or on such shorter period of notice as the Scheme Adviser and the Scheme Manager may agree in writing.

5.1.7    The office of a Scheme Adviser shall be vacated if being an individual he is subject to an Individual Termination Event or being a corporation it is subject to a Corporate Termination Event.

5.1.8    If the office of a Scheme Adviser is vacated in accordance with clause 5.1.6 or 5.1.7 the Scheme Manager shall be entitled to appoint a replacement Scheme Adviser provided that:

    (a)    such replacement consents to act and is independent; and

    (b)    all remaining Scheme Advisers, if any, consent to such appointment.

5.1.9    The Scheme Manager and the Scheme Company acknowledge and agree that the Scheme Adviser will be entitled to have full access to all such information as may from time to time be required in relation to the operation of the Scheme and to all books, papers, documents and other information contained or represented in any format whatsoever in the possession or under the control of the Scheme Company and/or the Scheme Manager.

**5.2** **The Scheme Manager**

5.2.1    The first Scheme Manager shall be MMS.

5.2.2    The Scheme Manager shall assist the Scheme Company in the administration of Scheme Claims submitted pursuant to the Scheme and such other functions as the Scheme Company and the Scheme Manager shall from time to time agree.

5.2.3    There may be more than one Scheme Manager in which case they may carry out their duties and functions under the Scheme either jointly or severally.

5.2.4    A Scheme Manager may resign its appointment at any time by giving no less than three months' notice in writing to the Scheme Company or on such shorter period of notice as the Scheme Manager and the Scheme Company may agree in writing.

5.2.5    The office of a Scheme Manager shall be vacated if being an individual he is subject to an Individual Termination Event or being a corporation it is subject to a Corporate Termination Event.

5.2.6    If the office of a Scheme Manager is vacated in accordance with clause 5.2.4 or 5.2.5 the Scheme Company shall be entitled to appoint a replacement Scheme Manager provided that:

(a)    such replacement consents to act; and

(b)    all remaining Scheme Managers, if any, consent to such appointment.

5.2.7    The Scheme Company acknowledges and agrees that the Scheme Manager will be entitled to have full access to all such information as may from time to time be required in relation to the operation of the Scheme and to all books, papers, documents and other information contained or represented in any format whatsoever in the possession or under the control of the Scheme Company.

**5.3    The Scheme Actuarial Adviser**

5.3.1    The first Scheme Actuarial Adviser shall be PricewaterhouseCoopers LLP.

5.3.2    The Scheme Actuarial Adviser's function will be to provide advice to the Scheme Manager to enable it, on behalf of the Scheme Company, to assess Scheme Creditors' Scheme Claims. When called upon to do so the Scheme Actuarial Adviser will also provide to the Scheme Adjudicator information in relation to advice given to the Scheme Manager.

5.3.3    There may be more than one Scheme Actuarial Adviser in which case they may carry out their duties and functions under the Scheme either jointly or severally.

5.3.4    A Scheme Actuarial Adviser may resign its appointment at any time by giving no less than three months' notice in writing to the Scheme Manager or on such shorter period of notice as the Scheme Actuarial Adviser and the Scheme Manager may agree in writing.

5.3.5    The office of a Scheme Actuarial Adviser shall be vacated if being an individual he is subject to an Individual Termination Event or being a corporation it is subject to a Corporate Termination Event.

5.3.6    If the office of a Scheme Actuarial Adviser is vacated in accordance with clause 5.3.4 or 5.3.5 the Scheme Manager shall be entitled to appoint a replacement Scheme Actuarial Adviser provided that:

(a)    such replacement consents to act and is independent; and

(b)    all remaining Scheme Actuarial Advisers, if any, consent to such appointment.

5.3.7    The Scheme Company acknowledges and agrees that the Scheme Actuarial Adviser will be entitled to have full access to all such information as may from time to time be required in relation to the operation of the Scheme and to all books, papers, documents and other information contained or represented in any format whatsoever in the possession or under the control of the Scheme Company.

**5.4    Scheme Adjudicator**

5.4.1    The first Scheme Adjudicator shall be John Ryan and only an individual shall be appointed as a Scheme Adjudicator.

5.4.2    The Scheme Adjudicator shall be qualified to act as the Scheme Adjudicator if the Scheme Manager, having taken advice from the Scheme Adviser, is of the reasonable opinion that the person to be appointed has the ability to carry out the functions of the Scheme Adjudicator under the Scheme. The Scheme Adjudicator shall be responsible for the valuation of Disputed Claims and their subsequent determination as Agreed Claims. The Scheme Adjudicator shall determine any disputes referred to the Scheme Adjudicator pursuant to Part 3 and shall undertake all other duties and functions conferred upon the Scheme Adjudicator by the Scheme. The Scheme Adjudicator shall have the powers and rights conferred upon the Scheme Adjudicator by the Scheme for such purposes.

5.4.3   In exercising his powers and rights and in carrying out his duties and functions under the Scheme, the Scheme Adjudicator shall act in good faith and with due care and diligence and shall exercise his powers and rights under the Scheme to ensure that the Scheme is operated in accordance with its terms.

5.4.4   A Scheme Adjudicator shall be paid on a time cost basis for the exercise and performance of his powers, rights, duties and functions under the Scheme, such remuneration to be paid in accordance with clause 3.6.12 and 3.6.13.

5.4.5   There may be more than one Scheme Adjudicator in which case they may carry out their duties and functions under the Scheme either jointly or severally.

5.4.6   A Scheme Adjudicator may resign his appointment at any time by giving no less than three months' notice in writing to the Scheme Manager or on such shorter period of notice as the Scheme Adjudicator and the Scheme Manager may agree in writing.

5.4.7   The office of a Scheme Adjudicator shall be vacated if he is subject to an Individual Termination Event.

5.4.8   If the office of a Scheme Adjudicator is vacated in accordance with clause 5.4.6 or 5.4.7 the Scheme Company shall ask the chairman (for the time being) of the Association of Run-Off Companies to nominate a person who is suitably qualified in accordance with clause 5.4.2 who shall be appointed as replacement Scheme Adjudicator provided that:

(a)   such replacement consents to act and is independent; and

(b)   all remaining Scheme Adjudicators, if any, consent to such appointment.

5.4.9   In the absence of any agreement as provided for in clause 3.6.8 where necessary, the chairman (for the time being) of the Association of Run-Off Companies may, at the request of the Scheme Company in consultation with the Scheme Adviser, appoint any qualified person to act as an additional Scheme Adjudicator provided that there shall be no more than two additional Scheme Adjudicators at any time and such additional Scheme Adjudicator shall have all the powers and duties conferred upon the Scheme Adjudicator under the Scheme. The Scheme Adviser shall direct which Scheme Adjudicator shall deal with which Disputed Claim so as to prevent a Scheme Adjudicator dealing with a Disputed Claim where a conflict of interests or other issue exists that might prevent a Scheme Adjudicator from being seen to deal fairly with a Disputed Claim.

## 5.5   Notification of Change of Office Holder

5.5.1   In the event that there is a change of Office Holder or an additional Office Holder is appointed, the Scheme Company shall place a notice on the Website giving details of the change or appointment.

## 5.6   Limit on Actions and Indemnity

5.6.1   Neither Scheme Creditors nor the Scheme Company shall be entitled to challenge the validity of any act done or omitted to be done by the Scheme Adjudicator in good faith and with due care and diligence pursuant to the provisions of the Scheme or in the performance or exercise or non-exercise of any power, right, duty or function conferred upon him under the Scheme and the Scheme Adjudicator shall not be liable for any loss unless any such loss is attributable to his negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty.

5.6.2   No Scheme Creditor shall be entitled to challenge the validity of any act done or omitted to be done by any Office Holder (other than the Scheme Adjudicator) or any of their Associated Companies, directors, partners, members, officers or employees in connection with the Scheme and no Office Holder or any of their Associated Companies, directors, partners, members, officers or employees shall be liable for any loss suffered by any Scheme Creditor or third party unless such loss is attributable to their negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty. Accordingly, no Scheme Creditor shall bring or institute any proceedings, claims or

complaints against any Office Holder or any of their Associated Companies, directors, partners, members, officers or employees.

5.6.3   The Office Holders or any of their Associated Companies, directors, partners, members, officers or employees shall, in relation to the Scheme Company and to the extent allowed by law, be entitled to an indemnity out of the Property of the Scheme Company against:

(a)   all expenses and liabilities properly incurred by the Office Holders or any of their Associated Companies, directors, partners, members, officers or employees in performing any services in connection with the Scheme; and

(b)   any liability (including costs) incurred by the Office Holders or any of their Associated Companies, directors, partners, members, officers or employees in defending any Proceedings, whether civil or criminal, including in respect of any alleged negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty on their part in relation to the Scheme, or in connection with any application in any such Proceedings, save in either case in respect of any Proceedings in which a court of competent jurisdiction holds that the Office Holders have been negligent, wilfully in breach of duty or trust, fraudulent or dishonest.

5.6.4   The Scheme Company will pay the costs incurred by the Office Holders or any of their Associated Companies, directors, partners, members, officers or employees in defending Proceedings of the nature described in clause 5.6.3(b) which relate to the operation of the Scheme provided such Office Holder undertakes to reimburse the Scheme Company (with interest) for any amount which would not, in the event, have been payable by the Scheme Company under clause 5.6.3(b).

5.6.5   The indemnity at clause 5.6.3(b) and 5.6.4 shall not apply to any proceedings brought by the Scheme Company against the Office Holders or any of their Associated Companies, directors, partners, members, officers or employees in relation to the performance by that Office Holder or Associated Company, director, partner, member, officer or employee of its duties and functions in connection with the Scheme.

# PART 6

# THE BOARD

**6.1      Powers of the Board**

The powers of the Board shall remain as before the Effective Date unless and until an Insolvency Event, being one of the events referred to in clause 9.1.1(a) or 9.1.1(b), occurs in relation to the Scheme Company. The effect of such an Insolvency Event on the powers of the Board of the affected company shall be determined in accordance with the law of the jurisdiction governing the Reorganisation Measures or Winding-Up Proceedings, as applicable.

**6.2      Responsibility of the Board**

No Scheme Creditor shall be entitled to challenge the validity of any act done or omitted to be done in good faith and with due care and diligence by any director of the Scheme Company in accordance with, or to implement the provisions of, the Scheme or in the performance or exercise or non-exercise of any power, right, duty or function conferred upon him under the Scheme and/or by law and no such person shall be liable for any loss unless such loss is attributable to negligence, wilful default, wilful breach of duty or trust, fraud or dishonesty.

# PART 7

# REVERSION TO RUN-OFF

**7.1    Reversion to Run-Off**

7.1.1    The provisions of this clause 7.1 apply at any time before any payment (other than an early payment pursuant to clause 4.2) is made to a Scheme Creditor under Part 4 or an Insolvency Event has occurred.

7.1.2    Subject to clause 7.1.3, if the Scheme Company believes, after consultation with the Scheme Adviser, that it is no longer in the interests of the Scheme Company and its Scheme Creditors for the Scheme to continue in force, it may send written notice to all of its Scheme Creditors for whom it has contact details which it does not believe are incorrect, that the Scheme has terminated, and subject to clause 7.2.1, all Scheme Claims against the Scheme Company shall thereafter be run-off in the ordinary course of business.

7.1.3    The Scheme Company may only terminate the Scheme pursuant to clause 7.1.2 where either:

    (a)    the Board has issued written confirmation that the Scheme Company has been notified of Scheme Claims which will become Ascertained Claims that are materially in excess of the Scheme Company's assets; or

    (b)    the Board has concluded that the continuation of the Scheme in relation to the Scheme Company will jeopardise the recovery of monies due under reinsurance treaties relating to Scheme Claims; or

    (c)    (in respect only of Minster or Malvern) the United States Bankruptcy Court has refused to grant injunctive relief under Chapter 15 of the United States Bankruptcy Code in the form (or substantially in the same form) set out in Schedule 5.

**7.2    Effects of Reversion to Run-Off**

7.2.1    Should the business of the Scheme Company revert to run-off pursuant to clause 7.1.2, except where a Scheme Creditor and the Scheme Company expressly agree that the Scheme Creditor's Ascertained Claim should remain binding, the respective rights and obligations of Scheme Creditors and of the Scheme Company in relation to Scheme Claims shall be the same in all respects as they would have been had the Scheme never become effective. Scheme Claims shall thereafter be run-off in the ordinary course of business.

7.2.2    The provisions of clause 4.3 shall apply to any payment made by the Scheme Company prior to any reversion to run-off which discharges in full any Ascertained Claim which the Scheme Company and the Scheme Creditor concerned have agreed should remain binding notwithstanding the reversion to run-off.

7.2.3    For the avoidance of doubt, following termination of a Scheme pursuant to clause 7.1.2, clause 3.4 shall cease to have effect and the Scheme Company shall not be entitled to reject a Scheme Claim submitted to it for payment on the basis that it was not notified to the Scheme Company by the Final Claims Submission Date in accordance with the provisions of the Scheme.

# PART 8

# TERMINATION OF THE SCHEME

**8.1**     **Termination of the Scheme**

8.1.1    The Scheme shall terminate on the date on which either:

(a)    the last cheque or telegraphic transfer is deemed to have been despatched to Scheme Creditors in accordance with clause 4.4;

(b)    the Scheme Company gives notice to Scheme Creditors in accordance with clause 7.1.2; or

(c)    an Insolvency Event occurs in respect of the Scheme Company.

**8.2**     **Notice of Termination**

8.2.1    Where the Scheme terminates pursuant to clause 8.1.1(a) or 8.1.1(c) the Scheme Company shall:

(a)    within 3 Business Days thereof, place a notice of termination on the Website; and

(b)    notify each Scheme Creditor which submitted a Scheme Claim prior to the Final Claims Submission Date of the termination.

**8.3**     **Provisions Surviving Termination**

Subject to clause 7.2.3, Part 1 and clauses 2.2.5, 2.3.1, 2.3.2, 2.3.3,3.4, 3.5.10, 3.6.11, 3.6.13, 3.7.7, 3.12.1, 4.3, 4.4.3,4.5,5.4.3,5.6,6.2,7.2, 8.2, 9.2, 10.7 and this clause 8.3 shall survive termination of the Scheme.

# PART 9

# INSOLVENCY EVENT

**9.1**    **Insolvency Event**

9.1.1    An Insolvency Event means:

    (a)    the adoption of Reorganisation Measures in relation to the Scheme Company;

    (b)    the opening of Winding-Up Proceedings in relation to the Scheme Company.

**92**    **Effects of an Insolvency Event**

9.2.1    Following the occurrence of an Insolvency Event, the provisions of clause 3.4 shall no longer apply and the Scheme Company shall not be entitled to reject a Scheme Claim submitted to it for payment on the basis that it was not notified to it by the Final Claims Submission Date in accordance with the provisions of the Scheme.

# PART 10

# GENERAL SCHEME PROVISIONS

**10.1     Effective Date**

10.1.1     The Scheme shall become effective on the Effective Date.

**10.2     Pre-Scheme Expenses and Scheme Costs**

10.2.1     As soon as practicable after the Effective Date, there shall be paid in full out of the Scheme Companies' Property all Pre-Scheme Expenses in proportions to be agreed between themselves.

10.2.2     There shall be paid in full out of Minster's Property as incurred all Scheme Costs.

**10.3     Modifications of the Scheme**

10.3.1 The Scheme Company may at any hearing by the Court to sanction the Scheme consent on behalf of Scheme Creditors to any modification of, or addition to, the Scheme or any terms or conditions which the Court may think fit to approve or impose and which would not directly or indirectly have a materially adverse effect on the rights of any Scheme Creditor under the Scheme.

**10.4     Notices**

10.4.1     Without prejudice to clause 10.5, any notice or other written communication to be given under or in relation to the Scheme shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, sent by Post or by fax, to:

(a)     in the case of the Scheme Company, c/o Minster Management Services Limited, 18 Mansell Street, London E1 8AA, fax number +44 (0)20 7709 5760, marked for the attention of Hilary Young or Brenda Payter, or such other address or fax number as the Scheme Company may notify to Scheme Creditors for the purposes of this clause 10.4;

(b)     in the case of the Scheme Adviser, PricewaterhouseCoopers LLP, Plumtree Court, London EC4A 4HT, United Kingdom, fax number +44 (0)20 7212 6316, marked for the attention of Simon Hawkins, or such other address or fax number as the Scheme Adviser may notify to Scheme Creditors for the purpose of this clause 10.4;

(c)     in the case of a Scheme Creditor, its last known address or fax number of which the Scheme Manager is aware.

10.4.2 Any notice or other written communication to be given under the Scheme shall (except as herein otherwise provided) be deemed to have been received:

(a)     if delivered by hand, on the first Business Day following delivery;

(b)     if sent by Post, on the second Business Day after posting if the recipient is in the country of dispatch and otherwise on the seventh Business Day after posting; and

(c)     if sent by fax, upon receipt of a clear fax transmission report.

10.4.3     In proving service, it shall be sufficient proof in the case of a notice sent by Post that the envelope was properly stamped, addressed and placed in the Post.

10.4.4 For the purposes of Part 3, the omission by any of the Scheme Company or any Office Holder to send any notice, written communication or other document in accordance with this clause 10.4 or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of that Part.

**10.5    Electronic Communications**

10.5.1    Notwithstanding anything to the contrary in the Scheme, information concerning Scheme Claims, (including Claim Forms and copies of any relevant supporting documentation) and any other communications required to be or capable of being given or sent hereunder may be given or sent by the Scheme Company, Scheme Adjudicator, Scheme Adviser, Scheme Manager or the Scheme Creditor concerned in electronic form to the address specified for that purpose by the Scheme Creditor, Scheme Company, Scheme Adjudicator, Scheme Adviser or Scheme Manager (all of whom hereby consent to the use of electronic communications) and references in the Scheme to Post and addresses shall be construed accordingly.

10.5.2   Where any communication is sent to the Scheme Company or Scheme Manager in electronic form:

   (a)    the complete electronic mail including any attachments must be less than 5 megabytes in size;

   (b)    a hard copy of any electronic mail must be sent to either the Scheme Manager or Scheme Company if either of them so requests;

   (c)    receipt by the Scheme Creditor of an automated acknowledgement shall constitute conclusive proof that the electronic mail was sent in accordance with clause 10.5.1; and

   (d)    the electronic mail shall not be deemed to have been received unless it is received in the Scheme Company's or Scheme Manager's mail box and the Scheme Company or Scheme Manager is able to open and print it and any attachments and, if requested, unless a hard copy is received in accordance with clause 10.5.2(b).

10.5.3   Where any communication to the Scheme Company, Scheme Adjudicator, Scheme Adviser, Scheme Manager or Scheme Creditor in electronic form exceeds 5 megabytes in size, the electronic mail should be split into multiple electronic mails each of which must be less than 5 megabytes in size, including any attachments. Alternatively, the communication should be sent to the Scheme Manager, Scheme Adjudicator, Scheme Adviser, Scheme Manager or Scheme Creditor by Post.

10.5.4    Subject to clause 10.5.2(d), notice given or information provided in electronic form shall be deemed to have been received on the first Business Day following the expiration of 48 hours after the time it was sent by the sender.

**10.6    Calculation of Time Periods**

10.6.1    Time periods laid down by the Scheme which are expressed in days shall be calculated by reference to elapsed days and not Business Days.

10.6.2    For the purposes of clauses 4.5.1 or 4.5.2, a period of 6 months shall run from the day of the month on which the period commences to the day in the sixth month thereafter numerically corresponding to that day, less one day. Where there is no numerically corresponding day in that month the period shall end on the last day of that month.

10.6.3    In the event that a time period expires on a day which is not a Business Day, such period shall be deemed not to expire until 5.30 p.m. (U.K. time) on the Business Day next following.

**10.7    Governing Law and Jurisdiction**

10.7.1    The Scheme shall be governed by, and construed in accordance with, the laws of England, and the Scheme Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any Proceedings and to settle any dispute which may arise out of the Explanatory Statement, the statement explaining the effect of the Scheme prepared and sent to Scheme Creditors pursuant to Part 26 of the Act, or any provision of the Scheme, including this clause 10.7, or out of any action taken or omitted to be taken under the Scheme or in connection with the

administration of the Scheme, and for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court provided, however, that nothing in this clause 10.7 shall affect the validity of any other provisions determining governing law as between the Scheme Company and any of its Scheme Creditors whether contained in any Insurance Contract or otherwise.

10.7.2     Notwithstanding the provisions of clause 10.7.1, the Scheme Company retain the right to bring Proceedings in the courts of any other country having jurisdiction under its own laws to hear such Proceedings.

Dated 4 November 2009

# SCHEDULE 1

# SCHEME BUSINESS

**SECTION 1**

**1      Minster**

All insurance and reinsurance business of Minster together with that business shown in Section 2, other than:

- Aviation business underwritten on behalf of Minster by Westminster Insurance Agencies Limited trading as Westminster Aviation Insurance Group ("WAIG") from 1993 to 1998;

- Non-proportional treaty reinsurance business underwritten on behalf of Minster by Donald Fox & Partners (Underwriting Management) Ltd (now Ridgwell Fox & Partners (Underwriting Management) Limited) from 1978 to 1980;

- Business underwritten on behalf of Minster as an underwriting agent by Alexander Howden & Company Limited between 1946 to 1952;

- Marine business underwritten on behalf of Minster by The London Assurance from 1946 to 1983.

- All reinsurance of Reliance's business made under the contract between Minster and Reliance dated 22 August 1995.

**2 .     M a l v e r n**

All insurance and reinsurance business.

**3 .     C o n t i n g e n c y**

All insurance and reinsurance business.

**4 .     P r o g r e s s**

All reinsurance business.

**5 .     G A N   I A**

All insurance and reinsurance business written by GAN IA through the ILU under:

- Stamp 328338 – 100 per cent. GAN IA from 1982 to 1994;

- Stamp 328349 – 3 per cent. GAN IA and 97 per cent. Malvern from 1982 to 1985.

**6.     QBE**

All insurance and reinsurance business written on behalf of QBE Insurance Company (UK) Limited (formerly Iron Trades Mutual Insurance Company Limited and Iron Trades Insurance Company Limited and transferred to QBE pursuant to Part VII of the Financial Services and Markets Act 2000) jointly with Minster and Reliance by Robt. Bradford & Company Limited or Robt. Bradford & Company (Agencies) Limited from 1952 to 1960.

**7 .     R e l i a n c e**

All insurance and reinsurance business written on behalf of Reliance jointly with Minster and QBE UK (formerly Iron Trades Mutual Insurance Company Limited and Iron Trades Insurance Company Limited) by Robt. Bradford & Company Limited and Robt. Bradford & Company (Agencies) Limited from 1952 to 1960.

# SCHEDULE 2

# ESTIMATION GUIDELINES

## 1.        Introduction

Each Section of the Estimation Guidelines must be read in its entirety. Reading individual parts of Sections in isolation could be misleading.

The Estimation Guidelines describe the approach that the Scheme Manager and the Scheme Company would expect Scheme Creditors to follow in valuing Scheme Claims. The Estimation Guidelines are designed to be of assistance to Scheme Creditors in developing their estimates of Scheme Claims by setting out estimation techniques that are generally accepted within the insurance market. Scheme Creditors are not, however, precluded from using other projection techniques where they consider these techniques to be appropriate, provided that such techniques are shown to be robust and that they use assumptions that can reasonably be justified by the Scheme Creditor. It should be noted in this context that the Scheme Company does not consider the valuation of "All Sums" claims on a "Pure All Sums" basis to be either appropriate or robust. The Scheme Company will only agree to settle such claims (or give weight to "All Sums" claims in a settlement) where such claims are calculated on a basis that is net of contributions to and from other insurers on the relevant coverage period.

The Scheme Manager on behalf of the Scheme Company will adopt the Estimation Guidelines in valuing Scheme Claims. Should the Scheme Manager consider that the circumstances of particular Scheme Claims are such that robust and justifiable approaches other than those set out below are more appropriate then these will be adopted in valuing Scheme Claims.

In all cases Scheme Creditors should value Scheme Claims as a Best Estimate, as defined in Section 2 of this Schedule.

A Scheme Creditor's Scheme Claims will consist of Non-IBNR Claims and IBNR Claims. In order for the Scheme Creditor to complete its Claim Form, the Scheme Creditor should initially estimate Non-IBNR Claims and IBNR Claims as at the Ascertainment Date and then adjust them to allow for:

- losses that have been notified to the Scheme Creditor between the Ascertainment Date and the Final Claims Submission Date (or the date of the Meetings in the case of completing its Voting Form); and

- Previously Agreed Liabilities arising between the Ascertainment Date and the Effective Date (or the date of the Meetings in the case of completing its Voting Form).

The value of Non-IBNR Claims and IBNR Claims after these adjustments should be the final values that are included on the Scheme Creditor's Claim Form (or Voting Form).

In most cases, the Scheme Manager will determine a Scheme Creditor's Agreed Claim without adjusting the Scheme Claim for the time value of money i.e. it will be assessed on an undiscounted basis; the exceptions to this are as discussed in of the Scheme Document.

The Scheme Company will not be bound by, or prepared to follow, any settlement made between the Scheme Creditor and another insurer or reinsurer if it believes that settlement to be unreasonable.

The supporting evidence that Scheme Creditors should provide in support of their estimates of Scheme Claims is set out in Schedule 4. The Estimation Guidelines and the Supporting Evidence document differ according to Insurance Contract type and claim loss type:

- Scheme Creditors whose Insurance Contract with the Scheme Company is:

    – Direct Insurance; or

    – Facultative Reinsurance of Direct Insurance

    should refer initially to Sections 2, 3 and 4 of this Schedule.

- Scheme Creditors whose Insurance Contract with the Scheme Company is:

  – Treaty Reinsurance;

  – Facultative Reinsurance other than of Direct Insurance;

  – Treaty Retrocession; or

  – Facultative Retrocession

  should refer initially to Sections 2, 5 and 6 of this Schedule.

- For each loss type the methodology differs according to whether the claim is related to asbestos, environmental pollution and other health hazards (collectively labelled as "APH"), or not related to asbestos, environmental pollution and other health hazards ("Non-APH").

In some instances, this Schedule makes reference to certain traditionally used actuarial methodologies. For further information on the use of these methodologies and the circumstances in which they can be used, reference can be made to  http://www.casact.org/admissions/syllabus/ch5.pdf.

## 2.    Definitions specific to the Estimation Guidelines

Various definitions are given below that are relevant to the Estimation Guidelines. Terms not otherwise defined in this Section shall have the meaning ascribed to them in the Scheme.

**APH**: means collectively asbestos, environmental pollution and/or other health hazards;

**Best Estimate**: means an estimate that is not biased either upwards or downwards and is intended to represent the mean of the distribution of possible outcomes;

**Non-APH**: means not related to asbestos, pollution or other health hazards;

## 3.    Direct Insurance/Facultative Reinsurance of Direct Insurance Non-APH Claims

This Section describes the Estimation Guidelines that may be useful to Scheme Creditors with Non-APH claims arising under an Insurance Contract with the Scheme Company that is Direct Insurance or Facultative Reinsurance of Direct Insurance.

This Section relates to a Scheme Claim arising under a Direct Insurance contract. If a Scheme Creditor has Facultative Reinsurance of any Direct Insurance contract, the points raised in the remainder of this Section will need to be considered in relation to the claim being made by the underlying insured to the Scheme Creditor. Consideration will then need to be given to the resulting claim from the Scheme Creditor to the Scheme Company.

### 3.1    *Projection techniques*

For each class of business and type of loss, an "average cost per claim method" should be adopted. This involves building up an estimate of the total number of claims to be received by the Scheme Creditor and applying to that an average claim cost to determine its total inwards liability. This can then be applied to the policy profile of the Scheme Creditor to derive the Scheme Company's share of that cost.

For each Scheme Creditor the process may involve the following steps (please refer to the website listed in Section 1 for further information):

- Estimate the ultimate number of claims that will be filed against the Scheme Creditor for the loss type under consideration and for the period over which the Scheme Company was providing coverage;

- Select average indemnity and expense costs per claim allowing for future inflation;

- Multiply the ultimate number of claims by the selected average indemnity cost per claim to derive an estimate of the total indemnity cost, and by the selected average expense cost per claim to derive an estimate of the total expense cost;

- Where applicable, for example if the approach has been applied at a level that has made use of data from policies not covered by the Scheme Company, allocate these costs (indemnity and expense) across the coverage period relevant to the loss concerned;

- Apply the cost for each year in the coverage period to the policy profile that is relevant to the loss to derive the Scheme Company's share of those costs.

The Scheme Creditor may need to consider an allocation of claims costs over the period under consideration if the coverage has varied over that period or where there are gaps in the Scheme Company's coverage or both. In carrying out this allocation, the Scheme Creditor can consider features of the claims experience for individual policies or alternative features that might indicate an expected level of claims on each policy (such as the policy's premiums or other suitable exposure measures) or both. Consideration of such exposure details will tend to be more appropriate where claims experience is limited or non-existent.

### 3.2 *Alternative approaches where historical information may not be available*

If a Scheme Creditor has evidence that it is exposed to liability from a source from which it has as yet no claims experience, it may under certain circumstances be appropriate to use information which is not based on past claims history to support its claim. A suitable methodology is likely to involve elements from epidemiological and demographic studies, industry comparisons and trend lines. Other methods, provided that the rationale and basis for the assumptions are clearly explained, might also be suitable.

The approach taken will need to draw from the information available to the Scheme Creditor. It should consider what information and supporting evidence it can gather and thus what approach should be developed which maximises its ability to provide backing information and justification for the assumptions used.

Once the ground-up loss for the Scheme Creditor has been established, the liabilities can be applied to the Scheme Company's policies in the normal manner. Consideration then needs to be given to the likelihood of the claims actually emerging to the extent indicated by the selected methodology. The final result needs to be adjusted for this probability which should be documented in full.

### 4   Direct Insurance/Facultative Reinsurance of Direct Insurance APH Claims

This Section describes the Estimation Guidelines that may be useful to Scheme Creditors with APH claims arising under an Insurance Contract with the Scheme Company that is Direct Insurance or is Facultative Reinsurance of Direct Insurance.

This Section relates to a Scheme Claim arising under a Direct Insurance contract. If a Scheme Creditor has Facultative Reinsurance of Direct Insurance contracts, the points raised in the remainder of this Section will need to be considered in relation to the claim being made by the underlying insured to the Scheme Creditor. Consideration will then need to be given to the resulting claim from the Scheme Creditor to the Scheme Company.

### 4.1 *Asbestos claims*

An "average cost per claim method" should be adopted. This involves building up an estimate of the total number of claims to be received by the Scheme Creditor and applying to that an average claim cost to determine its total inwards liability. This can then be allocated across the appropriate coverage period and applied to the policy profile of the Scheme Creditor to derive the Scheme Company's share of that cost.

If this approach is adopted, the following steps should be followed (note that further guidance for some of these points is given later):

- Estimate the ultimate number of claims to be filed against the Scheme Creditor;

- Select average indemnity and expense costs per claim allowing for future inflation;

- Multiply the ultimate number of claims by the selected average indemnity cost per claim to derive an estimate of the total indemnity cost, and by the selected average expense cost per claim to derive an estimate of the total expense cost;

- Identify the coverage period over which these costs are to be allocated by reference to the appropriate trigger;

- Allocate the costs (indemnity and expense) across this coverage period and apply the results to the policy profile of the Scheme Creditor to derive the Scheme Company's share of those costs.

Within the above approach separate consideration should be given to the disease type (e.g. mesothelioma, lung cancer, other cancer, asbestosis, other non-malignant) and the US State or country in which the claim originates.

If the claim includes an allowance for asbestos claims in policy sections or policies other than those relating to products coverage, a separate analysis should be included for these claims. This analysis should be similar to the approach outlined above and should include assumptions on the numbers and amounts of occurrences and the basis of aggregation.

*Claim numbers*

The estimates of claim numbers should take account of the historical claims development together with any available independent studies of the incidence of asbestos-related diseases and should reflect the prevailing legal environment in the relevant country and/or jurisdiction.

*Expenses*

Scheme Creditors should indicate whether expenses are included in the limits or in addition to the limits for each policy.

*Trigger of coverage*

The most common approach adopted by the US courts to determine the period over which the losses should be allocated is the continuous trigger, whereby all policies available over the period from the date of first exposure to asbestos up to the date when the disease became clinically evident are triggered.

The selection of the coverage period should also take the following into consideration:

- The treatment of any periods of self insurance;

- The period during which the Scheme Creditor manufactured, installed or distributed asbestos-containing products;

- Exclusion clauses within the Scheme Creditor's policies;

- Settlements and other major agreements between the Scheme Creditor and its insurers;

- Legal judgments in any coverage disputes between the Scheme Creditor and its insurers;

- The latest approaches adopted by the US courts (or courts in other countries, if appropriate).

*Allocation of costs to the coverage period*

In most circumstances, we would expect the costs to be spread over the entire period covered by the triggered policies with reference to the Scheme Creditor's asbestos exposure over time. The Scheme Manager will expect the Scheme Creditor to provide exposure information in support of its approach.

The Scheme Creditor is normally required to share in the allocation by bearing the loss allocated to periods of self insurance or non-insurance.

In circumstances where consideration may be given to settlement on an "All Sums" basis, the Scheme Manager will assign an appropriate weight (which may be 100 per cent.) to an All Sums calculation, where that calculation is conducted on a basis that is net of contributions to and from other insurers on the relevant coverage period.

Where appropriate and insofar as is practicable and possible, the basis of settlement shall include an assignment to the Scheme Creditor of any and all rights that the Scheme Company may have against other insurers on the relevant coverage period now and/or in the future.

The Scheme Manager will consider other methods of allocating costs to the coverage period provided that they are shown to be robust and that they use assumptions that can reasonably be justified by the Scheme Creditor.

Some of the issues highlighted above for the selection of the coverage period will also be relevant here and should be considered within the allocation approach.

4.2    **Environmental pollution claims**

In order to determine the Liability in respect of polluted sites an exposure-based approach should be used. The Scheme Creditor should identify all sites to which it has exposure for which liability potential has already been notified and sites for which they believe they will be notified of Liability potential in the future. The steps below should be used for each site to convert the estimated clean-up cost of these sites into a potential Scheme Claim to the Scheme Company. Further guidance for some of these points is given below:

- Estimate the cost of cleaning up a polluted site;

- Distribute these clean-up costs between the Scheme Creditor and other Potentially Responsible Parties ("PRPs");

- Estimate corresponding expenses;

- Identify the period over which these clean-up costs and expenses are to be allocated with reference to the appropriate trigger;

- Allocate the clean-up costs and expenses over this period and apply the results to the Scheme Creditor's policy profile;

- Assess the legal coverage issues involved in determining the validity of the claim.

*Clean-up costs*

For each site an undiscounted clean-up cost should be established. The Scheme Creditor should provide independent supporting evidence when claiming future clean-up costs. Past costs may be supported by internal evidence held or obtained by the Scheme Creditor. Where the information provided by the Scheme Creditor differs significantly from other sources then the Scheme Manager may request additional information from the Scheme Creditor and retain the right to request independent verification of clean-up costs.

*Expenses*

Scheme Creditors should indicate whether expenses are included in the limits or in addition to the limits for each policy. Where expenses are included in the clean-up cost amounts this should be

indicated by the Scheme Creditor. Each creditor should provide details of how their own expenses have been determined, allowing for the number of PRPs involved at the site if appropriate.

*PRP share*

The total costs for each site should be allocated to PRPs using participation percentages or volumetric shares where possible. Where neither of these is available, the share of unallocated costs on a site should be estimated with reference to the most appropriate available information.

*Governing Law*

The ultimate loss to the Scheme Company for a site will depend, to some extent, on the assumptions adopted by the courts in any litigation in the relevant jurisdiction. These assumptions vary from state to state. The US courts are now generally using the site location as the key factor in determining the appropriate Governing Law although there are some exceptions to this general statement (see below). The Governing Law in relation to any Scheme Claim will therefore be the law of the state where the particular site is located and the Scheme Manager will apply that law by reference to the principles set out below. The exceptions to this are where:

- The Scheme Creditor has agreed a settlement with the London Market;

- The Scheme Creditor can identify a court decision that means that any claim will be subject to a different governing law.

*Trigger of coverage*

The most common approach adopted by the US courts to determine the period over which the losses should be allocated is the continuous trigger, whereby all insurance policies on the risk are triggered commencing on the date of first exposure through to the date of manifestation. Other triggers have occasionally been selected and applied.

*Allocation of costs to triggered policies*

The default method of allocation should be the *pro-rata* allocation. Under this basis, the costs are spread evenly over the entire period covered by the triggered policies.

The Scheme Creditor is normally required to share in the allocation by bearing the loss allocated to periods of self insurance or non-insurance.

In circumstances where consideration may be given to settlement on an "All Sums" basis, the Scheme Manager will assign an appropriate weight (which may be 100 per cent.) to an All Sums calculation, where that calculation is conducted on a basis that is net of contributions to and from other insurers on the relevant coverage period.

Where appropriate and insofar as is practicable and possible, the basis of settlement shall include an assignment to the Scheme Creditor of any and all rights that the Scheme Company may have against other insurers on the relevant coverage period now and/or in the future.

The Scheme Manager will consider other methods of allocating costs to the coverage period provided that they are shown to be robust and that they use assumptions that can reasonably be justified by the Scheme Creditor.

*Coverage issues*

Insurers may not in all cases be liable to pay the clean-up costs and expense costs. Each policy covering the Scheme Creditor has a number of clauses that insurers and reinsurers may argue preclude Liability. The key issues to consider are:

- The presence of the "absolute", "sudden and accidental" and "owned property" exclusion clauses;

- Whether clean-up costs are considered as damages;

- The "expected or intended" argument.

The effect of any of the above issues on individual sites will be assessed by considering recent legal precedents to determine the likelihood of various outcomes by state and policy-year. For the "owned property" exclusion a similar approach should be adopted only to sites that are owned property and, as such, these should be indicated by the Scheme Creditor.

*Future sites*

If the Scheme Creditor considers that it will potentially be exposed to as yet unidentified sites, then it should consider an allowance for these sites using an "average cost per claim method". The Scheme Creditor should estimate the number of such sites, with reference to the past emergence of unidentified sites, and apply an average cost per site. This average cost per site will need to have regard to the characteristics that the unidentified sites are likely to exhibit.

43    *Other health hazards*

For each health hazard, an "average cost per claim method" should be adopted. This involves building up an estimate of the total number of claims to be received by the Scheme Creditor and applying to that an average claim cost to determine its total inwards liability. This can then be allocated across the appropriate coverage period and applied to the policy profile of the Scheme Creditor to derive the Scheme Company's share of that cost.

This process involves the following steps (note that further guidance for some of these points is given below):

- Estimate the ultimate number of claims that will be filed against the Scheme Creditor for the loss type under consideration;

- Select average indemnity and expense costs per claim allowing for future inflation;

- Multiply the ultimate number of claims by the selected average indemnity cost per claim to derive an estimate of the total indemnity cost, and by the selected average expense cost per claim to derive an estimate of the total expense cost;

- Allocate the costs (indemnity and expense) across the coverage period relevant to the Scheme Creditor;

- Apply the results of the above allocation to the policy profile of the Scheme Creditor to derive the Scheme Company's share of the costs.

*Claim numbers*

The estimates of claim numbers should take account of the historical claims development together with any independent studies of the incidence of the loss type.

*Expenses*

Scheme Creditors should indicate whether expenses are included in the limits or in addition to the limits for each policy.

*Trigger of coverage*

The most common approach adopted by the US courts to determine the period over which the losses should be allocated is the continuous trigger, whereby all policies available over the period from the date of first exposure up to the date when the disease became clinically evident are triggered.

The selection of the coverage period should also take the following into consideration:

- Settlements and other major agreements between the Scheme Creditor and its insurers;

- Legal judgments in any coverage disputes between the Scheme Creditor and its insurers;

- The latest approaches adopted by the courts.

*Allocation of costs to the coverage period*

In most circumstances, the *pro-rata* allocation basis will be appropriate. Under this basis, the costs are spread evenly over the entire period covered by the triggered policies.

The Scheme Creditor is normally required to share in the allocation by bearing the loss allocated to periods of self insurance or non-insurance.

In circumstances where consideration may be given to settlement on an "All Sums" basis, the Scheme Manager will assign an appropriate weight (which may be 100 per cent.) to an All Sums calculation, where that calculation is conducted on a basis that is net of contributions to and from other insurers on the relevant coverage period.

Where appropriate and insofar as is practicable and possible, the basis of settlement shall include an assignment to the Scheme Creditor of any and all rights that the Scheme Company may have against other insurers on the relevant coverage period now and/or in the future.

The Scheme Manager will consider other methods of allocating costs to the coverage period provided that they are shown to be robust and that they use assumptions that can reasonably be justified by the Scheme Creditor.

### 4.4 *Alternative approaches where historical information may not be available*

If a Scheme Creditor has evidence that it is exposed to liability from a source from which it has as yet no claims experience, it may under certain circumstances be appropriate to use information which is not based on past claims history to support its claim. A suitable methodology is likely to involve elements from epidemiological and demographic studies, industry comparisons and trend lines. Other methods, provided that the rationale and basis for the assumptions are clearly explained, might also be suitable.

The approach taken will need to draw from the information available to the Scheme Creditor. It should consider what information and supporting evidence it can gather and thus what approach should be developed which maximises its ability to provide backing information and justification for the assumptions used.

Once the ground-up loss for the Scheme Creditor has been established, the liabilities can be applied to the Scheme Company's policies in the normal manner. Consideration then needs to be given to the likelihood of the claims actually emerging to the extent indicated by the selected methodology. The final result needs to be adjusted for this probability which should be documented in full.

## 5 Reinsurance Non-APH Claims

This Section describes the Estimation Guidelines that may be useful to Scheme Creditors with non-APH claims arising under an Insurance Contract with the Scheme Company that is Treaty Reinsurance or is Treaty Retrocession or is Facultative Retrocession (but not Facultative Reinsurance of Direct Insurance).

### 5.1 *Overview*

If possible, the Scheme Creditor should initially estimate the ultimate claims cost from its inwards claims. This ultimate claims cost should then be applied to the Scheme Creditor's outwards reinsurance programme to calculate ultimate recoveries from the Scheme Company.

To estimate the ultimate claims cost from its inwards claims, catastrophes or other single large distorting losses should first be extracted from the inwards data and analysed separately. Scheme Creditors should refer to Section 5.2 for further detail.

Then the ultimate claims cost in respect of the residual losses should be estimated for each class of business and year of account. Scheme Creditors should refer to Sections 5.3 and 5.4 for further detail.

Once gross ultimate claims have been estimated in accordance with the contents of Sections 5.2 to 5.4, the gross IBNR needs to be allocated in a manner that is suitable for the Scheme Creditor's outwards reinsurance programme to derive the Scheme Company's share of the costs. Scheme Creditors should refer to Section 5.5 for further detail.

Where the Scheme Creditor's data or information are not sufficient to perform the techniques set out in Sections 5.2 to 5.5, they should refer to Sections 5.6 to 5.7.

## 5.2 *Catastrophes or other single large distorting losses*

Scheme Creditor's inwards catastrophes and any other single large distorting losses should be analysed individually. Note that these analyses should ideally be carried out on data that ensures that the results are appropriate to the Scheme Creditor's outwards reinsurance programme. If it becomes necessary to aggregate data across different business classes, it may be necessary to allocate resulting IBNR to the business classes that are suitable for the Scheme Creditor's outwards reinsurance programme. For further guidance in this area, refer to Section 5.5.

The ultimate claims costs for catastrophes and other distorting losses should be estimated using projection approaches as described below:

- Curve-fitting historical paid or incurred claims development via use of an appropriate mathematical function, such as the Craighead curve, or, if such a curve cannot be closely enough fitted, a fit by eye can be used;

- Decay methods – for each loss, estimate a factor that represents a typical decline in incremental paid or incurred amounts over an appropriate period. The selected factor should then be applied to the latest paid or incurred increment over an appropriate period to project the applicable amounts of future paid or incurred claims. The projected future amounts can then be added to the cumulative paid or incurred position as at the Ascertainment Date to determine the gross ultimate claims cost for the loss in question;

- Exposure-based analysis – estimate gross ultimate claims for the loss with reference to the Scheme Creditor's individual inwards exposures. The Scheme Creditor should determine which of its inwards policies are potentially exposed to the loss in question and estimate, on a policy-by-policy basis, the amount of coverage used;

- Benchmarking – the Scheme Creditor may also adopt benchmarking techniques to produce a gross estimates of the ultimate cost of the loss in question. Further information is available in Section 5.7. In applying the approaches set out in Section 5.7, the Scheme Creditor will need to bear in mind that the benchmarks should be applied to gross data as at the Ascertainment Date, rather than the reinsurance data that is the basis for that Section.

## 5.3 *Residual losses on Direct Insurance, proportional or working layer excess of loss Reinsurance contracts*

The ultimate claims cost in respect of the residual losses should be estimated for each class of business and underwriting year using one of the following approaches:

- Chain-ladder method, in which the past development of individual years of account is used to estimate future development for less mature years of account;

- Empirical methodologies on individual years of account e.g. curve-fitting or survival ratio techniques. Curve-fitting techniques are as described in Section 5.2. In the survival ratio technique, a typical paid or incurred increment is selected before a multiplier is applied in order to estimate the future claims cost.

The Scheme Creditor needs to ensure that any paid data that is used in these estimates is free of the distorting effects of structured settlements arising in the past. For example, with respect to past payments relating to Lifetime Medical Claims, such payments would need to be capitalised and included within the data in the period of the initial payment.

For further information on these techniques, refer to the website listed in Section 1.

Scheme Creditors should estimate their gross inwards ultimate claims for each class of business and underwriting year.

### 5.4 *Residual losses on medium to high level excess of loss Reinsurance contracts*

The ultimate claims cost in respect of the residual losses impacting medium to high level excess of loss contracts (where losses are expected less frequently than would be the case with working layers) should be estimated for each class of business, underwriting year and layer using, for example, an "average cost per claim" method as follows:

- Estimate the ultimate number of claims that will be received by the Scheme Creditor;

- Select average indemnity and expense costs per claim allowing for future inflation;

- Multiply the ultimate number of claims by the selected average indemnity cost per claim to derive an estimate of the total indemnity cost, and by the selected average expense cost per claim to derive an estimate of the total expense cost.

The results of the average cost per claim method set out above can be enhanced by considering likely distributions of claims received by the Scheme Creditor in order better to understand how these claims will result in recoveries from the Scheme Company.

This process can be enhanced further by the adoption of stochastic modelling techniques in which statistical distributions can be applied to some or all of the key assumptions, such as the average cost of each claim and/or the number of claims to be reported to the Scheme Creditor in the future. These distributions can then be sampled many thousands of times in order to derive a distribution for the aggregate ultimate claims falling within the terms of the reinsurance contract of the Scheme Company.

### 5.5 *Application to reinsurance programme*

The estimated ultimate claims costs deriving from inwards claims, as estimated in Sections 5.2, 5.3 and 5.4 should then be applied to the Scheme Creditor's outwards reinsurance programme to derive the Scheme Company's share of the costs.

The results of the estimations described in Sections 5.2, 5.3 and 5.4 should ideally already be in a format that is suitable for direct application to the Scheme Creditor's outwards reinsurance programme. If aggregation of data is required in order to estimate inwards claims, then it will be necessary to allocate the resulting IBNR back to the business categories that are suitable for the Scheme Creditor's outwards reinsurance programme. This allocation can be achieved with reference to one or more of the following, depending on the quality and nature of the data available;

- Cumulative paid or incurred claims aggregated for each business category;

- Total case estimates for each business category;

- A suitable exposure measure such as the total gross premiums or cover originally available or cover remaining for each business category.

Once this allocation has been carried out, the resulting estimates of gross ultimate claims costs can be applied to the Scheme Creditor's outwards reinsurance programme to derive estimates of the recoveries due from the Scheme Company. This application will need to take account of relevant features of the reinsurance coverage, such as the limit and excess points for excess of loss contracts and the proportion ceded for proportional contracts.

In certain circumstances, the Scheme Creditor may be able to apply alternative approaches designed to estimate its reinsurance recoveries at an overall level from all of its reinsurers. However, this analysis may not permit an explicit identification of the Scheme Company's share of the Scheme Creditor's total reinsurance recoveries. In these circumstances, it may be possible to adjust the ratios derived from the Scheme Creditor's total reinsurance recoveries to make them applicable to the reinsurance coverage specific to the Scheme Company. Suitable ratios for use in these circumstances include ratios of IBNR Claims to Non-IBNR Claims or the ratios of ultimate claims to paid or incurred claims. Necessary adjustments will depend on how the Scheme Company's coverage compares with the Scheme Creditor's total outwards reinsurance programme with respect to the nature, extent and level of the reinsurance coverage specific to the Scheme Company.

If the Scheme Creditor has made use of an approach that employs stochastic modelling techniques, the model may need to be tailored so that it is appropriate to the Scheme Creditor's submission. Following any tailoring necessary to make the model appropriate in estimating the Scheme Creditor's recoveries from the Scheme Company, it will be necessary to determine the mean of the distribution of recoveries emerging from the model (in order to be consistent with the requirement for a Best Estimate figure in the Scheme Creditor's claims submission).

5.6     *Projections using outwards reinsurance data*

Where the Scheme Creditor is unable to carry out the techniques outlined in Sections 5.2 to 5.5 on part or all of the accounts reinsured by the Scheme Company, the Scheme Creditor may be able to apply any of the projection techniques in Sections 5.2 to 5.4 directly to its outwards ceded experience (with no requirement to follow the process described in Section 5.5 since this approach will estimate the Scheme Creditor's reinsurance recoveries directly).

The experience that forms the basis for projection within this Section will be in respect of the cessions under the cover that is the subject of the submission. This would need to be submitted together with reasons why it has not been possible for the Scheme Creditor to follow techniques applied to gross data (as outlined in Sections 5.2 to 5.4) and then set the results emerging from this process against the relevant reinsurance programmes (as outlined in Section 5.5). The Scheme Creditor should also support the submission with benchmarks for which detail is given in the next Section.

Additional consideration will need to be given to features of the outwards reinsurance coverage that may lessen the reliability of results derived using these methods, such as policy limits applying to excess of loss covers.

5.7     *Benchmarking techniques*

Where the Scheme Creditor's data or information are not sufficient to perform the techniques set out in Sections 5.1 to 5.5 or 5.6, the Scheme Creditor should make use of benchmarking approaches. This would also be expected as support for a submission based on outwards ceded experience, as set out in Section 5.6. If benchmarking techniques are the sole methodology used by the Scheme Creditor, justification will need to be submitted as to why the approaches outlined in Section 5.1 to 5.5 or 5.6 could not be used.

Benchmarks should be applied to positions as at the Ascertainment Date in respect of paid, outstanding and incurred recoveries between the Scheme Creditor and the Scheme Company. Benchmarks that could be used include ratios of IBNR Claims to Outstanding Claims or ratios of ultimate claims to incurred claims based on an analysis of the Scheme Creditor's exposures.

Allowance should be made for the effect of large single movements, such as large losses or major commutations, and for any other features of the experience that could distort these benchmark approaches.

Consideration should be given to the subdivisions of the Scheme Creditor's account which are used in the benchmarking process. A balance needs to be struck between subdividing to make the benchmarking process more appropriate to each subdivision of data and not subdividing so much that the resulting data being used in the benchmarking process lacks statistical credibility.

The types of subdivision will depend on the data available and may consist of any or all of the following:

- Type of loss (e.g. liability or property damage);

- Type of business (e.g. proportional or non-proportional);

- Class of business.

Where possible, the results from this approach should be supported using development data for ceded paid and incurred claims.


## 6       Reinsurance APH Claims

This Section describes the Estimation Guidelines that may be useful to Scheme Creditors with APH claims arising under an Insurance Contract with the Scheme Company that is Reinsurance (but not Facultative Reinsurance of Direct Insurance) or is Retrocession.

The preferred approach to estimating the ultimate Scheme Claim for such Reinsurance or Retrocession contracts is to project the ultimate claims costs to the Scheme Creditor for the underlying policies and apply these costs to the Reinsurance contracts. Possible methodologies that the Scheme Creditor may adopt are detailed in Sections 6.1 and 6.2 below.

The approach in Section 6.1 requires detailed information regarding the Scheme Creditor's underlying liabilities which may not be held by some Scheme Creditors. In addition, this approach may not be suitable for certain types of Reinsurance, in particular Retrocession, owing to their complex nature. In such cases, the methodology in Section 6.2 is likely to be more appropriate. If neither of these methods can be carried out with the data available the benchmark approach detailed in Section 6.3 should be used and the requested supporting evidence provided.


6.1      *Estimation of underlying liabilities: Exposure-based model*

This approach requires detailed information regarding the Scheme Creditor's underlying insureds and is likely to be suitable where the contract that the Scheme Creditor has with the Scheme Company is a Treaty Reinsurance which protects an underlying direct account.

An exposure-based model should be used by the Scheme Creditor to estimate the ultimate claims costs from its direct insureds. These ultimate claims costs should then be applied to the Scheme Creditor's outwards reinsurance programme to calculate ultimate recoveries from the Scheme Company. For guidance on estimating the ultimate claims costs from the direct insureds the Scheme Creditor should refer to Section 4 (Direct Insurance or Facultative Reinsurance of Direct Insurance APH Claims).

For underlying insureds where the Scheme Creditor's data or information are not sufficient to support the estimation of ultimate claims costs from the direct insureds that is described in Section 4, an analysis can be carried out using a model which classifies the underlying insureds into categories or tiers, according to the Scheme Creditor's view of each underlying insured's ultimate claims costs. Percentages (erosion percentages) should then be applied to each inwards policy layer to estimate the proportion of the layer that will be eroded. These percentages should be specific to each category and reflect the layer at which exposures are expected to attach.

Under both the individual and category based approaches above, the Scheme Creditor should provide details of whether claims have been allocated to the products or non-products section of a policy. The erosion percentages or categorisation used should reflect the Scheme Creditor's views on the appropriate method of aggregation which should be considered separately for products and non-products claims. For example, this information would be particularly relevant for asbestos non-products claims, such as premises claims, and for pollution site clean-up cost claims emerging from individual direct insureds.

Where the Scheme Creditor has insufficient data available to use any of the exposure-based approaches described above, other methods, for example those outlined in Sections 6.2 or 6.3, may be used. In these circumstances clear details of the methodology and assumptions should be provided and evidence should be supplied as to why the approach taken is appropriate.

6.2    *Estimation of underlying liabilities: Other approaches*

If the approach outlined in Section 6.1 above is not possible, for example under Retrocession contracts or Reinsurance of direct insurers with more limited information, it may be possible for the Scheme Creditor to estimate its inwards liabilities using other methods and apply these costs to the Reinsurance contracts.

These methods may involve the Scheme Creditor estimating its inwards liabilities at an aggregate level, split by claim-type, as per the following examples:

- Underlying insured analysis – An analysis of the emerging claims experience (both numbers and amounts at the level of data available) from each underlying insured, for all cedants of the Scheme Creditor combined;

- Cedant analysis – An analysis of the emerging claims experience (both numbers and amounts at the level of data available) from each individual cedant of the Scheme Creditor;

- Categorised cedant analysis – An assignment of the cedants to a number of relevant categories (e.g. London market, US primary reinsurer etc) and application of selected erosion percentages for each category.

Where appropriate the analyses should be supplemented by a consideration of the likely allowance for future claims to emerge from cedants or underlying insureds from whom the Scheme Creditor has not yet received a claim.

Once the Scheme Creditor has estimated its ultimate inwards liabilities, these claims costs should then be applied to the Scheme Creditor's outwards reinsurance programme to calculate ultimate recoveries from the Scheme Company. The Scheme Creditor should consider an appropriate aggregation of its inwards liabilities before allocating these claims to its reinsurance programme.

Throughout this analysis, the Scheme Creditor should consider the extent to which its Scheme Claims may be impacted by limited reinstatement provisions that may be present in both its underlying policies and Reinsurance contracts.

The approach used by the Scheme Creditor to estimate its inwards liabilities need not be limited to the methods described above. However, clear details of the methodology and assumptions used should be provided and evidence should be supplied as to why the approach taken is appropriate.

6.3    *Benchmarking*

It may be that it is not possible for the Scheme Creditor to relate its inwards liabilities to the Scheme Claims in all cases, because of a lack of data and/or a complexity of reinsurance contracts. In such cases, a benchmarking approach is likely to be the most appropriate method of estimating the Scheme Claims.

Benchmarks should be applied to positions as at the Ascertainment Date in respect of paid, outstanding and incurred recoveries between the Scheme Creditor and the Scheme Company. Benchmarks could be based on an analysis of the Scheme Creditor's exposures and could include:

- Ratios of IBNR Claims to Non-IBNR Claims;

- Ratios of ultimate claims (Scheme Claims) to incurred claims;

- Ratios of ultimate claims (Scheme Claims) to paid claims;

- Paid and incurred survival ratios.

In using benchmarks allowance should be made for the effect of large single claims movements or any other features of the experience that could distort these benchmark approaches. Allowance should also be made for the effect of any policy conditions, for example limited reinstatement provisions, which could distort these benchmark approaches.

Consideration should be given to the subdivisions of the Scheme Creditor's account which are used in the benchmarking process. A balance needs to be struck between subdividing to make the benchmarking process more appropriate to each subdivision of data and not subdividing so much that the resulting data being used in the benchmarking process lacks statistical credibility.

The types of subdivision will depend on the data available and may consist of any or all of the following:

- Type of loss (e.g. liability or property damage);

- Type of business (e.g. proportional or non-proportional);

- Age of business;

- Class of business;

- Underlying insured;

- Cedant or type of cedant.

Where possible, the results from this approach should be additionally supported using development data for ceded paid and incurred claims.


7.        **Unanticipated latent claims**

Where a Scheme Creditor has reason to believe that there is inwards exposure to types of claim that are not yet known about, then, subject to the conditions set out later in this Section, the Scheme Creditor can submit a claim for this exposure. Such exposure is expected to diminish over time until it eventually reduces to an immaterial level. The exposure is expected to vary according to several factors, including:

- Nature of claim;

- Class of business;

- Type of acceptance and other coverage aspects;

- The nature of the (underlying) insured's business;

- Territory.

The Scheme Creditor will first need to supply information to demonstrate the existence of the exposure. This information will have regard to the above factors and will need to draw on company and industry data to prove a reasonable likelihood that the future experience will occur at some level.

Having demonstrated that the future experience is likely to occur, the Scheme Creditor needs to provide an estimate of the ultimate cost of the experience together with appropriate supporting evidence. In view of the diverse nature of the underlying claims, the Scheme Manager will accept any reasonable approach, provided that it is appropriately supported and takes into account the factors listed above.

## 8      Risk loading and discount for the time value of money

The preceding Sections give guidance to assist the Scheme Creditor in estimating its Scheme Claims. Please see Schedule 3 of the Scheme document which describes the approach that the Scheme Manager will take to adjust the Scheme Claims to allow for a risk loading and a discount for the time value of money.

# SCHEDULE 3

# RISK LOADING

1.      The Estimation Guidelines at Schedule 2 give guidance to assist the Scheme Creditor in estimating
its Scheme Claims. This Schedule describes the approach that the Scheme Manager will take to adjust the Scheme Claims to allow for a risk loading and a discount for the time value of money.

## 2.    Overview

2.1     The Scheme Manager will add a risk loading to the value of the Scheme Claims in recognition of the risk being transferred back onto the Scheme Creditor's balance sheet. The resulting amount will then be discounted for the time value of money at the Risk Free Rate.

2.2     The Scheme Manager has analysed past experience in respect of the Scheme Business and has determined that the risk loading and discount for the time value of money approximately offset each other in most circumstances. In recognition of this, the Scheme Creditor's Agreed Claims will be agreed without adjusting the value of Scheme Claims for a risk loading or the time value of money (subject to the points made below in Section 3 below).

## 3.    Limitations on the risk loading

3.1     There are situations where no risk or only limited risk is being passed back to the Scheme Creditor because the Scheme Claims are at or near the maximum amount payable to a Scheme Creditor in relation to an underlying loss.

3.2     In these situations, the Scheme Manager considers that any risk loadings payable should be limited. The risk loading will be limited in the following situations:

3.2.1    Where losses are assessed individually (e.g. aggregated asbestos claims set against an individual underwriting year or catastrophe claims), the maximum possible value of the Scheme Claims will be the relevant Scheme Company's share of the total combined policy limits available for each loss ("**Loss Limit**") i.e. the total vertical coverage available for each loss. For such losses, the risk loading will be limited to the difference between the value of the Scheme Claims and the Loss Limit for each loss.

3.2.2    Where losses are assessed in aggregate (e.g. attritional claims), the risk loading will be limited if the Scheme Manager can demonstrate that an element of the Scheme Claims does, in fact, relate to individual losses that have the potential to be at or near individual Loss Limits.

3.2.3    Where a structured agreement exists between the Scheme Company and a Scheme Creditor (i.e. an agreement providing for a sequence of payments such as an annuity type agreement), and the maximum amount payable by the Scheme Company is capped, the risk loading will be limited to the difference between the value of the Scheme Claims and the cap for each loss.

3.3     In all of the above situations, where the risk loading has been limited, the resulting value of the Scheme Claims plus the risk loading will be discounted to allow for the time value of money. This will be achieved by the Scheme Manager applying the Risk Free Rate to expected payment patterns, as at the Final Claims Submission Date, that the Scheme Companies Manager considers are appropriate to the nature of the Scheme Claims.

3.4     In exceptional circumstances, the Scheme Creditor may suggest an alternative payment pattern for discounting for agreement with the Scheme Manager, provided that the Scheme Creditor can supply a calculation that the Scheme Manager considers is robust and which includes justifiable underlying assumptions.

3.5     In all of the above situations, the discounted value of the Scheme Claims plus the risk loading will be less than the undiscounted value of the Scheme Claims.

# SCHEDULE 4

# SUPPORTING EVIDENCE TO SCHEME CLAIMS SUBMITTED USING THE ESTIMATION GUIDELINES

## 1. Introduction

This Schedule sets out the level of supporting evidence that should be supplied by a Scheme Creditor in support of the different approaches used for estimating Scheme Claims for different Insurance Contract types and claim types as described in Schedule 2.

Terms used in this Section shall have the meaning ascribed to them in the Scheme and the Estimation Guidelines in Schedule 2 to the Scheme.

## 2. Techniques not covered in Schedule 2

Wherever the Scheme Creditor adopts projection techniques other than those set out in Schedule 2, full supporting evidence should be provided, including full descriptions of the techniques adopted and the assumptions made, including supporting data to justify each of the assumptions made.

## 3. Direct Insurance/Facultative Reinsurance of Direct Insurance Non-APH Claims

This Section describes the supporting evidence that should be submitted by Scheme Creditors with Non-APH claims arising under an Insurance Contract with the Scheme Company that is Direct Insurance or Facultative Reinsurance of Direct Insurance.

This Section relates to a Scheme Claim arising under a Direct Insurance contract. If a Scheme Creditor has Facultative Reinsurance of Direct Insurance contract, it will need to supply information with respect to the underlying contracts and insureds that constitute the underlying claim source. This information will be in addition to the policy data described below. This additional information is needed in order to understand exactly how the underlying claim has resulted in a claim to the Scheme Company.

3.1 *Projection techniques*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance Non-APH claims following the approach set out in Schedule 2 Section 3.1 should provide supporting evidence with the Claim Form that should include:

- Policy details as required by the Claim Form;

- The underlying data used and the methodology and assumptions applied to estimate the ultimate claims cost (and hence how the value of Scheme Claims has been estimated);

- The methodology and assumptions used to allocate the ultimate claims cost to each policy (where applicable);

- The historical development of paid and incurred losses to the policies;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Justification of the probability of any new claims occurring based on the evidence of past delays in notification;

- The assumptions used in assessing the future claims amounts.

3.2     *Alternative approaches where historical information may not be available*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance Non-APH claims following the approach set out in Schedule 2 Section 3.2 should provide supporting evidence with the Claim Form that should include full details of the approach taken and justification of assumptions made.

## 4     Direct Insurance/Facultative Reinsurance of Direct Insurance APH Claims

This Section describes the supporting evidence that should be submitted by Scheme Creditors with APH claims arising under an Insurance Contract with the Scheme Company that is Direct Insurance or Facultative Reinsurance of Direct Insurance.

This Section relates to a Scheme Claim arising under a Direct Insurance contract. If a Scheme Creditor has Facultative Reinsurance of Direct Insurance contract, it will need to supply information with respect to the underlying contracts and insureds that constitute the underlying claim source. This information will be in addition to the policy data described below. This additional information is needed in order to understand exactly how the underlying claim has resulted in a claim to the Scheme Company.

4.1     *Asbestos claims*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance Asbestos claims following the approach set out in Schedule 2 Section 4.1 should provide supporting evidence with the Claim Form that should include:

*Agreements or settlements with any insurer*

If there is a coverage in place agreement or settlement with any insurer, the Scheme Creditor should:

- Provide a copy of the agreement (the Scheme Manager and/or Scheme Company and its advisers will sign a confidentiality agreement if necessary);

- Indicate the policy years covered by the agreement;

- Indicate the extent to which the limits provided by the agreement have been paid to date.

*Claims estimation data*

The Scheme Creditor should provide details of the asbestos product(s) involved and the years that the product(s) were manufactured and distributed by the Scheme Creditor.

A claimant database should also be provided, to include, at a minimum, the following information for each individual claimant who has filed a claim against the Scheme Creditor:

- Claimant name;

- Date when the claim was filed against the Scheme Creditor;

- Type of claim (i.e. products bodily injury, products property damage, premises, other types of non-products etc);

- If the claim is a non-products claim, the site, and US State where that site is located, from where the claim arose;

- Claim status (i.e. whether the claim is still open, or whether it has been closed);

- If the claim has been closed, a flag to show whether the claim was settled or dismissed, the date when settlement/dismissal took place and the total indemnity amount of the settlement;

- Total defence costs paid to date in respect of each claim (both for the closed (settled and dismissed) and open claims);

- Disease type (e.g. mesothelioma, lung cancer, other cancer, asbestosis, other non-malignant);

- US State or other jurisdiction in which the claim was filed;

- Law firm representing the claimant;

- Doctor supporting the claim and the screening facility;

- If the claim record relates to a class action or multi-plaintiff lawsuit, the number of underlying individual claimants (although ideally, we would like full data in respect of each individual claimant underlying a particular class action);

- Date of first and last exposure to asbestos for the claimant.

From this database, it should be possible to determine the following summary information for each claim type and disease type:

- Number of claims filed, settled and dismissed by year and by state, for as many years as possible including the number of claims against the Scheme Creditor remaining open as at the Ascertainment Date;

- Indemnity and expense costs for claims closed by the Scheme Creditor, by year, by state, by disease type, for as many years as possible.

*Policy data*

The Scheme Creditor should provide policy data as follows:

- A complete coverage chart showing erosion to date, in both an electronic format and as a colour coded chart as appropriate;

- A list of the policies written by the Scheme Company where asbestos claims have been
allocated including information on policy limits, aggregate limits and excess points;

- Evidence of prior settlement where blocks of coverage are excluded from allocation;

- Evidence of policies being costs in addition where the Scheme Creditor is making such an assertion;

- Evidence of entitlement under the policies where the Scheme Creditor is not the named insured;

- Details of any exclusion clauses.

*Basis of estimation*

The Scheme Creditor should indicate the basis of estimation that it has used and should provide:

- A description of the Scheme Creditor's own basis of estimation of the ultimate asbestos claims cost, including the techniques used for projecting future numbers of claims filed and for projecting average claims costs and details of any assumptions used;

- Evidence of court or other rulings to substantiate the basis of estimation;

- Details of the methodology and assumptions used to allocate the ultimate claims cost to the Scheme Creditor's policies with the Scheme Company;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company.

4.2     *Environmental pollution claims*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance Pollution claims following the approach set out in Schedule 2 Section 4.2 should provide supporting evidence with the Claim Form that should include:

*Agreements or settlements with any insurer*

Scheme Creditors should provide a copy of, or excerpt from, any settlement agreement with any insurer specifying the date of the settlement, the amount of the agreement, the allocation to policy years, the sites involved and the split of the settlement between indemnity and expense costs (the Scheme -Manager and/or Scheme Company and its advisers will sign a confidentiality agreement if necessary).

*Numbers of sites exposed*

The Scheme Creditor should provide the Environmental Protection Agency (EPA) site ID for each site where the Scheme Creditor is submitting a claim to the Scheme Company for liability arising under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Appropriate identifiers should also be provided for third party, Resource, Conservation and Recovery Act ("RCRA"), Natural Resource Damage ("NRD") or other sites as applicable.

*Claims estimation data*

For each of the sites listed above, the following information will be required:

- Site name, site state;

- Estimated undiscounted cost of cleaning up the site including operation and maintenance costs, either

  – for the whole site with volumetric share or participation percentage or estimated share as documented by site engineers; or

  – for the Scheme Creditor's share of the site clean-up costs only;

- Evidence as to how the costs have been estimated and by who will need to be provided;

- Start date of involvement at site;

- End date of involvement at site;

- Notification date or discovery date for involvement;

- Costs spent to date for clean-up or investigation of the site by the Scheme Creditor;

- Legal costs spent to date by the Scheme Creditor;

- Whether the site is owned property;

- Latest and pertinent previous records of decision;

- Legal assumptions made regarding the trigger and allocation to policies including, if the Scheme Creditor has calculated the settlement on an "All Sums" basis, the "All Sums" year selected.

*Policy data*

The Scheme Creditor should provide policy data as follows:

- A complete coverage chart showing erosion to date, in both an electronic format and as a colour coded chart as appropriate;

- A list of the policies written by the Scheme Company where pollution claims have been allocated including information on policy limits, aggregate limits and excess points;

- Evidence of prior settlement where blocks of coverage are excluded from allocation;

- Evidence of policies being costs in addition where the Scheme Creditor is making such an assertion;

- Evidence of entitlement under the policies where the Scheme Creditor is not the named insured;

- Details of any exclusion clauses;

- Where the Scheme Creditor has assumed aggregate limits on lower layer policies, the Scheme Creditor should provide evidence of the existence of these lower layer aggregate limits.

*Basis of estimation*

The Scheme Creditor should indicate the basis of estimation that it has used and should provide:

- A description of the Scheme Creditor's own basis of estimation of the ultimate pollution claims cost;

- Evidence of court or other rulings to substantiate the basis of estimation;

- Details of the methodology and assumptions used to allocate the ultimate claims cost to the Scheme Creditor's policies with the Scheme Company;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company.

43    *Other health hazards claims*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance APH claims following the approach set out in Schedule 2 Section 4.3 for claim types such as those occurring under US product liability insurances should provide supporting evidence with the Claim Form that should include:

*Agreements or settlements with any insurer*

If there is a coverage in place agreement or settlement with any insurer, the Scheme Creditor should:

- Provide a copy of the agreement (the Scheme Manager and/or Scheme Company and its advisers will sign a confidentiality agreement if necessary);

- Indicate the policy years covered by the agreement;

- Indicate the extent to which the limits provided by the agreement have been paid to date.

*Claims estimation data*

The Scheme Creditor should provide details of:

- Any products involved, including the years the products were manufactured and distributed by the Scheme Creditor;

- All claims information should be split by type of claim (e.g. products bodily injury, products property damage, types of non-products claims etc.);

- Number of claims filed against the Scheme Creditor, by year, by state, by disease type (i.e. malignant, non-malignant) for as many years as possible;

- Number of claims closed by the Scheme Creditor, by year, by state, by disease type, for as many years as possible;

- Indemnity and expense costs for claims closed by the Scheme Creditor, by year, by state, by disease type, for as many years as possible;

- Analysis of closed claims split into those settled at cost and those settled for zero cost;

- Number and amounts of claims against the Scheme Creditor remaining open as at the Ascertainment Date by year, by state, by disease type;

- If appropriate, a claimant database to include at a minimum, claim status, claimant name, doctor, screening facility, law firm, filing date, state, disease type, date of first exposure and date of last exposure.

### Policy data

The Scheme Creditor should provide policy data as follows:

- A complete coverage chart showing erosion to date, in both an electronic format and as a colour coded chart as appropriate;

- A list of the policies written by the Scheme Company where other health hazards claims have been allocated including information on policy limits, aggregate limits and excess points;

- Evidence of prior settlement where blocks of coverage are excluded from allocation;

- Evidence of policies being costs in addition where the Scheme Creditor is making such an assertion;

- Evidence of entitlement under the policies where the Scheme Creditor is not the Named Insured;

- Details of any exclusion clauses.

### Basis of estimation

The Scheme Creditor should indicate the basis of estimation that it has used and should provide:

- The technique and basis used for projecting average claims costs;

- The technique and basis used for projecting future numbers of claims filed;

- Evidence of court or other rulings to substantiate the basis of estimation;

- Details of the methodology and assumptions used to allocate the ultimate claims cost to the Scheme Creditor's policies with the Scheme Company;

- The value of Scheme Claims being claimed by the Scheme Creditor from each Scheme Company.

### 4.4 *Alternative approaches where historical information may not be available*

Scheme Creditors with Direct Insurance/Facultative Reinsurance of Direct Insurance APH claims following the approach set out in Schedule 2 Section 4.4 should provide supporting evidence with the Claim Form that should include full details of the approach taken and justification of assumptions made.

## 5    Reinsurance Non-APH Claims

### 5.1    *Overview*

This Section describes the supporting evidence that should be submitted by Scheme Creditors with Non-APH claims arising under an Insurance Contract with a Scheme Company that is Treaty Reinsurance or is Treaty Retrocession or is Facultative Retrocession (but not Facultative Reinsurance of Direct Insurance).

### 5.2    *Catastrophes or other single large distorting losses*

Scheme Creditors' inwards catastrophes and any other distorting losses should be analysed individually following the approach set out in Schedule 2 Section 5.2. Scheme Creditors should provide supporting evidence with the Claim Form that should include:

- The underlying data used and the methodology and assumptions applied to estimate the ultimate claims cost for each large loss;

    - where a curve has been successfully fitted, details of the mathematical function used together with the selected parameters;

    - where a decay method has been used, reasons why a paid decay method has been selected over an incurred decay (or *vice versa*) and reasons why the period selected is representative of a typical decay and is therefore suitable for the projection to ultimate;

    - where the exposure-based method has been used, details of the inwards exposures used in the projection together with reasons for the selections of the amounts of coverage used on each individual exposure.

- The historical development of paid and incurred claims for each large loss, at the level at which the projection is being performed;

- Details of any court or other rulings being relied on, together with details of how these factors have influenced the projection to ultimate.

### 5.3    *Residual losses on proportional or low level excess of loss contracts*

Scheme Creditors with gross losses impacting proportional or low level excess of loss contracts following the approach set out in Schedule 2 Section 5.3 should provide supporting evidence with the Claim Form that should include:

- The underlying data used to estimate the ultimate claims costs for the inwards claims to the Scheme Creditor;

- The methodology and assumptions applied to estimate the total ultimate claims costs for the inwards claims to the Scheme Creditor;

- Where chain-ladder methodologies have been used, details of individual factors to ultimate together with reasons for the selection of a methodology based on paid claims and/or incurred claims;

- Where a survival ratio technique has been used, reasons why a paid increment has been selected over an incurred increment (or *vice versa*) and reasons why the period selected is representative of a typical decay and is therefore suitable for the projection to ultimate. In the selection of the ratio, the Scheme Creditor should refer to the contents of Section 5.7 on benchmarking;

- The historical development of paid and incurred losses to the policies, at the level at which the projection is being performed which should therefore exclude any losses considered in Section 5.2;

- If applicable, details of how the paid data has been adjusted for the presence of structured settlements.

### 5.4 *Residual losses on medium to high level excess of loss contracts*

Scheme Creditors with gross losses impacting medium to high level excess of loss claims following the approach set out in Schedule 2 Section 5.4 should provide supporting evidence with the Claim Form that should include:

- The underlying data used to estimate the ultimate number of claims and the average indemnity and expense costs per claim;

- The methodology and assumptions applied to estimate the ultimate number of claims;

- The methodology and assumptions applied to estimate the average indemnity and expense costs per claim;

- The historical development of paid and incurred losses to the policies, at the level at which the projection is being performed.

To the extent that the average cost per claim method has been enhanced by considering likely distributions of claims received by the Scheme Creditor, explanations should be provided to support the selection of the various distributions. Where these differing claims distributions have been relied upon in the submission, via the application of probabilities attaching to the different distributions or otherwise, sufficient detail should be supplied to understand both how the analyses have been relied upon and any assumptions that have been made.

If any of the assumptions are to be modelled using stochastic assumptions, a detailed description should be supplied that shows clearly which assumptions are being modelled stochastically and which deterministically, together with detail as to how all the assumptions fit together (including allowance for correlation of different model inputs, if applicable) to produce the resulting distribution of aggregate ultimate claims falling to the reinsurance contract of the Scheme Company. Deterministic assumptions should be supported in the manner described in earlier Sections. Where an assumption is modelled stochastically, detail should be supplied to support the selection of the mathematical function and parameters used. This detail should include supporting underlying data and analysis relating to the fit of the assumption to the data. The detail of the resulting distribution should be supplied in order to understand the variability of the result around a Best Estimate.

### 5.5 *Application to reinsurance programme*

The results of Sections 5.2, 5.3 and 5.4 should then be applied to the Scheme Creditor's outwards reinsurance programme to derive the Scheme Company share of the costs following the approach set out in Schedule 2 Section 5.5. Scheme Creditors should provide supporting evidence with the Claim Form that should include:

- Outwards policy details as required by the Claim Form, including details of policies that inure to the benefit of the Scheme Company's policies;

- Details of how the estimates of the ultimate costs for the inwards claims are converted into claims on the outwards reinsurance contracts;

- Where aggregation was used to estimate ultimate inwards claims, the methodology and assumptions used to allocate aggregate IBNR back to the business categories suitable for the Scheme Creditor's outwards reinsurance programme;

- If recoveries due on the Scheme Company's coverage have been derived with reference to adjustments made to ratios applying for the total outwards reinsurance programme, details of the ratios used together with reasoning to support the adjustments, which should include

commentary on how the Scheme Company's coverage fits into the Scheme Creditor's outwards reinsurance programme;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company.

5.6     *Projections using outwards reinsurance data*

Scheme Creditors following the approach set out in Schedule 2 Section 5.6 should provide supporting evidence with the Claim Form that should include:

- Outwards policy details as required by the Claim Form, including details of policies that inure to the benefit of the Scheme Company's policies;

- The underlying outwards ceded paid and incurred experience used to estimate the value of the Scheme Claims being claimed by the Scheme Creditor;

- The methodology and assumptions applied to estimate the value of the Scheme Claims being claimed by the Scheme Creditor, together with detail to understand how potential short-comings of this approach have been overcome, such as the exhaustion of coverage available;

- The value of the Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Justification for why the approaches outlined in Schedule 2 Sections 5.2 to 5.5 could not be applied;

- Supporting evidence for benchmarking techniques for which detail is given in the next Section.

5.7     *Benchmarking*

Scheme Creditors following the approach set out in Schedule 2 Section 5.7 should provide supporting evidence with the Claim Form that should include:

- Outwards policy details as required by the Claim Form, including details of policies that inure to the benefit of the Scheme Company's policies;

- Type of claim;

- Details of the benchmarks and how they have been applied;

- Evidence to justify why the benchmarks used apply to the Scheme Creditor;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Justification for why the approaches outlined in Schedule 2 Sections 5.2 to 5.6 could not be applied.

6     **Reinsurance APH Claims**

This Section describes the supporting evidence that should be submitted by Scheme Creditors with APH claims arising under an Insurance Contract with a Scheme Company that is Reinsurance (but not Facultative Reinsurance of Direct Insurance) or is Retrocession.

6.1     *Estimation of underlying liabilities: Exposure-based model*

Scheme Creditors with Reinsurance claims following the approaches set out in Schedule 2 Section 6.1 should provide supporting evidence with the Claim Form that should include a list of underlying insureds to which the Scheme Creditor is exposed and a means of referencing the

Scheme Creditor's exposures to these insureds. For each underlying insured the Scheme Creditor should provide the following information in respect of the claims by the underlying insureds against the Scheme Creditor:

- Name of insureds and insured code;

- Start and end dates of cover;

- Policy limits (including details of the aggregate and/or per occurrence combined single limits and, if applicable, separate bodily injury and property damage single limits);

- Excess points (to be supplied as a numerical and/or a text field. In many instances this field may only include a general description that the policy was in excess of primary or underlying coverage);

- The Scheme Creditor's share of each policy (supplied through London Order, Insurer Signed line, Global 100 per cent. amount, London 100 per cent. amount);

- Any information about primary layers and self-insured retentions;

- Paid and outstanding amounts on these underlying policies, including corresponding attorney report date;

- An estimate of the ultimate claims costs inwards to the Scheme Creditor in respect of each underlying policy;

- Latest copies of any relevant attorney reports;

- Where relevant, detailed evidence of the Scheme Creditor's assumptions of the percentage of each policy layer that will be eroded by category and by layer at which exposures attach;

- Where relevant (e.g. environmental pollution claims), site names and site locations for each underlying insured claim;

- Where relevant (e.g. environmental pollution claims), an estimate of the underlying insured's site clean-up costs, and the source of these estimates;

- Where the estimate of future recoveries is material, more detail should be provided based on the descriptions for Direct Insurance in Section 4.

The supporting evidence to be provided with the Claim Forms should also include the following information in respect of the claims by the Scheme Creditor on a Scheme Company:

- Listing of the relevant Reinsurance contracts of the Scheme Creditor with the Scheme Company, including start and end dates of cover, shares, limits and deductibles;

- Details of how the estimates of the ultimate claims costs for the underlying insureds are converted into claims on the Reinsurance contracts;

- Details of any court or other rulings being relied on;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Where claims have been aggregated for the purposes of making reinsurance recoveries, the basis of, and justification for, the method of aggregation should be explained. (Please note that the Scheme Manager does not expect environmental pollution claims from individual sites to be aggregated for the purpose of making reinsurance recoveries.)

6.2 **Estimation of underlying liabilities: Other approaches**

Scheme Creditors with Reinsurance claims that have followed the underlying insured approach set out in Schedule 2 Section 6.2 should provide supporting evidence with the Claim Form that should include the following, split by claim type in respect of the claims by underlying insureds on the Scheme Creditor:

- A list of underlying insureds (and cedants in the case of retrocession) in respect of which the Scheme Creditor has received claims;

- Details of the emerging claims experience, both numbers and amounts, appropriate to the analysis performed;

- The estimated ultimate inwards claims cost to the Scheme Creditor, in respect of each underlying insured. If possible, this information should be provided split by underwriting year and, where appropriate, environmental site;

- Full descriptions of the techniques adopted and the assumptions made, including supporting data to justify each assumption made, in determining these estimated ultimate claims costs;

- Details of any other components of the inwards liabilities to the Scheme Creditor (e.g. estimated claims from new underlying insureds) that will ultimately form part of the Scheme Claims. Each such component should be supported by a full description of the techniques adopted and the assumptions made, including supporting data where possible to justify each assumption made.

Scheme Creditors that have followed the individual cedant analysis approach described in Schedule 2 Section 6.2 should also provide the details set out above in respect of all cedants that have submitted claims against the Scheme Creditor, also split by claim type.

If the Scheme Creditor adopts projection techniques other than those set out in Schedule 2 Section 6.2 in order to determine its inwards liabilities, full supporting evidence should be provided, including full descriptions of the techniques adopted and the assumptions made, including supporting data to justify each of the assumptions made.

The supporting evidence to be provided with the Claim Forms should also include (in respect of the claims by the Scheme Creditor on a Scheme Company):

- Listing of the relevant Reinsurance contracts of the Scheme Creditor, including start and end dates of cover, shares, limits and deductibles;

- Details of how the estimates of the ultimate claims costs for the underlying insureds are converted into claims on the Reinsurance contracts;

- Details of any court or other rulings being relied on;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Where claims have been aggregated for the purposes of making reinsurance recoveries, the basis of, and justification for, the method of aggregation should be explained. (Please note that the Scheme Manager does not expect environmental pollution claims from individual sites to be aggregated for the purpose of making reinsurance recoveries.)

6.3 **Benchmarking**

Scheme Creditors with Reinsurance APH claims following the approach set out in Schedule 2 Section 6.3 should provide supporting evidence with the Claim Form that should include:

- Type of claim;

- Names and geographical locations of underlying insureds and/or cedants;

- Details of the benchmarks and how they have been applied;

- Evidence to justify why the benchmarks used apply to the Scheme Creditor;

- Listing of the relevant Reinsurance contracts of the Scheme Creditor, including start and end dates of cover, shares, limits and deductibles;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- Where claims have been aggregated for the purposes of making reinsurance recoveries, the basis of and justification for the method of aggregation should be explained.

## 7    Unanticipated Latent Claims

Scheme Creditors submitting a claim in respect of inwards unanticipated latent claims, following the approach set out in Schedule 2 Section 7, should provide supporting evidence with the Claim Form that should include:

- Outwards policy details as required by the Claim Form, including details of policies that inure to the benefit of the Scheme Company's policies;

- Information to demonstrate the existence of the exposure, which will need to draw on company and industry data;

- The value of Scheme Claims being claimed by the Scheme Creditor from the Scheme Company;

- The methodology and assumptions used to estimate the total value of the Scheme Claims being claimed by the Scheme Creditor from the Scheme Company.

## 8    Risk loading and discount for the time value of money

Where the Scheme Creditor believes that exceptional circumstances apply with respect to its Scheme Claim such that the expected payment pattern differs from that anticipated by the Scheme Manager, the Scheme Creditor will need to submit additional information to support this stance. This will consist of reasons why they would expect payments to fall due at a different time to that anticipated by the Scheme Manager.

# SCHEDULE 5

# PROPOSED FORM OF CHAPTER 15 ORDER

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

In re

In a Case Under Chapter 15 of the
Bankruptcy Code

Case No. – B ———

MINSTER INSURANCE COMPANY LIMITED,

Debtor in a Foreign Proceeding.

AND/OR

In re

In a Case Under Chapter 15 of the
Bankruptcy Code

Case No. – B ———

MALVERN INSURANCE COMPANY LIMITED,

Debtor in a Foreign Proceeding.

**ORDER RECOGNIZING FOREIGN MAIN PROCEEDING OF [MINSTER INSURANCE COMPANY LIMITED] [MALVERN INSURANCE COMPANY LIMITED]** *AND PERMANENT INJUNCTION*

This matter having come before the Court upon the petition for recognition of a foreign main proceeding (the "Verified Petition") commencing this Chapter 15 case, the Verified Petition for Recognition of a Foreign Main Proceeding and Motion for a Permanent Injunction and Related Relief Pursuant to 11 U.S.C. §§1504, 1515, 1517, 1520, 1521 (the "Petition and Motion"), the Memorandum of Law in Support of the Petition and Motion (the "Memorandum of Law"), the Declaration of in Support of the Petition and Motion, (the "_____ Declaration"), the Statement of Foreign Representative Pursuant to 11 U.S.C. §1515(c) Identifying Foreign Proceedings (the "Section 1515(c) Statement") and the List Pursuant to Fed. R. Bankr. P. 1007(a)(4) (the "Bankruptcy Rule 1007(a)(4) List," and together with the Verified

Petition, the Petition and Motion, the Memorandum of Law, the _____ Declaration and the Section 1515(c) Statement, the Chapter 15 Pleadings"), each filed on , \_\_\_ by or on behalf of (the "Petitioner") on behalf of [Minster Insurance Company Limited ("Minster"),] [Malvern Insurance Company Limited ("Malvern"),] [(collectively], the "Compan[y][ies]") in his capacity as the duly appointed foreign representative of the Compan[y][ies], [each][a] debtor[s] in a proceeding relating to the adjustment of debts, namely scheme[s] of arrangement (the "Scheme[s] of Arrangement"), under Part 26 of the Companies Act of 2006 (the "English Proceeding") before the High Court of Justice of England and Wales (the "English Court"); the English Court having approved the Schemes of Arrangement by a sanction order dated , \_\_\_ (the "Sanction Order"); the Court having reviewed and considered the Chapter 15 Pleadings; the Court having held a hearing on , \_\_\_ (the "Recognition Hearing"); due and timely notice of the filing of the Chapter 15 Pleadings and the Recognition Hearing having been given pursuant to the Order Scheduling Hearing and Specifying the Form and Manner of Service and Notice, dated , \_\_\_, which notice is deemed adequate for all purposes such that no other or further notice thereof need be given; no objections or other responses having been filed thereto that have not been overruled, withdrawn or otherwise resolved; all interested parties having had due and proper notice and an opportunity to be heard; upon the record of the Recognition Hearing; and after due deliberation and sufficient cause appearing therefor, and for the reasons stated by the Court on the record of the Recognition Hearing, the Court hereby FINDS AND CONCLUDES THAT:

A. This court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and the Standing Order of referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated 10 July 1984.

B. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(P).

C. Venue is proper in this District pursuant to 28 U.S.C. §1410.

D. This case was properly commenced pursuant to 11 U.S.C. §§1504 and 1517.

E. The Verified Petition meets the requirements of 11 U.S.C. §1515.

F. The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. §§1515 and 1517(a).

G. The English Proceeding is a foreign proceeding within the meaning of 11 U.S.C. §101(23).

H. The English Proceeding is pending in the U.K., which is the country where the center of the main interests of [each of] the Compan[ies][y] is located and as such, is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. §§1502(4) and 1517(b)(1).

I. The Petitioner is a person and the duly appointed foreign representative of the Compan[ies][y] within the meaning of 11 U.S.C. §101(24) (the "Foreign Representative").

J. On \_\_\_\_\_, \_\_\_, the English Court issued the Sanction Order, which sanctioned the Scheme[s] of Arrangement of [each of] the Compan[ies][y]. Pursuant to the terms of the Scheme[s] of Arrangement, the Sanction Order will become effective on the date on which an office copy of the Sanction Order is delivered for registration to the Registrar of Companies in England and Wales (the "Effective Date").

K. The Foreign Representative is entitled to all of the relief set forth in 11 U.S.C. §1520.

L. Absent permanent injunctive relief, it appears to this Court that one or more parties-in-interest may commence or continue the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with a claim against the Compan[ies][y], [or each of them], or [the][its] property [of each of them] in the United States, thereby interfering with and causing harm to the English Proceeding and as a result, the Foreign Representative, the Compan[ies][y], [the][its] creditors [of each of them] and [the][its] estate [of each of them] would suffer immediate and irreparable injury for which there is no adequate remedy at law.

M.  Absent permanent injunctive relief, the English Proceeding and the Compan[ies'][y's] efforts in consummating the Scheme[s] of Arrangement may be thwarted by actions of certain creditors, a result inimical to the purposes of Chapter 15 as reflected, *inter alia*, in section 1501(a). Such actions may threaten, frustrate, delay and ultimately jeopardize the English Proceeding and the implementation of the Scheme[s] of Arrangement.

N.  The relief sought in the Petition and Motion will not cause undue hardship or inconvenience to parties-in-interest and, to the extent that any hardship or inconvenience may result, such hardship or inconvenience will be outweighed by the benefits to the Compan[ies][y], [the][its] estate and [the][its] creditors [of each of them].

O.  The relief sought in the Petition and Motion is necessary to effectuate the purposes of Chapter 15, to protect the Compan[ies][y] and the interests of [the][its] creditors [of each of them], and is not manifestly contrary to the public policy of the U.S.

P.  The Petitioner is entitled to the relief set forth herein under 11 U.S.C. §1521.

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT, UPON THE EFFECTIVE DATE:

1.  The English Proceeding is granted recognition as a foreign proceeding as defined in 11 U.S.C. §101(23) and pursuant to 11 U.S.C. §1517(a); and

2.  The English Proceeding is granted recognition as a foreign main proceeding pursuant to 11 U.S.C. §1517(b)(1); and

3.  The Petitioner is the duly appointed foreign representative of the Compan[ies][y] within the meaning of 11 U.S.C. §101(24) (the "Foreign Representative"); and

4.  The Scheme[s] of Arrangement shall be given full force and effect and be binding on and enforceable against all Scheme Creditors[1] in the U.S.; and

5.  All claims of Scheme Creditors shall be adjudicated pursuant to the terms of the Scheme[s] of Arrangement; and

6.  Except as provided in the Scheme[s] of Arrangement, all Scheme Creditors are permanently enjoined and restrained from:

(a)  taking or continuing any act to obtain possession of, or exercise control over, [any of] the Compan[ies][y] or any of [the][its] property [of any of them] that is located within the territorial jurisdiction of the United States or any proceeds thereof ("Property");

(b)  transferring, relinquishing or disposing of any Property of any of the Compan[ies][y];

(c)  commencing or continuing any action or legal proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim, (each individually, an "Action") against [any of] the Compan[ies][y] or any of [the][its] Property of any of them or seeking discovery of any nature against any of the Compan[ies][y];

(d)  commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against [any of] the Compan[ies][y] or any [of its] Property [of any of them], including, without limitation, rights under insurance, reinsurance or retrocession contracts;

(e)  invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state, or local law or regulation requiring [any of] the Compan[ies][y] to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or

---

1 Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Scheme[s] of Arrangement.

defending any Action and such statute, rule or requirement shall not apply to [any of] the Compan[ies][y] as party to any Action; provided, however, that nothing in this Order shall in any respect affect any security in existence at the Effective Date or the replacements for such security;

(f) withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which [any of] the Compan[ies][y] has an interest in excess of amounts expressly authorized by the terms of the contract and any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established; and

(g) declaring, considering or treating the filing of the Chapter 15 Pleadings or the Scheme[s] of Arrangement a default or event of default under any agreement, contract or arrangement; and

7. Except as provided in the Scheme[s] of Arrangement, all Scheme Creditors that are parties to any trust, escrow agreement or similar arrangement in which [any of] the Compan[ies][y] has an interest, are required to:

(a) provide notice to the Foreign Representative's U.S. counsel, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Gary S. Lee and Kathleen E. Schaaf), of any withdrawal from, set-off against, or other application of property that is the subject of any such trust or escrow agreement or similar arrangement in which [any of] the Compan[ies][y] has an interest, together with information sufficient to permit the Foreign Representative to assess the propriety of such withdrawal, set-off or other application, including, without limitation, the date and amount of such withdrawal, set-off or other application and a copy of any contract, related trust or other agreement pursuant to which any such withdrawal, set-off or other application was made, and provide such notice and other information contemporaneously; and

(b) turn over and account to the Foreign Representative for all funds resulting from such withdrawal, set-off or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established; and

8 Except as provided in the Scheme[s] of Arrangement, all Scheme Creditors are required to:

(a) turn over and account to the Foreign Representative for any Property of [any of] the Compan[ies][y] of which they have possession, custody or control;

(b) deliver to the Foreign Representative any books, papers or records of [any of] the Compan[ies][y] of which they have possession, custody or control and all Scheme Creditors having any books, papers or records that [any of] the Compan[ies][y] or the Foreign Representative may reasonably require in relation to their duties or related to any matter that may affect the implementation of the Scheme[s] of Arrangement shall preserve them and submit them to the Foreign Representative or its designees for examination at all reasonable times; and

(c) to the extent that they have a claim of any nature or source against [any of] the Compan[ies][y] or any Property of [any of] the Compan[ies][y] or are a party to any Action in which [any of] the Compan[ies][y] is or was named as a party, or as a result of which a liability of [any of] the Compan[ies][y] may be established, notify the Foreign Representative and put the Foreign Representative's U.S. counsel on the master service list (or similar common notice mechanism) of any such Action and take such other steps as may be necessary to ensure that they receive (i) copies of any and all documents sent by the parties to such Action or issued by the court, administrator, arbitrator, regulator or similar official having jurisdiction over such Action, and (ii) any and all correspondence on other documents circulated to parties named in the master service list; and

9. Subject to the terms and provisions of the Scheme[s] of Arrangement, all Scheme Creditors shall be permanently enjoined and restrained from commencing or continuing any act or Action against the provider of any letter of credit that has been released by the execution of a deed of release as provided for in the Scheme[s] of Arrangement; and

10. Nothing in this Order shall prevent the continuance or commencement of an Action against any insurer other than the Compan[ies][y], provided however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Compan[ies][y], such settlement or judgment shall not be binding on or enforceable against any of the Compan[ies][y]; and

11. This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order or requests for any additional relief in this case filed under Chapter 15 of the Bankruptcy Code and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court; and

12. No action taken by [any of] the Compan[ies][y], the Foreign Representative, their successors, agents, representatives or counsel in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Schemes of Arrangement, this Order, this Chapter 15 case, any further order for additional relief in this Chapter 15 case, or any adversary proceedings in connection therewith, will be deemed to constitute a waiver of the immunity afforded to the Compan[ies][y], the Foreign Representative or their successors, agents, attorneys or representatives pursuant to section 1510 of the Bankruptcy Code; and

13. This Order shall be served:

    (a) by U.S. mail, first class postage prepaid, upon all known Scheme Creditors of whose address [any of] the Compan[ies][y] is aware (or their counsel, if known to [any of] the Compan[ies][y]) on _____, ___; and

    (b) by publication in Business Insurance, Insurance Day, The Times, the U.K. and international editions of the Financial Times, the US and international edition of The Wall Street Journal), De Volkrant (Netherlands), The Globe & Mail (Canada), Les Echos (France), The Australian (Australia), and Handelsblatt (Germany), on _____ , ___ (or as soon as reasonably practicable thereafter);

    (c) and such service will be good and sufficient service and adequate notice for all purposes; and

14. The Chapter 15 Pleadings shall be made available by the Foreign Representative upon request to the Foreign Representative's U.S. counsel, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Gary S. Lee and Kathleen E. Schaaf).

Dated: New York, New York

_____

United States Bankruptcy Judge

# EXHIBIT D

_[vertical text in top-left corner, partially legible:]_ ...Square ...London EC4R 3..., Tel: +44 (0)20 7606 9800, Fax: +44 (0)20 7606 ..., Email: ...@barlowlyde.com

IN THE HIGH COURT OF JUSTICE

Claim No: 16521/09

CHANCERY DIVISION

COMPANIES COURT

**Before the Honourable Mr Justice Kitchin**

**Wednesday the 4th day of November 2009**

IN THE MATTERS OF:

MINSTER INSURANCE COMPANY LIMITED

MALVERN INSURANCE COMPANY LIMITED

THE CONTINGENCY INSURANCE COMPANY LIMITED

PROGRESS INSURANCE COMPANY LIMITED

GAN ASSURANCES IARD

QBE INSURANCE (EUROPE) LIMITED

THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION

LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006



**Draft ORDER**

**UPON** the applications by Part 8 Claim Form of Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company Limited, Progress Insurance Company Limited, GAN Assurances IARD , QBE Insurance (Europe) Limited and (following the making of the order in paragraph 1 below) The Reliance Fire and Accident Insurance Corporation Limited (the "**Scheme Companies**") dated 17 July 2009

**AND UPON** hearing Leading Counsel for the Scheme Companies

**AND UPON** reading the evidence recorded on the Court File as having been read

**IT IS ORDERED** that:

WE HEREBY CERTIFY THIS TO BE A TRUE COPY OF THE ORIGINAL

_[signature]_

BARLOW LYDE & GILBERT LLP

1       The Reliance Fire and Accident Corporation Limited be added as a further Claimant to the Part 8 Claim Form dated 17 July 2009;

2       The Scheme Companies do have liberty to convene meetings of their Scheme Creditors (as that term is defined in the schemes of arrangement proposed to be made between the Scheme Companies and their Scheme Creditors pursuant to Part 26 of the Companies Act 2006 (the "**Scheme**")) to be held on 18 January 2010 (or, if it becomes expedient to hold the said meetings at a later date, on a date within 3 months of 18 January 2010), at the offices of Barlow Lyde & Gilbert LLP, Beaufort House, 15 St Botolph Street, London, EC3A 7NJ, United Kingdom (or, if such venue is not available, such other suitable venue in central London as the Scheme Companies may select), which meetings shall be held in accordance with paragraphs 3 and 4 below, for the purpose of considering, and, if thought fit, approving (with or without modification) the Scheme (together the "**Meetings**");

3       Minster Insurance Company Limited, Malvern Insurance Company Limited, The Contingency Insurance Company, GAN Assurances IARD, QBE Insurance (Europe) Limited and The Reliance Fire and Accident Insurance Corporation Limited shall convene Meetings of each class of their Scheme Creditors as follows:

       3.1     one Meeting for Scheme Creditors to vote in relation to their Scheme Claims other than their IBNR claims (as defined in the Scheme); and

       3.2     one Meeting for Scheme Creditors to vote in relation to their IBNR Claims;

4       Progress shall convene a single meeting of its Scheme Creditors;

5       The Scheme Companies do convene the Meetings to commence at 11am (or as soon thereafter as the Chairman's introductory address referred to in paragraph 7 below shall have been concluded) and the Meetings shall be held concurrently save that the voting at each of the Meetings shall be held separately;

6      Jonathan Yorke of Barlow Lyde & Gilbert LLP, Beaufort House, 15 St Botolph Street, London EC3A 7NJ, or failing him, Clive O'Connell of Barlow Lyde & Gilbert LLP, Beaufort House, 15 St Botolph Street, London EC3A 7NJ be appointed as chairman ( the "**Chairman**") of the Meetings;

7      The Chairman, at the commencement of the Meetings, be at liberty to address all of the Scheme Creditors of each of the Scheme Companies generally on the Scheme, the method of voting at the Meetings and any other appropriate matters and that such address will be deemed to have been made at and for the purposes of each of the Meetings;

8      At least 63 days before the day appointed for the Meetings, a Notice convening the Meetings (the "**Notice**") shall be sent by first class Post or airmail (as appropriate) to: (i) each person or entity which one or more of the Scheme Companies believes is or might be a Scheme Creditor; and (ii) each broker or successor to a broker known to have placed business falling within the scope of the Scheme, in each case at their last known address, enclosing the following documents:

8.1      A Form of Proxy and Voting Form;

8.2      The Guidance Notes for the Completion of Form of Proxy and Voting Form;

8.3      A map showing the location of the venue for the meeting; and

8.4      The Scheme and the appendices thereto and the explanatory statement required to be provided pursuant to section 897(1)(a) of the Companies Act 2006 and the schedules thereto (the "**Explanatory Statement**"), together comprising the "**Scheme Document**");

9      At least 63 days before the day appointed for the Meetings, the documents referred to in paragraph 10 below shall be made available to Scheme Creditors to read or download from the website at www.minsterins.co.uk;

10     As soon as reasonably practicable after the making of this order, an advertisement giving notice of the Meetings and stating that the following documents:

   10.1    The Form of Proxy and Voting Form;

   10.2    The Guidance Notes for the Completion of Form of Proxy and Voting Form; and

   10.3    The Scheme Document;

can be downloaded from the website at www.minsterins.co.uk or obtained in hard copy, free of charge, by contacting Hilary Young at Minster Management Services Limited, 18 Mansell Street, London E1 8AA (the "**Advertisement**") be published once in the newspapers and publications listed in Schedule 1 hereto and such further publications as may be deemed appropriate by the Scheme Companies;

11     The Notice, Advertisement, Form of Proxy and Voting Form and Scheme Document, in the form or substantially in the form of the drafts of the same contained in exhibit "JLS4" to the Fourth Witness Statement of James Lee Saitch, are hereby settled by the Court, subject to completion of blanks and minor modifications as advised by solicitors and Counsel, and approved for use at and in connection with the Meetings;

12     Unless the Court orders otherwise, the accidental omission to give any Scheme Creditor or other person notice of the Meetings or the non-receipt of the Notice of the Meetings by a Scheme Creditor or other person shall not invalidate the proceedings at the Meetings;

13     Scheme Creditors be requested: (a) to return their Forms of Proxy and Voting Forms, marked for the attention of Hilary Young, (i) by post to Minster Management Services Limited, 18 Mansell Street, London E1 8AA; or (ii) by fax to +44 (0)20 7709 5760; or (iii) having scanned and saved such forms in Portable Document Format (PDF), by email to minsterscheme@minsterins.co.uk, in each case to be received by 5pm GMT on 15 January 2010, or (b) to hand in their Forms of Proxy and Voting Forms at the registration desk prior to the commencement of the Meetings on 18 January 2010;

14    The Chairman shall be at liberty to adjourn the Meetings, or any adjourned Meeting(s), for such period as he shall deem appropriate, provided that any adjourned Meeting shall recommence as soon as reasonably practicable thereafter;

15    The Chairman be at liberty to permit the attendance of persons who are not entitled to attend and vote at the Meetings unless an objection is taken by (or by a person appointed to vote by proxy for) a Scheme Creditor entitled to attend and vote at the Meetings, but such a person shall not be entitled to speak at the Meetings;

16    The Chairman be entitled to rely on the signatures on the Forms of Proxy and Voting Forms, including those sent by email or fax, as a warranty that the signatory has been duly authorised by the relevant Scheme Creditor to sign the Voting Form on behalf of that Scheme Creditor;

17    The Chairman be entitled to allow each Lloyd's Syndicate, whose underwriting members are or may be creditors of any Scheme Company in their capacity as members of such syndicate, one vote in number only, the value of the said vote being the aggregate of the claims of such members in respect of their membership of such syndicate;

18    The Chairman be responsible for determining the entitlement of and value for which any Scheme Creditor be permitted to vote at the Meetings by reference to any information supplied by the relevant Scheme Creditor (whether in connection with its Voting Form or otherwise), and any information contained in the Scheme Companies' books and records;

19    The Chairman be at liberty to accept the value for which a Scheme Creditor seeks to vote, in whole or in part, notwithstanding any failure by such Scheme Creditor to comply with the relevant requirements contained in the Voting Form, if sufficient information has been provided in the Voting Form, or by some other means, to enable the Chairman to assess the fairness and reasonableness of the value for which such Scheme Creditor should be permitted to vote, and to accept otherwise incomplete or late Voting Forms at his discretion after the date fixed in

the Notice (but, for the avoidance of doubt provided that any such Voting Form is received before he closes the relevant Meeting);

20      If the Chairman disagrees with the vote value submitted by a Scheme Creditor on the Scheme Creditor's Voting Form (either because it is higher or lower than the value held in the Scheme Company's records), the Chairman will determine what he considers to be a fair and reasonable value for voting purposes, with regard to any report received by him from the Independent Vote Assessor provided in accordance with paragraph 21 below;

21      George Maher, be appointed to act as the independent vote assessor (the "Independent Vote Assessor") for the purposes of:

   21.1   Providing an independent assessment of the values which are properly attributable to: (a) all votes which the Chairman does not accept in the amount in which they are cast and which he is unable to agree with the relevant Scheme Creditor; and (b) if and to the extent that any votes are cast against the resolution to approve the Scheme, sufficient votes which are cast in favour of the resolution to approve the Scheme in order that the Independent Vote Assessor is satisfied that the resolution has been passed by the requisite statutory majorities at each of the Meetings; and

   21.2   Preparing a report to the Chairman on the reasonableness of the values of those votes referred to him;

22      The Independent Vote Assessor shall undertake his review of vote values in accordance with the Independent Vote Assessment Protocol set out in Schedule 2 hereto;

23      For the purposes of determining whether the requisite statutory majorities of Scheme Creditors voting for the Scheme have been achieved the Chairman shall convert all claims of Scheme Creditors voting (whether in person or by proxy) at the Meetings into Sterling, using the mid-market closing rate of exchange quoted by The Financial Times two business days prior to the Meetings (or if no such rate is

published, such other rate as may reasonably be selected by the Chairman);

24 James Lee Saitch has been duly appointed to act as the foreign representative (the "**Foreign Representative**") on behalf of Minster Insurance Company Limited and Malvern Insurance Company Limited (together the "**Chapter 15 Companies**") to execute and verify the Chapter 15 Petitions and to cause the Chapter 15 Petitions to be filed in the United States Bankruptcy Court for the Southern District of New York;

25 The Foreign Representative has been duly authorised on behalf of the Chapter 15 Companies to take any and all actions, to execute, deliver, certify, file and/or record and perform any and all documents, agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, or certificates, and to take any and all steps deemed by the Foreign Representative to be necessary or desirable to carry out the purpose and intent of the Schemes;

26 If the Scheme is approved at the Meetings by the required statutory majorities the Claim Form shall be restored and a further Court hearing at which the Scheme Companies shall seek the sanction of the Court to the Scheme shall be listed;

27 The Chairman be directed to file a report on the Meetings and the voting prior to the hearing of the applications for the Court's sanction of the Scheme (assuming the requisite majorities are obtained at the Meetings);

28 The Claim Form be adjourned generally with liberty to the Scheme Companies to restore it;

29 There be liberty to apply generally;

**SCHEDULE 1**

Business Insurance

Insurance Day

The Financial Times (UK and International editions)

The Times

Wall Street Journal (US and International editions)

El Cronista (Argentina)

Der Standard (Austria)

The Australian (Australia)

The Guardian (Bahamas)

Akhbar Al Khaleej (Bahrain)

De Tijd (Flemish)

L'Echo (French) (Belgium)

Bermuda Sun (Bermuda)

Gazeta Mercantil (Brazil)

The Globe & Mail (Canada)

Caymanian Compass (Cayman Islands)

Diario Financiero (Chile)

Economic Observer (China)

Portafolio (Colombia)

Borsen (Denmark)

Al Ahram (Egypt)

Kauppalehti (Finland)

Les Echos (France),

Handelsblatt (Germany)

Naftemporiki (Greece)

South China Morning Post (Hong Kong)

Morgunbladid (Iceland)

Economic Times (India)

Bisnis Indonesia (Indonesia)

Irish Times Ireland)

Globes (Israel)

Il Sole 24 Ore (Italy)

Nihon Keizai Shimbun ('Nikkei') (Japan)

Al Ra'i (Jordan)

Daily Nation (Kenya)

Kuwait Times (Kuwait)

Le Orient Le Jour (Lebanon)

Draft order (FINAL) (4)

Lux Wort (German)/La Voix (French) (Luxembourg)

New Straits Times (Malaysia)

El Economista (Mexico)

De Volkrant (Netherlands)

New Zealand Herald (New Zealand)

Business Day (Nigeria)

Dagens Naeringsliv (Norway)

The Times of Oman (Oman)

Dawn (Pakistan)

La Prensa (Panama)

Gestion (Peru)

Business World (Philippines)

Jornal de Negocios (Portugal)

Evenimentul Zilei (Romania)

Al Eqtisadiah (Saudi Arabia)

Business Times (Singapore)

Business Day (South Africa)

Korea Economic Daily (South Korea)

Expansion (Spain)

Sunday Observer (Sri Lanka)

Draft order (FINAL) (4)

Borneo Bulletin (Sultanate of Brunei)

Dagens Industri (Sweden)

Finanz und Wirtschaft (Switzerland)

Commercial Times (Taiwan)

Krungthep Turakij (Thailand)

Dunya (Turkey)

Al Bayan (United Arab Emirates)

Reporte (Venezuela)

## SCHEDULE 2

## VOTE VALUATION PROTOCOL

In the first instance, all estimates of Scheme Claims submitted for voting purposes will be reviewed by the relevant Scheme Company and thereafter passed to the Chairman for his review (as outlined below). A review by the Independent Vote Assessor will be required only if there are votes received against the Scheme. In that event:

- the Chairman shall provide the Independent Vote Assessor with a full list of all votes submitted in relation to the Scheme, which shall indicate for each Scheme Creditor:

  - the valuation of the vote as cast by the Scheme Creditor in each class;

  - the valuation of the vote in each class according to the relevant Scheme Company;

  - the percentage variance of the two valuations; and

  - whether the vote is disputed by the relevant Scheme Company.

- the direction of the vote cast shall not be disclosed to the Independent Vote Assessor by the Chairman, the relevant Scheme Company, or anyone else;

- the Chairman will indicate to the Independent Vote Assessor a selection of votes that, in his opinion, require review in order to determine whether the statutory requirement has been met (being all of votes against the Scheme and sufficient vote values submitted in favour of the Scheme of a majority representing 75% by number of those that vote);

- the Independent Vote Assessor shall be free to review any additional vote that he shall request.

**Review process**

For the purposes of carrying out the review of votes, the Independent Vote Assessor will be sent any Voting Forms he shall select. The Voting Forms will be accompanied by:

- a front sheet (which will include Scheme Creditor submitted voting value, relevant Scheme Company value, calculated variance value and percentage and the relevant Scheme Company's recommendations as to 'reasonableness' of submission);

- any supporting documentation submitted by the Scheme Creditor;

- any relevant documentation that the relevant Scheme Company has used in support of its valuation, such as:

  o any legal and Scheme Actuarial Adviser comment;

  o correspondence between the Scheme Creditor and the relevant Scheme Company;

  o relevant policy documents;

  o other supplementary/relevant documentation.

The supporting and relevant documentation referred to in the bullet points above should identify the data, assumptions, and methods used in deriving the vote valuation with sufficient clarity that the Independent Vote Assessor can evaluate the reasonableness of the work.

The Independent Vote Assessor will complete his assessment of the value of the votes by 4 weeks after the receipt of the Voting Form and associated documentation for the last vote submitted to him.

Following completion of the review by the Independent Vote Assessor, the Independent Vote Assessor will provide the Chairman with his assessment of the value of any claim that should be admitted for voting purposes.

The Chairman will then reconsider the vote in light of the Independent Vote Assessors assessment of its value.

The Independent Vote Assessor will prepare a report on the values placed by him on the votes assessed by him under this Protocol which will be submitted to the Court as part of any application to sanction the Scheme.

The Scheme Creditor will be informed by the Chairman as to whether its vote value has been accepted as lodged or accepted with a revised value for voting purposes, or has been rejected.

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

Before the Honourable Mr Justice Kitchin

Wednesday the 4th day of November 2009

IN THE MATTERS OF:

MINSTER INSURANCE COMPANY
LIMITED

MALVERN INSURANCE COMPANY
LIMITED

THE CONTINGENCY INSURANCE
COMPANY LIMITED

PROGRESS INSURANCE COMPANY
LIMITED

GAN ASSURANCES IARD

QBE INSURANCE (EUROPE) LIMITED

THE RELIANCE FIRE AND ACCIDENT
INSURANCE CORPORATION LIMITED

AND IN THE MATTER OF THE
COMPANIES ACT 2006

---

ORDER

---

Barlow Lyde & Gilbert LLP
Beaufort House
15 St Botolph Street
London   EC3A 7NJ

020 7643 7331
020 7071 9248
7254-8/JY/EYC/7254-8

# EXHIBIT E

Before Mr Justice Newey

Dated: Tuesday the 16th day of March 2010

### IN THE MATTERS OF:

**MINSTER INSURANCE COMPANY LIMITED**

**MALVERN INSURANCE COMPANY LIMITED**

**THE CONTINGENCY INSURANCE COMPANY LIMITED**

**PROGRESS INSURANCE COMPANY LIMITED**

**GAN ASSURANCES (formerly GAN Assurances IARD)**

**QBE INSURANCE (EUROPE) LIMITED**

**THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION LIMITED**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

---

### ORDER

---

**UPON** the applications by Part 8 Claim Form of Minster Insurance Company Limited (the "**Company**") dated 17 July 2009

**AND UPON** hearing Leading Counsel for the Company

**AND UPON** reading the written evidence filed

**IT IS ORDERED** that:

1    the Scheme of arrangement (the "**Scheme**"), the terms of which are set out in the Schedule to this Order, is hereby sanctioned by this Court so as to be binding upon the Company and its Scheme Creditors as defined in the Scheme;



WE HEREBY CERTIFY THIS TO BE
A TRUE COPY OF THE ORIGINAL

BARLOW LYDE & GILBERT LLP

7424905.doc

2    the Company do, as soon as is reasonably practicable, deliver an office copy of this Order to the Registrar of Companies for England and Wales.



**Schedule**

**Scheme of Arrangement**

IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

Before Mr Justice Newey

Dated: Tuesday the 16th day of March
2010

IN THE MATTERS OF:

MINSTER INSURANCE COMPANY
LIMITED

MALVERN INSURANCE COMPANY
LIMITED

THE CONTINGENCY INSURANCE
COMPANY LIMITED

PROGRESS INSURANCE COMPANY
LIMITED

GAN ASSURANCES (formerly GAN
ASSURANCES IARD)

QBE INSURANCE (EUROPE) LIMITED

THE RELIANCE FIRE AND ACCIDENT
INSURANCE CORPORATION LIMITED

AND IN THE MATTER OF THE
COMPANIES ACT 2006

ORDER

The Court sent this Order and sealed
copies for service to:

Barlow Lyde & Gilbert LLP
Beaufort House
15 St Botolph Street
London    EC3A 7NJ

020 7643 7331
020 7071 9248
7254-8/JY/EYC/7254-8

Solicitors for the Company
Entered: A J Pooley:
Chancery Associate – 020 7947 6258

# EXHIBIT F

Before Mr Justice Newey

Dated: Tuesday the 16th day of March 2010

IN THE MATTERS OF:

MINSTER INSURANCE COMPANY LIMITED

MALVERN INSURANCE COMPANY LIMITED

THE CONTINGENCY INSURANCE COMPANY LIMITED

PROGRESS INSURANCE COMPANY LIMITED

GAN ASSURANCES (formerly GAN Assurances IARD)

QBE INSURANCE (EUROPE) LIMITED

THE RELIANCE FIRE AND ACCIDENT INSURANCE CORPORATION

LIMITED

AND IN THE MATTER OF THE COMPANIES ACT 2006



ORDER

UPON the applications by Part 8 Claim Form of Malvern Insurance Company Limited (the "**Company**") dated 17 July 2009

AND UPON hearing Leading Counsel for the Company

AND UPON reading the written evidence filed

IT IS ORDERED that:

1    the Scheme of arrangement (the "**Scheme**"), the terms of which are set out in the Schedule to this Order, is hereby sanctioned by this Court so as to be binding upon the Company and its Scheme Creditors as defined in the Scheme;



WE HEREBY CERTIFY THIS TO BE
A TRUE COPY OF THE ORIGINAL

BARLOW LYDE & GILBERT LLP

7424907.doc

2    the Company do, as soon as is reasonably practicable, deliver an office copy of this Order to the Registrar of Companies for England and Wales.





**Schedule**

**Scheme of Arrangement**



IN THE HIGH COURT OF JUSTICE

CHANCERY DIVISION

COMPANIES COURT

**Before Mr Justice Newey**

**Dated: Tuesday the 16th day of March 2010**

IN THE MATTERS OF:

MINSTER INSURANCE COMPANY
LIMITED

MALVERN INSURANCE COMPANY
LIMITED

THE CONTINGENCY INSURANCE
COMPANY LIMITED

PROGRESS INSURANCE COMPANY
LIMITED

GAN ASSURANCES (formerly GAN
ASSURANCES IARD)

QBE INSURANCE (EUROPE) LIMITED

THE RELIANCE FIRE AND ACCIDENT
INSURANCE CORPORATION LIMITED

AND IN THE MATTER OF THE
COMPANIES ACT 2006

---

### ORDER

---

The Court sent this Order and sealed copies for service to:

Barlow Lyde & Gilbert LLP
Beaufort House
15 St Botolph Street
London    EC3A 7NJ

020 7643 7331
020 7071 9248
7254-8/JY/EYC/7254-8

Solicitors for the Company
Entered:  A J Pooley:
Chancery Associate – 020 7947 6258

# EXHIBIT G

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | |
| | : | In a Case Under Chapter 15 |
| | : | of the Bankruptcy Code |
| MINSTER INSURANCE COMPANY LIMITED, | : | |
| | : | Case No. 10-_____ |
| | : | |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

| | | |
|---|---|---|
| In re | : | |
| | : | In a Case Under Chapter 15 |
| | : | of the Bankruptcy Code |
| MALVERN INSURANCE COMPANY LIMITED, | : | |
| | : | Case No. 10-_____ |
| | : | |
| Debtor in a Foreign Proceeding. | : | |
| | : | |

## ORDER RECOGNIZING FOREIGN MAIN PROCEEDING OF MINSTER INSURANCE COMPANY LIMITED AND MALVERN INSURANCE COMPANY LIMITED AND PERMANENT INJUNCTION

This matter having come before the Court upon the petition for recognition of a foreign

main proceeding (the "Verified Petition") commencing this Chapter 15 case, the Verified

Petition for Recognition of a Foreign Main Proceeding and Motion for a Permanent Injunction

and Related Relief Pursuant to 11 U.S.C. §§ 1504, 1515, 1517, 1520 and 1521 (the "Petition and

Motion"), the Memorandum of Law in Support of the Petition and Motion (the "Memorandum of

Law"), the Declaration of James Lee Saitch in Support of the Petition and Motion (the "Saitch

Declaration"), the Statement of Foreign Representative Pursuant to 11 U.S.C. § 1515(c)

Identifying Foreign Proceedings (the "Section 1515(c) Statement") and the List Pursuant to Fed.

R. Bankr. P. 1007(a)(4) (the "Bankruptcy Rule 1007(a)(4) List," and, together with the Verified

Petition, the Petition and Motion, the Memorandum of Law, the Saitch Declaration and the

Section 1515(c) Statement, the "Chapter 15 Pleadings"), each filed on July 19, 2010 by or on

behalf of James Lee Saitch (the "Petitioner") on behalf of Minster Insurance Company Limited

("Minster") and Malvern Insurance Company Limited ("Malvern") (collectively, the

"Companies") in his capacity as the duly appointed foreign representative of the Companies,

both debtors in a proceeding relating to the adjustment of debts, namely a scheme of arrangement

(the "Schemes of Arrangement"), pursuant to Part 26 of the U.K. Companies Act of 2006 (the

"English Proceeding") before the High Court of Justice of England and Wales (the "English

Court"); the English Court having approved the Minster and Malvern Schemes of Arrangement

by sanction orders dated March 16, 2010 (the "Sanction Orders"); copies of the Sanction Orders

having been delivered to the Registrar of Companies on March 25, 2010 and the Schemes of

Arrangement having become effective on that date; the Final Claims Submission Date, by when

all Scheme Creditors must submit their scheme claims in accordance with the Schemes of

Arrangement, having been set for September 21, 2010; the Court having reviewed and

considered the Chapter 15 Pleadings; the Court having held a hearing on_____, 2010 (the

"Recognition Hearing"); due and timely notice of the filing of the Chapter 15 Pleadings and the

Recognition Hearing having been given pursuant to the Order Scheduling Hearing and

Specifying the Form and Manner of Service and Notice, dated _____, 2010, which notice is

deemed adequate for all purposes such that no other or further notice thereof need be given; no

objections or other responses having been filed thereto that have not been overruled, withdrawn

or otherwise resolved; all interested parties having had due and proper notice and an opportunity

to be heard; upon the record of the Recognition Hearing; and after due deliberation and sufficient

cause appearing therefor, and for the reasons stated by the Court on the record of the Recognition

Hearing, the Court hereby FINDS AND CONCLUDES THAT:

2

A.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984.

B.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

C.     Venue is proper in this District pursuant to 28 U.S.C. § 1410.

D.     This case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1517.

E.     The Verified Petition meets the requirements of 11 U.S.C. § 1515.

F.     The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. §§ 1515 and 1517(a).

G.     The English Proceeding is a foreign proceeding within the meaning of 11 U.S.C. § 101(23).

H.     The English Proceeding is pending in the U.K., which is the country where the center of the main interests of both Minster and Malvern located and as such, is entitled to recognition as a foreign main proceeding pursuant to 11 U.S.C. §§ 1502(4) and 1517(b)(1).

I.     The Petitioner is a person and the duly appointed foreign representative of the Companies within the meaning of 11 U.S.C. § 101(24) (the "Foreign Representative").

J.     On January 18, 2010, the Schemes of Arrangement were approved by Scheme Creditors at the Meeting of Scheme Creditors. On March 16, 2010, the English Court issued the Minster and Malvern Sanction Orders, which approved the Schemes of Arrangement of Minster and Malvern. Copies of the Sanction Orders were delivered to the Registrar of Companies in

England and Wales on March 25, 2010, and the Scheme of Arrangement became effective on that date. The Final Claims Submission Date, by when all Scheme Creditors must submit their scheme claims in accordance with the Schemes of Arrangement, is September 21, 2010.

K. The Foreign Representative is entitled to all of the relief set forth in 11 U.S.C. § 1520.

L. Absent permanent injunctive relief, it appears to this Court that one or more parties in interest may commence or continue the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with a claim against the Companies, or each of them, or the property of each of them in the United States, thereby interfering with and causing harm to the English Proceeding and as a result, the Foreign Representative, the Companies and the creditors and the estate of each of them would suffer immediate and irreparable injury for which there is no adequate remedy at law.

M. Absent permanent injunctive relief, the English Proceeding and the Companies' efforts in consummating the Schemes of Arrangement may be thwarted by actions of certain creditors, a result inimical to the purposes of Chapter 15 as reflected, *inter alia*, in section 1501(a). Such actions may threaten, frustrate, delay and ultimately jeopardize the English Proceeding and the implementation of the Schemes of Arrangement.

N. The relief sought in the Petition and Motion will not cause undue hardship or inconvenience to parties in interest and, to the extent that any hardship or inconvenience may result, such hardship or inconvenience will be outweighed by the benefits to the Companies, the estate and the creditors of each of them.

4

O.      The relief sought in the Petition and Motion is necessary to effectuate the

purposes of Chapter 15, to protect the Companies and the interests of the creditors of each of

them, and is not manifestly contrary to the public policy of the U.S.

P.      The Petitioner is entitled to the relief set forth herein under 11 U.S.C. § 1521.

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing

therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The English Proceeding is granted recognition as a foreign proceeding as defined

in 11 U.S.C. § 101(23) and pursuant to 11 U.S.C. § 1517(a); and

2.      The English Proceeding is granted recognition as a foreign main proceeding

pursuant to 11 U.S.C. § 1517(b)(1); and

3.      The Petitioner is the duly appointed foreign representative of the Companies

within the meaning of 11 U.S.C. § 101(24) (the "Foreign Representative"); and

4.      The Schemes of Arrangement shall be given full force and effect and be binding

on and enforceable against all Scheme Creditors in the United States (the "U.S. Scheme

Creditors"); and

5.      All claims of the U.S. Scheme Creditors shall be adjudicated pursuant to the terms

of the Schemes of Arrangement; and

6.      Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors are

permanently enjoined and restrained from:

(a)     taking or continuing any act to obtain possession of, or exercise control over, Minster or Malvern or any of the property of either of them that is located within the territorial jurisdiction of the United States or any proceeds thereof ("Property");

(b)     transferring, relinquishing or disposing of any Property to any person other than the Foreign Representative;

(c)     commencing or continuing any action or legal proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim, (each individually, an "Action") against Minster and/or Malvern or any of the Property or seeking discovery of any nature against Minster and Malvern;

(d)     commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against Minster or Malvern or the Property, including, without limitation, rights under insurance, reinsurance or retrocession contracts underwritten by Minster or Malvern;

(e)     invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state or local law or regulation requiring Minster and Malvern to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any Action and such statute, rule or requirement shall not apply to Minster or Malvern as party to any Action; provided, however, that nothing in this Order shall in any respect affect any security in existence at the Effective Date or the replacements for such security;

6

(f)     drawing down any letter of credit established by, on behalf of or at the request of Minster or Malvern unless expressly authorized by the terms of any agreement pursuant to which the letter of credit has been established;

(g)     withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which Minster or Malvern has an interest in excess of amounts expressly authorized by the terms of the contract and any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established; provided, however, that no Action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction; and

(h)     declaring, considering or treating the filing of the Petition or any pleadings, declarations, memoranda or statements in support thereof, or the Schemes of Arrangement, a default or event of default under any agreement, contract or arrangement; and

7.     Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors that are parties to any trust, escrow agreement or similar arrangement in which Minster or Malvern has an interest, are required to:

(a)     in addition to any notice required by the relevant agreements between the parties, provide notice within the later of thirty (30) days after the entry of this Order or fifteen (15) days after any action set forth below provide notice to the Foreign Representative's U.S. counsel, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Gary S. Lee and Kathleen E. Schaaf), of any

7

withdrawal from, set-off against, or other application of property located within the territorial jurisdiction of the United States that is the subject of any such trust or escrow agreement or similar arrangement in which Minster or Malvern has an interest, together with information sufficient to permit the Foreign Representative to assess the propriety of such withdrawal, set-off or other application, including, without limitation, the date and amount of such withdrawal, set-off or other application and a copy of any contract, related trust or other agreement pursuant to which any such withdrawal, set-off or other application was made, and provide such notice and other information contemporaneously; and

(b)     turn over and account to the Foreign Representative for all funds resulting from such withdrawal, set-off or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such trust, escrow or similar arrangement has been established; and

8.     Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors that are beneficiaries of letters of credit established by, or on behalf or at the request of, Minster or Malvern are required to:

(a)     in addition to any notice required by the relevant agreements between the parties, provide notice within the later of thirty (30) days after the entry of the Order or fifteen (15) days after any action set forth below provide notice to the Foreign Representative's U.S. counsel of any drawdown (without the express written consent of the Companies or the Foreign Representative and/or in contravention of the Schemes of Arrangement) of any such letter of credit, together with information sufficient to permit

the Foreign Representative to assess the propriety of such drawdown and a copy of any letter of credit pursuant to which any such drawdown was made, and provide such notice and other information contemporaneously; and

(b)     turn over and account to the Foreign Representative for all funds resulting from such drawdown; and

9.     Except as provided in the Schemes of Arrangement, all U.S. Scheme Creditors are required to:

(a)     turn over and account to the Foreign Representative for any Property of which they have possession, custody or control;

(b)     deliver to the Foreign Representative any books, papers or records of Minster or Malvern of which they have possession, custody or control and all Scheme Creditors having any books, papers or records that Minster or Malvern or the Foreign Representative may reasonably require in relation to their duties or related to any matter that may affect the implementation of the Schemes of Arrangement shall preserve them and submit them to the Foreign Representative or his designees for examination at all reasonable times; and

(c)     to the extent that they have a claim of any nature or source against Minster or Malvern or any Property or are a party to any Action in which Minster or Malvern is or was named as a party, or as a result of which a liability of either of them may be established, notify the Foreign Representative and put the Foreign Representative's U.S. counsel on the master service list (or similar common notice mechanism) of any such

Action and take such other steps as may be necessary to ensure that they receive (i) copies of any and all documents sent by the parties to such Action or issued by the court, administrator, arbitrator, regulator or similar official having jurisdiction over such Action, and (ii) any and all correspondence or other documents circulated to parties named in the master service list; and

10.    Subject to the terms and provisions of the Schemes of Arrangement, all U.S. Scheme Creditors shall be permanently enjoined and restrained from commencing or continuing any act or Action against the provider of any letter of credit that has been released by the execution of a deed of release as provided for in the Schemes of Arrangement; and

11.    Nothing in this Order shall prevent the continuance or commencement of an Action against any insurer other than the Companies, provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Companies, such settlement or judgment shall not be binding on or enforceable against Minster or Malvern ; and

12.    This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order or requests for any additional relief in this case filed under Chapter 15 of the Bankruptcy Code and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court; and

13.    No action taken by Minster, Malvern, the Foreign Representative, or their successors, agents, representatives or counsel in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Schemes of Arrangement, this Order, these Chapter 15 cases, any further order for additional relief in these Chapter 15 cases or any

adversary proceedings in connection therewith will be deemed to constitute a waiver of the immunity afforded to the Companies, the Foreign Representative or their successors, agents, attorneys or representatives pursuant to section 1510 of the Bankruptcy Code; and

14.    This Order shall be served:

(a)    by U.S. mail, first class postage prepaid, upon all known U.S. Scheme Creditors of whose address Minster or Malvern is aware (or their counsel, if known to either of the Companies) on _____ \_\_\_, 2010; and

(b)    by publication in *Insurance Day*, the national edition of *The Wall Street Journal* and the international edition of *The Financial Times* on _____ \_\_, 2010 (or as soon as reasonably practicable thereafter); and

(c)    by posting on the Scheme website (www.minsterins.co.uk) no later than _____, 2010.

15.    Such service will be good and sufficient service and adequate notice for all purposes; and

16.    The Chapter 15 Pleadings shall be made available by the Foreign Representative upon request to the Foreign Representative's U.S. counsel, Morrison & Foerster LLP, 1290 Avenue of the Americas, New York, New York 10104 (Attn: Gary S. Lee and Kathleen E. Schaaf).

ny-796752

Dated:  New York, New York
         _____ \_\_\_, 2010


_____
UNITED STATES BANKRUPTCY JUDGE